## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

NAPLES PRIDE,

                Plaintiff,

                                        <u>Case No. 2:25-cv-291</u>

v.

CITY OF NAPLES; NAPLES CITY
COUNCIL; TERESA HEITMANN,
TERRY HUTCHISON, RAYMOND
CHRISTMAN, BETH PETRUNOFF, BILL
KRAMER, LINDA PENNIMAN, and
BERNE BARTON, in their official capacities
as City Council members; NAPLES POLICE
DEPARTMENT; and CIRO
DOMINGUEZ, in his official capacity as
Naples Chief of Police,

                Defendants.

_____/

## <u>COMPLAINT</u>
### Preliminary and Permanent Injunctive, and Declaratory Relief Requested

Plaintiff Naples Pride brings this action against Defendants: the City of Naples ("Naples" or the "City"); the Naples City Council (the "City Council"); each member of the City Council in their official capacity (Teresa Heitmann, Terry Hutchison, Raymond Christman, Beth Petrunoff, Bill Kramer, Linda Penniman, and Berne Barton); the Naples Police Department; and the Naples Chief of Police, Ciro Dominguez, in his official capacity (the "Chief of Police"), for violations of the First Amendment to the United States Constitution.

## INTRODUCTION

1.      Naples Pride brings this lawsuit because Defendants have violated, and continue to violate, its First Amendment rights.

2.      Each summer, Naples Pride hosts its annual Pridefest celebration at Cambier Park, downtown Naples' premier public space.  Pridefest is intended to celebrate the LGBTQ+[1] community and encourage greater-Naples LGBTQ+ residents to express themselves without fear.

3.      Since Pridefest began in 2017, the festival's centerpiece has been a family-friendly drag performance.

4.      Drag is a type of performance art in which the performers caricature or challenge gender stereotypes by adopting dress or mannerisms stereotypical of a different gender.  As courts across the country have recognized, drag is "indisputably protected speech" for First Amendment purposes.  *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023).

5.      Like all performance art, drag *can* involve risqué elements, but Pridefest's drag performances categorically do not: from Pridefest's inception, Naples Pride has ensured these performances are family-friendly.

6.      For years, without issue, Pridefest's drag performances took place on Cambier Park's outdoor mainstage.

---

[1] "LGBTQ+" is an acronym referring to people who are lesbian, gay, bisexual, transgender, or queer, or who otherwise differ from traditional expectations in their sexual orientation or gender identity.

7.    However, in 2022, a sudden wave of anti-drag sentiment spread across the United States, including Florida.   In Naples, a group of anti-drag activists campaigned to ban Pridefest's drag performance, falsely claiming that it was a threat to children.

8.    Urged on by City Council members who shared their anti-drag views, these activists attended City Council meetings to oppose Naples Pride's permit applications.  At those meetings, the activists and certain City Council members falsely accused LGBTQ+ people and drag performers of "pedophilic behavior" and "grooming" children (training them to be targets for sexual abuse).

9.    Defendants caved to these activists' pressure.   Starting in 2023, Defendants made clear that Naples Pride's permit application would be rejected if it sought to use Cambier Park's outdoor mainstage for a drag performance, citing their constituents' opposition to drag and perceived safety threats from the very same anti-drag activists whose protests they helped foment in the first place.

10.    As a result, Naples Pride was forced to hold its 2023 and 2024 Pridefest drag performances in a small indoor venue that accommodates only a fraction of the performance's typical audience.  Forcing the show indoors—as if it were something shameful—undermined the performance's intended message of acceptance and living as an LGBTQ+ person openly and without fear.  Moreover, the reduced ticket sales caused a serious blow to Naples Pride's fundraising and its ability to attract top tier performing talent.

11.    For 2025, Naples Pride sought to return Pridefest's drag performance to the Cambier Park outdoor mainstage. Defendants, however, rejected Naples Pride's request and engaged in viewpoint and content-based discrimination.

12.    In addition to rejecting Naples Pride's request to hold Pridefest's drag performance outside, Defendants went even further in burdening Naples Pride's protected speech.

13.    First, as a condition of granting a permit, Defendants insisted that Naples Pride prohibit anyone under age 18 from attending the family-friendly drag performance—even with an approving parent or guardian present. To justify this restriction, Defendants cited viewpoint and content-based opposition to drag and perceived safety threats from those opposed to the message of the planned performance.

14.    Second, Defendants also refused to approve Naples Pride's permit application at all unless it paid over $30,000 in purported "security fees." This exorbitant fee is grossly disproportionate to what Defendants charged in prior years for the same event; grossly disproportionate to the fees Defendants have charged for other events that do not feature drag performances; and grossly disproportionate to what other Florida cities have charged for similar Pride festivals featuring drag performances. Defendants explicitly justified the amount of this fee by pointing to the "controversial" nature of drag performances, and the consequent "need" to provide heightened security against disapproving "outside actors." Naples Pride—a small

nonprofit—cannot pay the exorbitant fee without jeopardizing its charitable mission and its ongoing viability as an organization.

15.    These restrictions on Naples Pride's upcoming drag performance violate the United States Constitution.  The First Amendment forbids Defendants from burdening the protected speech of Naples Pride—and the ability of its willing audience to receive that speech—because some members of the Naples community disapprove of its message.

16.    The First Amendment also prohibits Defendants from imposing costs on Naples Pride's speech due to the anticipated reaction of "hostile counter demonstrators" who oppose that speech's viewpoint or content.  The law on these points is clear and well-settled.  *See, e.g.*, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992); *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1525 (11th Cir. 1985).

17.    This Court should swiftly enjoin these unlawful burdens on Naples Pride's speech and expression so that the upcoming drag performance can take place on June 7, 2025, free of these unconstitutional restrictions.  Naples Pride intends to file a time-sensitive motion for preliminary injunctive relief together with, or shortly after, this complaint.

## PARTIES

### Plaintiff

18.    Plaintiff Naples Pride is a volunteer-based, grassroots 501(c)(3) nonprofit that provides social services to the greater Naples LGBTQ+ community, including

counseling and support groups, housing and legal assistance, and healthcare like STI/HIV screening.  Naples Pride is a small organization, with just one full-time staff member, its Executive Director.  It is based in Naples, Florida and is incorporated under Florida law.

**Defendants**

19.    Defendant City of Naples is an incorporated city in the State of Florida.

20.    Defendant Naples City Council is the official governing body of the City of Naples.

21.    Defendants Teresa Heitmann, Terry Hutchison, Raymond Christman, Beth Petrunoff, Bill Kramer, Linda Penniman, and Berne Barton are the members of the Naples City Council and are sued in their official capacities.

22.    Defendant Naples Police Department is the primary law enforcement agency of the City of Naples.

23.    Defendant Ciro Dominguez is the Naples Chief of Police and is sued in his official capacity.

## JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983.

25.    This Court has personal jurisdiction over Defendant City of Naples, as it is a municipality located and incorporated in the State of Florida.  This Court has personal jurisdiction over Defendant Naples City Council, as it is the official governing

body of that municipality, and over Defendant Naples Police Department, which is an agency of that municipality.

26.    This Court has personal jurisdiction over Defendants Teresa Heitmann, Terry Hutchison, Raymond Christman, Beth Petrunoff, Bill Kramer, Linda Penniman, and Berne Barton, sued in their official capacities as members of the Naples City Council, and over Defendant Ciro Dominguez, sued in his official capacity as Naples Chief of Police, since they are all citizens of Florida who reside and perform their official duties in the City of Naples.

27.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because all parties are located in this judicial district and division, and a substantial part of the events that gave rise to Plaintiff's claims occurred within this judicial district and division.

## FACTUAL BACKGROUND

### I.    Naples Pride's Annual Pridefest

28.    Since 2017, Naples Pride has hosted Pridefest each summer—usually in June, which is known as LGBTQ+ Pride Month.[2]  Pridefest celebrates the LGBTQ+ community and encourages LGBTQ+ individuals to express themselves without fear. The event also raises money for Naples Pride to carry out its mission: providing social services to the greater Naples LGBTQ+ community.  Pridefest is Naples Pride's largest fundraising event, providing about 25% of its annual budget.

---

[2] Pridefest did not take place in 2020 or 2021 due to COVID-19 restrictions.

29.     For the first four years Pridefest took place, it was held entirely outdoors in Cambier Park, the most prominent public space in downtown Naples.  Pridefest features music, speeches, and performances.

30.     Pridefest lasts five hours over one day, and Naples Pride has sought minimal street closures for the event: at most, one block of one street so that attendees could more safely cross the street to the park.

31.     The Naples Police Department, members of its Parks and Recreation Department, the City Manager, and members of the City Council have all praised Naples Pride for how well-organized and well-run Pridefest is.  Notably, there have been no security incidents—save for a single arrest in 2022 of an outside protester, unaffiliated with the event, for disorderly conduct.

32.     Since it began, Pridefest's centerpiece has been a family-friendly drag performance, lasting between two and two-and-a-half hours.  For the festival's first four years (2017-2019 and 2022), this performance took place on the outdoor mainstage of Cambier Park.

33.     Holding these performances outdoors, in a prominent public space, has symbolic and expressive importance to Naples Pride, whose mission emphasizes bringing the Naples LGBTQ+ community "out of the closet" and into the public square.  It also reinforces Pridefest's similar message of acceptance and living openly and without fear as an LGBTQ+ person.

34.     The drag performance's outdoor location is also key to Naples Pride's fundraising efforts.  The drag performance is the main draw for Pridefest attendees,

and holding it outdoors in Cambier Park allows as many as 5,000 paying ticketholders to attend.

35.    To ensure that the drag performances remain family-friendly, Naples Pride forbids performers from incorporating any nudity or vulgar, sexual, or obscene content into their performances, and it has instructed attendees not to tip performers. Naples Pride expressly makes performers aware of these requirements when they are booked and reminds them of these requirements up until moments before their performances.

36.    In 2022, citizen complaints triggered an investigation into Naples Pride's drag performances. After that thorough investigation—which included a review of videos of the drag performances—the Naples Police Department concluded that these complaints were unfounded, that the drag performances were not lewd or sexual, and that the "way the [performers] were dressed was no more revealing than being in a bathing suit at a public pool or beach."

## II.    Background on Drag Performances

37.    As noted above, drag is a type of performance art where performers caricature or challenge gender stereotypes by adopting dress or mannerisms stereotypical of a different gender.

38.    Like any form of stage performance, drag can include risqué elements; however, it is not inherently sexual or explicit, and is a popular form of entertainment for all ages.

39.    Drag allows marginalized individuals to express pride in their identities, and combat shame and social stigma, by challenging societal gender norms and expectations.

40.    Drag performances "express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 843 (S.D. Tex. 2023).

41.    Drag performances, LGBTQ+ Pride celebrations (*e.g.*, festivals and parades), and the expressive message that these events send are all closely connected. Pride festivals, including Pridefest, typically occur during LGBTQ+ Pride Month in June to commemorate the June 1969 Stonewall Uprising, a critical moment in the LGBTQ+ rights movement. Drag performers played a crucial role in the Stonewall Uprising and continue to play a prominent role in the LGBTQ+ community.[3]

42.    Given drag's expressive message, courts across the country have held that drag performances are "indisputably protected speech" for purposes of the First Amendment. *HM Fla.-ORL, LLC v. Griffin*, 679 F. Supp. 3d 1332, 1342 (M.D. Fla. 2023) ("*HM*"); *see also S. Utah Drag Stars*, 677 F. Supp. 3d at 1286; *Woodlands Pride*, 694 F. Supp. 3d 820; *Imperial Sovereign Ct. of Mont. v. Knudsen*, 684 F. Supp. 3d 1095 (D.

---

[3] *See* Smithsonian, *Marsha Johnson, Sylvia Rivera, and the History of Pride Month*, SMITHSONIAN STORY (June 7, 2021), https://www.si.edu/stories/marsha-johnson-sylvia-rivera-and-history-pride-month; *see also* Erin Blakemore, *What was the Stonewall Uprising?*, NAT'L GEOGRAPHIC (Jun. 1, 2023), https://www.nationalgeographic.com/history/article/stonewall-uprising-ignited-modern-lgbtq-rights-movement.

Mont. 2023); *Texas A&M Queer Empowerment Council v. Mahomes*, No. 25-cv-992, 2025 WL 895836, at *6 (S.D. Tex. Mar. 24, 2025).

### III.   Naples' Permitting Scheme

43.   Pursuant to Naples' laws and regulations governing public special events (the "Permitting Scheme"), Naples Pride must apply for a permit to hold its annual Pridefest.

44.   Any permit must be approved by a City Council resolution "incorporating reference to the [City of Naples] Special Events Manual" (hereinafter, the "Manual").  *See* Naples Ordinance No. 2023-15181.  The City Council may impose "*[a]ny* event specific conditions" that it desires "as conditions of approval," including, but not limited to, "hours of operation, operational controls, site plans, *etc.*"  *Id.* (emphases added).

45.   No statute, ordinance, or other source of law limits the nature or scope of these conditions or provides any binding procedure or guidelines for determining when they should be imposed.

46.   After an organization applies for a permit, the Special Events Committee, which includes representatives from various city departments including Parks, Police, and Fire, reviews the application and makes a recommendation to the City Council "based on the guidelines/policies/ordinances in place, and the impact on the community."  Manual at 3.  No standards set forth how this consideration is to take place or what is meant by the "impact on the community."

47.    The City Council then meets and decides whether to deny the permit, approve the permit, or to approve it subject to any special conditions of their choosing. *Id.*; Naples Ordinance No. 2023-15181.

48.    Separate and apart from the City Council's authority to approve or deny the permit, the Manual grants the City Manager authority to approve or deny a permit based on, *inter alia*, whether "[t]he event is generally compatible with the character of the city."  Manual at 9.  No standards set forth what this phrase means or how this determination is to be made.

49.    The Naples Municipal Code provides a fee schedule for use of the city's parks, including Cambier Park.  Naples, FL., Mun. Code, App'x A § 28-32.  Relevant here, Naples charges $900 a day for hosting a large event in a park, and $80 an hour to use Cambier Park's bandshell.  *Id.* § 28-32(2)(l) & (7)(a).

50.    The Naples Municipal Code also allows the City Council to assess additional fees on event organizers for using city parks.  Naples, FL., Mun. Code § 28-32(a).  Through that authority, the City Council adopted additional fee requirements in the Manual.  *See* Naples Ordinance No. 2023-15181; Manual at 4, 10.

51.    The Manual sets forth certain fixed fees for event permits, including a $150 non-refundable processing fee and a $500 refundable damage deposit.  *Id.*  It also provides that the "City may require Police, Fire, . . . barricades, etc.," with the cost of "all services provided for the event [to] be paid for by the [event organizer]."  *Id.*

52.    By its terms, the Manual provides the City Council with unbounded discretion to determine what services should be provided—and charged to the event

organizer—to "ensure the safety of participants, minimize the inconvenience to residents and reduce the liability exposure to the City." *Id.* Neither the Manual, nor any code provision, ordinance, or City Council resolution sets forth the criteria that the City Council should use for determining the amount of "necessary" additional services, or how these costs should be determined. *Id.* at 12.

53. Regarding security fees, the Manual states that, for events "deemed to have specific safety requirements, the hiring of law enforcement officers may be required." *Id.* at 6. The Manual delegates all security-related authority to the Naples Police Department, stating that "[t]he organizer must comply and resolve all safety concerns of the Naples Police Department," who "are the primary subject matter experts on the safety and security for all events in the City of Naples." *Id.*

54. The Manual does not provide criteria for assessing or calculating security costs. Instead, the Chief of Police retains complete discretion to impose whatever security fee he sees fit, even if (as here) it amounts to tens of thousands of dollars. The Chief of Police is not required to rely on or provide any objective justification for the amount imposed.

55. That said, in a January 14, 2025 email from the Chief of Police to the City Council, he described the six criteria he used to "staff personnel" at special events: (1) "Risk/Threat Assessments," (2) "Real time intelligence/current events in the country/world," (3) "Venue size, location, and capability/capacity," (4) *"Potential for conflict or protests (political/controversial issues),"* (5) "Expected attendee crowd size," and

(6) "Event particulars (i.e. night/day, alcohol involved, street closures etc.)" (emphasis added).

### IV.   Anti-Drag Sentiment Impacts Pridefest in 2023 and 2024

56.   Although drag performances have taken place for centuries, in the last few years, this art form has been subjected to sudden and intense backlash.

57.   Beginning in 2022, many states, including Florida, enacted laws to restrict drag performances, often deeming them categorically "lewd" or "sexual," regardless of their actual content.

58.   Florida's statute targeting drag performances ("Florida's Drag Law") was enacted in May 2023.  The law authorized the State to revoke or suspend the operating and liquor licenses of any establishment that "knowingly admit[s] a child" to a drag performance.  It also made doing so a crime punishable by up to one year in prison or a $1,000 fine.  Fla. Stat. §§ 827.11, 775.082, 775.083.

59.   Florida's Drag Law was expressly motivated by anti-drag and anti-LGBTQ+ sentiment.  For example, Randy Fine, the bill's sponsor in the Florida Senate, described the law as seeking to "protect our children by ending the gateway propaganda to this evil — 'Drag Queen Story Time.'"  And Florida House Speaker Paul Renner commented that Florida's Drag Law was "a response to . . . a regrettable

effort, by adults, in this case drag queens, who seem to be obsessed with pushing their lifestyle on children."[4]

60.     On June 23, 2023, a judge of this Court enjoined Florida's Drag Law, concluding that it likely violated the First Amendment. *HM*, 679 F. Supp. 3d at 1342.

61.     Anti-drag sentiment also surged in Naples itself.  For example, Defendant Terry Hutchison, who serves on the City Council and votes on Naples Pride's permit applications, helped organize several local anti-drag protests. Hutchison also spoke at a town hall meeting on behalf of an organization called "Stop Naples Drag," and alerted anti-drag activists when Naples Pride's permit applications would be on the City Council's agenda, encouraging them to attend to protest their approval.

62.     Former City Council member and mayoral candidate Ted Blankenship also encouraged activists to appear at City Council meetings to protest Naples Pride's events.  Blankenship told local news media that he was "running for mayor to make sure that drag shows aren't held publicly in the City of Naples."

63.     In 2023, Naples Pride applied for a permit including an outdoor drag performance for Pridefest—just as in prior years.  But this time, Naples Pride faced unprecedented scrutiny from the City Council during the application process, including demands that it specify every vendor that it planned to use at Pridefest, and

---

[4] Danielle J. Brown, *Drag Queens Defend Their Livelihood While Lawmakers Try to Define "Adult Live Performances,"* Fla. Phoenix (Mar. 24, 2023), https://floridaphoenix.com/2023/03/24/drag-queens-defend-their-livelihood-while-lawmakers-try-to-define-adult-live-performances/.

that its application explicitly identify the type of entertainment it planned to offer as "drag," rather than just live music and performances, as in the past.  City staff and City Council members also recommended that Naples Pride provide a presentation to the City Council to explain the work of Naples Pride, Pridefest, and drag performances.  Other permit applications did not receive this exacting level of scrutiny.

64.    The City Council initially voted 5-2 to approve Naples Pride's 2023 permit application.  However, after the vote, public backlash to Pridefest's drag performance intensified—urged on in part by members of the City Council themselves. Members of Stop Naples Drag attended public City Council meetings in February and March 2023 to protest the decision, stating that Pridefest's drag performance was a form of "grooming" children for child abuse by "exposing [them] to sexualized content at a young age" and that "[t]his has to do with . . . filth being displayed openly."[5]

65.    Thereafter, certain City Council members, the Chief of Police, and the City Manager scheduled a conference call with Naples Pride, during which City officials (including Council Member Beth Petrunoff) explained that, in light of increased opposition to the drag performance, Naples Pride must either move the drag performance indoors or it was highly likely that its permit would be revoked altogether. Officials on the call stated that, because of increased public opposition to drag, they

---

[5] Kaitlyn Snook, *Naples Pride Moves Drag Show Indoors as Opposition Grows*, WGCU (Apr. 29, 2023), https://news.wgcu.org/section/democracywatch/2023-04-29/naples-pride-moves-drag-show-indoors-as-opposition-grows.

were concerned about attacks—such as another "Charlottesville" or "Orlando Pulse Nightclub"—if the performance moved forward as planned.

66.     Naples Pride was left with an impossible decision: move the drag performance indoors, thus curtailing the expressive message of Pridefest and decimating its fundraising potential, or have no Pridefest at all.  Ultimately, Naples Pride caved to Defendants' threats and agreed to modify its permit application by both moving the drag performance indoors and restricting attendance to adults only.

67.     As a result, the 2023 Pridefest drag performance took place in the small, 200-seat Norris Center, adjacent to Cambier Park.

68.     In 2024, Naples Pride again hosted Pridefest's drag performance indoors and only for adults—both because it understood that Defendants would only approve its permit application under those conditions, and because it was uncertain whether Florida's Drag Law would be in effect at the time of 2024's Pridefest.

69.     The 2024 Pridefest drag performance took place at the Naples Woman's Club, which holds only 180 people.  Only 200 people attended the drag performance in 2024 (even with Naples Pride running the performance multiple times).

70.     Pridefest attendees reported to Naples Pride that it was inconvenient (or impossible) for them to attend the drag performance because it would force them to be separated from their children and friends.

71.     Overall attendance at Pridefest has also declined sharply, from approximately 5,000 people in 2022 (when the drag performance was last held outside) to just 2,400 in 2024.  This decline was due in large part to the limited capacity of these

indoor venues and the inability of parents to attend the drag performances with their children.

72.    Because of decreased Pridefest attendance, and the subsequent impact on fundraising, Naples Pride saw an approximately 46% decrease in its annual budget from 2022 to 2024.  As a result, Naples Pride cannot afford to provide certain social services it had planned for 2025, including an additional case manager, an after-school program, and a food and clothing pantry.

73.     Moreover, in addition to their impact on attendance and fundraising, Defendants' actions forcing the Pridefest drag performance indoors have adversely affected Naples Pride's expressive message.

74.    Typically, Naples Pride retains well-known drag entertainers from outside of Southwest Florida, who bring additional perspectives on drag and renown to Pridefest.  But Naples Pride has been unable to attract the same caliber of nationally recognized entertainers in the smaller, indoor venues like the Norris Center.

75.    Further, forcing the family-friendly drag performance to take place indoors and out of public view—as if it were something explicit and lewd— undermines the performance's intended symbolic message of celebrating LGBTQ+ identities and coming "out of the closet" without fear.  Instead, it forces Naples Pride to send an undesired message that drag performance and LGBTQ+ identities are shameful and should be hidden out of sight.

### V.    Defendants Unconstitutionally Restrict Naples Pride's 2025 Permit: Forcing the Drag Performance Inside, Prohibiting Attendance for Anyone Under 18, and Imposing Exorbitant Fees

76.    For the 2025 Pridefest, scheduled for June 7, 2025, Naples Pride again sought to host its Pridefest drag performance outdoors and open to all ages.  In response, Defendants imposed a series of burdensome and unlawful restrictions on Naples Pride's permit: an indoors-only restriction, an adults-only restriction, and an exorbitant "security fee."

### a.  The Indoors-Only and Adults-Only Restrictions

77.    In November and December 2024, City staff and City Council members explained to Naples Pride via email and telephone calls that its 2025 Pridefest permit application would not be approved at all if Naples Pride sought to hold the drag performance outdoors.

78.    In a December 2024 meeting with Naples Pride, Chad Merritt, Director of the Naples Parks Department, said that the City Council would probably impose an "indoors only" condition on Naples Pride's permit, regardless of what was requested in its application.  Merritt pointed to the Manual as authority for the City Council to impose any conditions on a permit it sees fit.

79.    At a January 2025 public meeting, the City Council officially considered Naples Pride's permit application for 2025 Pridefest.

80.    The meeting, which lasted multiple days, overflowed with anti-drag and anti-LGBTQ+ sentiment—much of it from members of Stop Naples Drag, whom Defendant Hutchinson had alerted in advance that Naples Pride's permit would be on

the agenda.  Several attendees accused LGBTQ+ people of "grooming" children and opposed Pride events altogether.  Other speakers falsely equated drag with exotic dancing and accused drag performers of "pedophilic behavior."

81.    Immediately before the permit was put to a vote, each City Council member offered their position on Naples Pride's permit.

82.    Defendant Terry Hutchison commented that an outdoor drag performance would equate to "targeting children" and would force unwilling members of the public to "acknowledge this lewdness."

83.    Defendant Raymond Christman explained that "the right answer is to approve this permit with the requirement that the drag show be held inside" because "drag shows are offensive to many people in this community," and an outdoor drag show would pose a safety risk.

84.    Defendant Berne Barton justified his vote to restrict Naples Pride's permit by citing safety concerns, stating that "it's going to be a lot easier for them to maintain public safety if it's held indoors versus outdoors."

85.    Defendant Bill Kramer justified his vote to restrict Naples Pride's permit by stating that "the people I represent, the vast, vast majority, more than ten to one do not want a drag show in Cambier Park."

86.    Defendant Linda Penniman noted that she had received hundreds of emails from people urging her to "just move the drag show inside," because they "don't care for that particular part" of Pridefest.

87.    Defendant Teresa Heitmann, the mayor of Naples, stated: "[T]hat drag queen show in the public park without the support of our constituents is not okay."

88.    The City Council ultimately voted 5-2 to issue the permit, but only on the conditions that (1) the drag performance take place indoors at the Norris Center; and (2) no one under 18 be admitted to the drag performance, even if accompanied by an adult parent or guardian.

89.    As alleged above, being forced to host the drag performance indoors severely limits the number of people to whom Naples Pride can communicate its expressive message, substantially inhibits Naples Pride's desired speech, and adversely impacts Naples Pride's ability to fundraise through ticket sales.

### b. Security Fee

90.    During the 2025 permit application process, the Naples Police Department initially told Naples Pride that it would have to pay $30,697.50 in security fees alone—on top of other permit fees—to hold the performance indoors, and $44,160.00 in security fees to hold it outdoors.  The indoors-only fee—$30,697.50—represents approximately two-thirds of the total proceeds that Pridefest generated in 2024.  The proposed fee for an outdoor performance is approximately equal to the total amount raised through Pridefest in 2024.

91.    These quoted security fees represent a sharp increase from the security fees Naples Pride was previously charged in connection with Pridefest:

- In 2017, Naples Pride was charged $1,125.00 in security fees.

- In 2018, Naples Pride was charged $1,942.50 in security fees.

- In 2019, Naples Pride was charged $1,627.50 in security fees.

- In 2022, Naples Pride was charged $3,867.00 in security fees.

- In 2023, Naples Pride was charged $5,513.75 in security fees.

- In 2024, Naples Pride was charged $15,520.00 in security fees.

92.   These increased fees are grossly disproportionate to what the City of Naples charges other public events that are larger, more disruptive, and/or pose greater risks.

93.   For example, the City of Naples hosts an annual car show that closes many local streets and fills them with luxury vehicles, which pose a significant risk of theft or property damage.  Given the requirement to shut down numerous streets, the event is also much more disruptive to the community than Pridefest, which has only twice requested partial street closures and did not request *any* street closures in its 2025 application.  Despite these clear differences, in 2024, the car show's organizers paid $16,276.25 in security fees.

94.   Likewise, Naples' Fifth Avenue Tree Lighting and Christmas Walk attracts a crowd of 10,000 to 15,000 people (which is four to six times Pridefest's 2024 attendance), takes place over two days, and requires major street closures.  Yet in 2024, its organizers were required to pay $18,000.00 in security fees.

95.    Finally, Naples Art Institute's New Years Art Festival, a multi-day event with approximately 20,000 attendees (more than eight times Pridefest's 2024 attendance), was charged $12,970.00 for 2024.

96.    In addition, the security fee of more than $30,000 quoted to Naples Pride is grossly disproportionate to what other cities charge for comparable Pride events. For example, Cape Coral, Florida—about an hour away from Naples—charged just $7,682.59 in security fees for its own 2024 pride festival, which had more than 3,000 attendees and featured an outdoor drag performance.

97.    To justify the sudden increase in fees to Naples Pride, the Naples Police Department explicitly cited increased safety concerns due to political opposition to drag.  The Naples Police Department also explained that the 46% increase in their fee quotation as between the indoor and outdoor scenarios was due to their prediction that anti-drag protesters would be more likely to show up if the performance were held outdoors.

98.    For example, in a November 19, 2024, email to Naples Pride's Executive Director, Lieutenant Michael O'Reilly stated that the fee estimate included "two added officers . . . based on best practices for planned events involving protestors or sensitive topics."  Fees were nearly $15,000 higher for an outdoor performance because of the purported need for "4 officers detailed to stage security and [additional officers] for protester monitoring and coordination," given the Naples Police Department's expectation that there would "likely be an increase in protester activity for a public

performance." Lieutenant O'Reilly added that "there may be a need for a reserve team of deputies to address crowd control issues in the event of large-scale protests."

99. Similarly, in an email sent to the City Council preceding its vote on the Pridefest permit, the Chief of Police stated that he determined staffing needs and associated fees for all events, including Pridefest, based on six criteria that expressly include an event's "controversial" nature and potential "protests": (1) "Risk/Threat Assessments," (2) "Real time intelligence/current events in the country/world," (3) "Venue size, location, and capability/capacity," (4) "Potential for conflict or protests (political/controversial issues)," (5) "Expected attendee crowd size," and (6) "Event particulars (i.e. night/day, alcohol involved, street closures etc.)."

100. Additionally, at the January 2025 meeting where the City Council considered Naples Pride's permit application, Defendant Ciro Dominguez stated that, among other factors, the Naples Police Department considers "the potential for conflict" when determining security fees for a public event. At the same meeting, Lieutenant Michael O'Reilly stated that, "if there was to be a drag performance on stage, we would need an additional contingency, because we anticipate, security wise, there would be a greater threat of outside actors."

101. The City Council justified the exorbitant security fee on similar viewpoint- and content-based grounds. Defendant Christman explained that "not all public events are the same . . . It depends on the type of event they are . . . [which] involves imposing, unfortunately, costs on the sponsors of these events." Christman continued: "whatever the City police say are the fair and reasonable costs of this,

Naples Pride has to be willing to pay that, or they can't have the event." Defendant Petrunoff echoed that sentiment, explaining that she would "expect that it would cost more if the drag show were outside because the risk level goes up," comparing Pridefest's family-friendly stage performance to hosting an explosive fireworks show.

102.   A week after the City Council vote, when Naples Pride asked about the factors used to justify its fee of more than $30,000, the Naples Police Department's Assistant Chief Matthew Fletcher and Lieutenant O'Reilly met with two members of Naples Pride and showed them a copy of the City's written cost criteria. However, they prohibited Naples Pride from taking photos or making copies of the document and characterized the meeting as "confidential."

103.   The document set out how events would be categorized into various security tiers, with "Tier 1" requiring the most security. The members of Naples Pride who were present at the meeting were informed that Pridefest was a "Tier 1" event, and they observed that the criteria for placing events in "Tier 1" included the "nature of the event," including whether it is "controversial."

104.   Although Lieutenant O'Reilly claimed at this meeting that Pridefest was classified as a "Tier 1" event for reasons besides its purported "controversial" nature like size and location, that statement was in direct contrast to the written communications of both Lieutenant O'Reilly and the Chief of Police, and the statements made by Chief Dominguez and Lieutenant O'Reilly on the public record at the January 15, 2025 City Council meeting. It is also belied by the fact that

Defendants imposed far greater security fees for Pridefest than they have for other, much larger and more disruptive events taking place in the same location.

105.    As alleged above, the permit fee of more than $30,000 represents approximately two-thirds of the proceeds that Pridefest has typically generated, all of which are used to fund Naples Pride's important public mission.

### COUNT I
### Violation of 42 U.S.C. § 1983
### First Amendment: As-Applied Challenge as to Naples Pride's 2025 Permit

106.    The allegations in Paragraphs 1 through 105 above are repeated and incorporated as though fully set forth herein.

107.    Defendants unconstitutionally burdened Naples Pride's speech and expression in three independent (but additive) ways: by imposing (1) the indoors-only and (2) adults-only restrictions on Naples Pride's 2025 Pridefest permit, and (3) by requiring Naples Pride to pay purported security fees of more than $30,000.

108.    Cambier Park, the desired location of Naples Pride's drag performance, is a traditional public forum, where the City Council's right to limit Naples Pride's expressive activity is "sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

109.    Defendants' restrictions on Naples Pride's speech constitute viewpoint- and content-based restrictions.

110.    Defendants imposed viewpoint-based restrictions on the Pridefest drag performance because of their or their constituents' subjective disapproval of the viewpoints that drag expresses about traditional gender roles.

111.    Defendants' restrictions are content-based because they explicitly target Naples Pride's drag performance because it is a *drag* performance—that is, because its performers intend to dress and act in a manner that challenges traditional gender roles.

112.    The City Council justified the indoors-only and adults-only restrictions, and the need for a large police presence and associated costs, by citing personal opposition to the content and viewpoint of drag performance, opposition to the content and viewpoint of drag performance from members of the community, and purported safety concerns related to the possible presence of demonstrators opposed to the content and viewpoint of drag performance.

113.    The First Amendment categorically forbids Defendants' viewpoint-based restrictions on Naples Pride's speech.  For that reason alone, Defendants have violated and continue to violate Naples Pride's First Amendment rights.

114.    Content-based restrictions on speech in a public forum, like Cambier Park, are presumptively unconstitutional and subject to strict scrutiny.  To satisfy strict scrutiny, Defendants must prove that the restrictions are narrowly tailored to serve a compelling government interest.   Because Defendants cannot show that the restrictions were narrowly tailored to serve a compelling government interest, their restrictions have violated and continue to violate Naples Pride's First Amendment rights.

115.    Defendants' restrictions have caused and continue to cause Naples Pride to suffer irreparable harm.  Thus, Defendants are liable in law and equity for depriving Naples Pride of its "rights, privileges, or immunities secured by" the First Amendment.

*See* 42 U.S.C. § 1983.  Without declaratory and injunctive relief from this Court, Defendants' unconstitutional conduct will continue to irreparably harm Naples Pride.

116.   Defendants' unconstitutional restrictions have caused, or will continue to cause, Naples Pride to suffer substantial monetary damages, including the security fees it has incurred in the past or will incur in 2025 due to the anticipated or actual presence or activity of third parties opposed to Pridefest and/or the Pridefest drag performance.

**COUNT II**
**Violation of 42 U.S.C. § 1983**
**First Amendment: Facial Challenge to Naples' Permitting Scheme**

117.   The allegations in Paragraphs 1 through 105 are repeated and incorporated as though fully set forth herein.

118.   Permitting schemes for First Amendment-protected activity are facially invalid "in the absence of narrowly drawn, reasonable and definite standards for the officials to follow."  *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004).

119.   Far from imposing "narrowly drawn, reasonable and definite standards," Naples' Permitting Scheme grants city officials unfettered discretion.   The City Council can impose "*[a]ny* event specific conditions" that it desires "as conditions of approval," including "hours of operation, operational controls, site plans, *etc.*"  Naples Ordinance No. 2023-15181 (emphases added).  No statute, ordinance, or other source of law limits the nature or scope of these conditions or provides any binding procedure or guidelines for determining when they should be imposed.

120.    Regarding security fees in particular, Naples' Permitting Scheme delegates all security-related authority to the Naples Police Department but does not provide any criteria for assessing or calculating security costs.  Instead, the Chief of Police retains complete discretion to impose whatever security fee he sees fit, without needing to rely on or provide any objective justification for the amount imposed.

121.    Moreover, Naples' Permitting Scheme allows the City Council and the Naples Police Department to impose fees based on the perceived risks posed by hostile protesters opposed to the message or viewpoint of the permit applicant.  Indeed, the list of criteria that the Chief of Police has decided, in his discretion, to rely on includes "Potential for conflict or protests (political/controversial issues)."

122.    Such unbridled discretion—including, but not limited to, the discretion to impose a "heckler's veto" in the form of security fees—poses an unacceptable risk of suppressing a particular point of view and renders Naples' Permitting Scheme facially unconstitutional.

123.    Defendants' Permitting Scheme has caused, and continues to cause, Naples Pride to suffer irreparable harm.  Thus, Defendants are liable in law and equity for depriving Naples Pride of its "rights, privileges, or immunities secured by" the First Amendment.  *See* 42 U.S.C. § 1983.  Without declaratory and injunctive relief from this Court, Defendants' unconstitutional Permitting Scheme will continue to irreparably harm Naples Pride and others subject to the scheme.

124.    Defendants' unconstitutional restrictions have caused, or will continue to cause, Naples Pride to suffer substantial monetary damages, including the security

fees it has incurred in the past or will incur in 2025 due to the anticipated or actual presence or activity of third parties opposed to Pridefest and/or the Pridefest drag performance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Grant a preliminary and permanent injunction preventing Defendants from unconstitutionally restricting Naples Pride's 2025 Pridefest permit and requiring Defendants to issue Naples Pride a new permit free of the challenged restrictions;

B.  Declare that Defendants' restrictions on Naples Pride's 2025 permit violated the First Amendment to the United States Constitution and that Defendants' Permitting Scheme facially violates the First Amendment to the United States Constitution;

C.  Award Naples Pride compensatory damages in an amount to be determined at trial;

D.  Award Naples Pride nominal damages;

E.  Award Naples Pride its costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 or other applicable statutes; and

F.  Award Naples Pride additional relief as the Court deems just and proper.

*[intentionally left blank]*

Dated: April 10, 2025

Respectfully submitted,

_____/s/ Samantha J. Past_____
Samantha J. Past (FBN 1054519)
Daniel B. Tilley (FBN 102882)
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
spast@aclufl.org
jedwards@aclufl.org
dtilley@aclufl.org

Jonah M. Knobler*
Thomas P. Kurland*
Justin Zaremby*
Maxwell K. Weiss*
Joshua M. Goldman*
Anthony J. Wong*
**PATTERSON BELKNAP WEBB
& TYLER LLP**
1133 Ave. of the Americas
New York, NY 10036
Tel: 212-336-2000
jknobler@pbwt.com
tkurland@pbwt.com
maweiss@pbwt.com
jgoldman@pbwt.com
awong@pbwt.com

*Attorneys for Plaintiff Naples Pride*
*\*Motions for special admission forthcoming*