## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

NAPLES PRIDE,

                                    Case No. 2:25-cv-291

                    Plaintiff,

v.

                                    **Preliminary Injunctive Relief**
                                              **Requested**

CITY OF NAPLES, *et al.*,

                    Defendants.

_____/

## PLAINTIFF'S TIME-SENSITIVE MOTION
## FOR A PRELIMINARY INJUNCTION

Plaintiff Naples Pride respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction against Defendants: the City of Naples ("Naples" or the "City"); the Naples City Council (the "City Council"); each Member of the City Council in their official capacity (Teresa Heitmann, Terry Hutchison, Raymond Christman, Beth Petrunoff, Bill Kramer, Linda Penniman, and Berne Barton); the Naples Police Department; and the Naples Chief of Police, Ciro Dominguez, in his official capacity (the "Chief of Police").

As discussed below, this motion is time-sensitive. Without expedient relief, Naples Pride's First Amendment rights will continue to be irreparably harmed. Given the expedited need for relief, Naples Pride respectfully requests that the Court order Defendants to respond within fourteen days from service of this motion, and rule on the motion by ***May 14, 2025***.

## INTRODUCTION

Each summer, Naples Pride hosts its Pridefest celebration in downtown Naples. Since its inception in 2017, the festival's centerpiece has been a family-friendly drag performance. Drag is a type of performance art in which performers caricature and challenge gender stereotypes by adopting dress or mannerisms stereotypical of a different gender. It is "an art form, a source of entertainment, and a form of activism" that "conveys a valuable political message." *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023). Thus, as courts across the country have recognized, it is "indisputably protected speech" for First Amendment purposes. *Id.*

Like all performance art, drag *can* involve risqué elements, but Pridefest's drag performances categorically do not. Each year, Naples Pride has ensured these performances are family-friendly—devoid of any nudity, explicit content, or adult themes. Indeed, in response to baseless citizen complaints, the Naples Police Department investigated Pridefest's past drag performances and found that they were not "lewd," and that the performers' dress "was no more revealing than being in a bathing suit at a public pool or beach."

Some people may be offended by performances that challenge traditional gender roles. While that is their prerogative, the First Amendment forbids government actors from catering to their views by muzzling others' expression. Allowing the government "to shut off discourse solely to protect others from hearing it" in the public square "would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Cohen v. California*, 403 U.S. 15, 21 (1971). But that is

2

precisely what Defendants have done here, in clear violation of the United States Constitution.

For years, without issue, Pridefest's drag performance took place on the outdoor mainstage of Cambier Park, in the heart of Naples. Beginning in 2022, however, a group of anti-drag activists began campaigning to restrict or ban Pridefest's drag performance. And the pressure campaign worked. Starting in 2023, Defendants made clear that Pridefest would be cancelled and its permit application rejected if it sought to hold an outdoor drag performance. Instead, Defendants forced Naples Pride to hold its drag performance indoors and out of public sight, at a venue that accommodates only a fraction of those wishing to attend. To appease the City Council—and because of uncertainty around Florida's statewide restrictions on drag performances—Naples Pride also self-censored by restricting attendance at the performance to adults only.

This year, Naples Pride sought to return Pridefest's drag performance to the Cambier Park outdoor mainstage and reopen it to all audiences. In response, Defendants went even further in bowing to anti-drag activists. Citing public opposition, they again required that the performance be hidden indoors and imposed an 18+ age restriction. This time, moreover, they conditioned the permit on Naples Pride's payment of more than $30,000 in fees, most of which is purportedly for "security." This fee is grossly disproportionate to what Defendants charged in prior years; to the fees Defendants have charged for other events that are far larger and more logistically complex; and to what other Florida cities have charged for similar Pride

3

festivals with drag performances.  Naples Pride—a small nonprofit—cannot pay this exorbitant fee.  Making matters worse, Defendants explicitly justified the size of the fee by invoking the "controversial" nature of drag, and the threat allegedly posed by potential protesters who oppose the performance's message.

The First Amendment prohibits Defendants from restricting speech in a public forum like Cambier Park, or from preventing minors from receiving protected speech, merely because some members of the Naples community disapprove of it.  Likewise, the First Amendment bars Defendants from foisting security costs on a speaker, such as Naples Pride, due to the anticipated reaction of outside hecklers who oppose its speech.  Indeed, not only are Defendants' actions unconstitutional as applied to Naples Pride; but also, the City's entire permitting scheme is unconstitutional on its face because it lacks concrete standards and affords unchecked discretion to impose restrictions on disfavored speech, like those Defendants impose here.

Naples Pride thus requests that this Court issue a preliminary injunction on or before ***May 14, 2025***, to ensure sufficient time for Naples Pride to plan and host its June 7, 2025 Pridefest free of these unconstitutional restrictions.

## I.    FACTUAL BACKGROUND

### A.    Naples Pride and Its Annual Pridefest and Drag Performance

Naples Pride is a 501(c)(3) nonprofit that provides social services to the greater Naples LGBTQ+ community.[1]  Decl. of Cori Craciun ("Craciun Decl.") ¶¶ 5-6.  It is

---

[1] "LGBTQ+" is an acronym referring to people who are lesbian, gay, bisexual, transgender, or queer, or who otherwise differ from traditional expectations in their sexual orientation or gender identity.

a small organization, with only one full-time staff member and an annual budget of just $250,000. *Id.* ¶ 7. Naples Pride hosts Pridefest each year to celebrate the LGBTQ+ community, encourage greater-Naples LGBTQ+ residents to express themselves without fear, and raise money to carry out the organization's mission. *Id.* ¶¶ 8-9.

Pridefest started in 2017 and takes place each summer, usually in June (historically, LGBTQ+ Pride Month across the U.S.).[2] *Id.* ¶ 10. It lasts approximately five hours on a single day. Pridefest has seen no security incidents—save for a single arrest in 2022 of an outside protester, unaffiliated with the event, for disorderly conduct. *Id.* ¶ 12. The Naples Police Department, members of the Parks and Recreation Department, the City Manager, and members of the City Council have all praised Naples Pride for how well-organized and well-run Pridefest is. *Id.* ¶ 11.

From its inception, the centerpiece and main draw of Pridefest has been a family-friendly drag performance, lasting two to two-and-a-half hours. *Id.* ¶ 13. For the festival's first four years, this performance occurred on the outdoor mainstage of Cambier Park. *Id.* ¶ 16. That these performances could take place outdoors, in a prominent public space, held great symbolic and expressive importance to Naples Pride, whose mission emphasizes bringing the Naples LGBTQ+ community "out of the closet" and into the public square. *Id.* ¶ 17. Holding the performance outdoors in Cambier Park allows as many as 5,000 paying ticketholders to attend. *Id.* ¶ 18.

Naples Pride has *always* forbidden its performers from incorporating any nudity

---

[2] Pridefest did not take place in 2020 or 2021 due to COVID-19. Craciun Decl. ¶ 10.

or vulgar, sexual, or obscene content into this drag performance. *Id.* ¶ 15. It expressly makes performers aware of these requirements when they are booked and reminds them of these requirements up until moments before their performances. *Id.*; Declaration of Shawn Desear ("Desear Decl.") ¶¶ 9-12.

This year's Pridefest is scheduled for June 7, 2025, and planning is well underway. Craciun Decl. ¶¶ 33-34. The theme for 2025 Pridefest, "Hate Has No Home Here," is intended to "send a powerful message of acceptance." *Id.* As in previous years, the festival will occur in Cambier Park and will feature live performances and a "kids' zone" with various activities for children. *Id.* ¶ 35. However, because of Defendants' actions discussed below, absent an injunction, the centerpiece of Pridefest—its drag performance—will take place in the Norris Center, a nearby indoor venue that holds only 200 people, and will exclude children. *Id.* ¶ 41.

Moving the performance inside and imposing an 18+ age restriction would severely limit the number of people to whom Naples Pride can communicate its expressive message and would decimate Naples Pride's chief source of fundraising. *Id.* ¶ 42. That is precisely what happened in 2023 and 2024, when the performance took place indoors. *Id.* ¶¶ 27-32. It would also alter Naples Pride's expressive message of public acceptance and symbolically forcing performers and attendees back into "the closet." *Id.* ¶¶ 36, 42; *see also* Desear Decl. ¶ 16.

## B. The Recent Wave of Anti-Drag Sentiment, and Defendants' Consequent Restrictions on The Pridefest Drag Performance

Despite existing for centuries, drag has recently and suddenly received intense

public scrutiny and political backlash.  Decl. of Samantha Past ("Past Decl.") Exs. 1-4.  Beginning in 2022, many states enacted laws to restrict drag performances, deeming them "lewd" or "sexual," regardless of their actual content.

Florida passed its own statute targeting drag performances ("Florida's Drag Law") in May 2023.  The law authorized the State to revoke or suspend the operating and liquor licenses of any establishment that "knowingly admit[s] a child" to a drag performance and made doing so a crime punishable by up to a year in prison or a $1,000 fine.  Fla. Stat. §§ 827.11, 775.082, 775.083.  Florida's Drag Law was expressly motivated by anti-drag and anti-LGBTQ+ sentiment, with the bill's sponsor describing drag performance as "evil."  *See HM Florida-ORL, LLC v. Griffin*, 679 F.Supp.3d 1332, 1335 (S.D. Fl. 2023) ("*HM*").  On June 23, 2023, this Court enjoined Florida's Drag Law, concluding that it likely violated the First Amendment.  *Id.* at 1342.[3]

Naples did not escape this wave of anti-drag sentiment.  Indeed, members of its City Council expressed similar anti-drag views.  For example, after the City Council approved Naples Pride's 2022 Pridefest permit, Defendant Terry Hutchison helped organize several local protests against Pridefest and its drag performance.  And Hutchison and former City Council member and mayoral candidate Ted Blankenship

---

[3] Florida sought a partial stay of the district court's injunction of Florida's Drag Law pending its appeal, which the Eleventh Circuit and the U.S. Supreme Court denied in October and November 2023, respectively.  *See HM Fla.-Orl, LLC v. Governor of Fla.*, No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023); *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023).  The Eleventh Circuit heard argument on Florida's appeal on October 9, 2024.  The outcome of that appeal does not control this case, however.  Even if in effect, Florida's Drag Law would not apply to Pridefest's drag performance, given its lack of any content that could be considered "lewd" or "sexual."  Florida's Drag Law also has no relevance to Defendants' ability to impose viewpoint and content-based "security" fees.

tipped off anti-drag activists to when Naples Pride's permits would be on the City Council agenda so they could attend and protest. Past Decl. Exs. 5-6.

In preparation for the 2023 Pridefest, Naples Pride applied for an event permit including an outdoor drag performance, just as its previous four applications had been submitted and approved. Craciun Decl. ¶ 20. This time, however, was different. After the City Council initially voted 5-2 to approve the application, it faced backlash from a vocal contingent of the Naples community—urged on in part by members of the City Council themselves. Declaration of Callhan Soldavini ("Soldavini Decl.") ¶¶ 25-31, 41. Members of an anti-drag organization called "Stop Naples Drag" attended a public City Council meeting in protest of the decision, stating that Pridefest's drag performance was a form of "grooming" children (*i.e.*, conditioning them to be victims of sexual abuse). Soldavini Decl. Decl. ¶ 27; Past Decl. Ex. 7.

Certain City Council members, the Chief of Police, and the City Manager scheduled a conference call with Naples Pride. On that call, City officials explained that, in light of increased public opposition, Naples Pride must either move the drag performance indoors or face cancellation of Pridefest altogether. Soldavini Decl. ¶ 42; Craciun Decl. ¶¶ 23-24. Officials on the call stated that because of public opposition to drag, they were concerned about attacks—such as another "Charlottesville" or "Orlando Pulse Nightclub"—if the performance moved forward as planned. Soldavini Decl. ¶ 43; Craciun Decl. ¶¶ 23-24.

After internal deliberations, Naples Pride eventually gave in to Defendants' threats and agreed to modify its permit application by moving the drag performance

indoors, and restricting attendance to adults only.  Craciun Decl. ¶ 25; Soldavini Decl. ¶ 44.  As a result, the 2023 Pridefest drag performance took place in the small, 200-seat Norris Center.  Craciun Decl. ¶ 27.

In 2024, Naples Pride again hosted Pridefest's drag performance indoors and only for adults—both because it understood that Defendants would only approve its permit application under those conditions, and because it was uncertain whether Florida's Drag Law would be in effect.  That year's indoor drag performance took place at the Naples Woman's Club, which holds only 180 people.  *Id.* ¶ 28.

Due in large part to the limited capacity of these indoor venues and the 18+ age restriction, attendance at Pridefest has declined sharply, from approximately 5,000 people in 2022 (when the drag performance was last held outside) to 2,400 in 2024.  *Id.* ¶ 30.  Only 200 people attended the drag performance in 2024 despite Naples Pride running the show multiple times.  *Id.*  Attendees reported that it was inconvenient (or impossible) to be separated from their children and friends, and that they had therefore declined to see the performance.  *Id.* ¶ 31.  Moreover, Naples Pride has been unable to book the same caliber of nationally recognized drag entertainers in the smaller, indoor venue.  *Id.* ¶ 14; Desear Decl. ¶ 17.  All of this means that Naples Pride's message has reached fewer and fewer people.

### C.    In 2025, Defendants Once Again Restrict Naples Pride's Permit, and also Impose an Exorbitant "Security Fee"

In 2025, Naples Pride sought to return Pridefest's drag performance to Cambier Park's mainstage.  Craciun Decl. ¶¶ 33-35.  This time, however, Naples Pride faced an

additional obstacle: arbitrary and exorbitant "security fees."  The Naples Police Department initially told Naples Pride that it would cost $30,697 in security fees—on top of other permit fees—to hold the drag performance *indoors*, and $44,160 in security fees to hold it *outdoors*.  *Id.* ¶¶ 43-44, Soldavini Decl. Ex. 6.  These quoted security fees represent a sharp increase from the security fees Defendants charged in previous years: $3,867 in 2022 (with an outdoor performance), $5,513 in 2023 (with an indoor performance), and $15,520 in 2024 (with an indoor performance).  Craciun Decl. ¶¶ 45-46.  They are also grossly disproportionate to what the City charges other public events that are larger and more disruptive, and to what other cities charge for comparable Pride events with outdoor drag performances.  *Id.* ¶¶ 47-48; Past Decl. Ex. 8.[4]

Defendants expressly justified the proposed fees by invoking the potential for protesters opposed to the performance's viewpoint and content.  In a November 19, 2024 email, Lieutenant Michael O'Reilly stated that the estimate included "two added officers . . . based on best practices for planned events involving protesters or sensitive topics."  Soldavini Decl. Ex. 8.  The quoted fees were nearly $15,000 higher for an outdoor performance because of the need for "4 officers detailed to stage security and

---

[4] For example: Naples' annual car show closes many streets and fills them with luxury vehicles at a high risk of property damage but paid $16,276.25 in security fees in 2024.  Naples' Fifth Avenue Tree Lighting attracts 10,000 to 15,000 people and requires major street closures for two days, but for 2024, its organizers paid $18,000 in security fees.  Defendants charged Naples Art Institute's New Years Art Festival, a multi-day event with approximately 20,000 attendees, $12,970 in 2024.  Meanwhile, Cape Coral, Florida charged $7,682 in security fees for its 2024 Pride festival, which had more than 3,000 attendees and featured an outdoor drag performance.  Past Decl. Exs. 8-9.

[additional officers] for protester monitoring and coordination," given the Naples Police Department's expectation that there would "likely be an increase in protester activity for a public performance." *Id.* Lieutenant O'Reilly added that "there may be a need for a reserve team of deputies to address crowd control issues in the event of large-scale protests." *Id.*

Similarly, in a January 14, 2025 email to the City Council, the Chief of Police was explicit that staffing and associated fees charged to a permit applicant depended on the anticipated public reaction to an event. Past Decl. Ex. 10. He stated that the Naples Police Department determined staffing needs and associated fees for all events, including Pridefest, based on six criteria: (1) "Risk/Threat Assessments," (2) "Real time intelligence/current events in the country/world," (3) "Venue size, location, and capability/capacity," (4) "*Potential for conflict or protests (political/controversial issues)*," (5) "Expected attendee crowd size," and (6) "Event particulars (i.e. night/day, alcohol involved, street closures etc.)." *Id.* (emphasis added). Defendant Berne Barton responded that the Chief of Police's explanation "was helpful." *Id.*

Defendants considered Naples Pride's application the next day at a January 15, 2025 City Council meeting. *Id.* Ex. 12. The meeting overflowed with anti-drag and anti-LGBTQ+ sentiment—much of it from members of Stop Naples Drag, whom Defendant Hutchison had invited. *Id.* Ex. 11, 12; Soldavini Decl. ¶¶ 51-53. Several attendees accused LGBTQ+ people of "grooming" children. Past Decl. ¶ 3 & Ex. 11 at 49:21-25. One attendee stated that being LGBTQ+ is "a sin" and that the LGBTQ+ movement was "a cancer that's getting worse and worse." *Id.* at 65:24-25; 66:21-67:1.

Others falsely equated drag with exotic dancing and accused drag performers of "pedophili[a]." *Id.* at 45:6-45:10.

Speaking on behalf of the Naples Police Department, Defendant Ciro Dominguez justified the increase in fees by citing increased safety concerns due to political opposition to drag. *Id.* Ex. 12 at 6:2-6:13. He stated that the Naples Police Department considered "the potential for conflict" when determining security fees for a public event. *Id.* Later, Lieutenant O'Reilly stated that, "if there was to be a drag performance on stage, we would need an additional contingency, because we anticipate, security wise, there would be a greater threat of outside actors." *Id.* at 13:17-14:4.

Despite the Naples Police Department presenting two options—$30,697 for an indoor performance and $44,160 for an outdoor one—the City Council ultimately refused to allow Naples Pride to return outside even if it paid the higher fee. The City Council voted 5-2 to issue the permit for 2025 Pridefest, but *only* on the conditions: (1) that the drag performance take place indoors at the Norris Center; (2) that no one under 18 be admitted to the drag performance, even if accompanied by an adult parent or guardian; and (3) that Naples Pride pay a $30,697 "security fee" to the Naples Police Department. *Id.* at 116:10-19; 121:4-23.

Before voting, each City Council member offered their position on Naples Pride's permit. Defendant Hutchison commented that an outdoor drag performance would equate to "target[ing] . . . children" and would force unwilling members of the public to "acknowledge this lewdness." *Id.* at 84:10-85:11. Defendant Raymond

Christman explained that "the right answer is to approve this permit with the requirement that the drag show be held inside" because "drag shows are offensive to many people in this community," and an outdoor drag show would pose a safety risk. *Id.* at 92:4-20. Defendant Barton likewise justified his vote to force the drag performance indoors because it posed a safety risk. *Id.* at 94:23-95:18. Defendant Bill Kramer stated that "the people I represent, the vast, vast majority, more than ten to one do not want a drag show in Cambier Park." *Id.* at 98:24-99:6. Defendant Linda Penniman noted that she had received hundreds of emails from people urging her to "just move the drag show inside," because they "don't care for" it. *Id.* at 102:22-103:12. Defendant Teresa Heitmann (who is also the mayor of Naples) summed it up: "[T]hat drag queen show in the public park without the support of our constituents is not okay." *Id.* at 113:16-21.

Specifically, as to the exorbitant security fee, Defendant Christman explained that "not all public events are the same" and costs will "depend[] on the type of event." *Id.* at 89:23-90:7. Christman continued: "whatever the City police say are the fair and reasonable costs of this, Naples Pride has to be willing to pay that, or they can't have the event." *Id.* at 91:14-17. Defendant Petrunoff echoed that sentiment, explaining that she would expect that an outdoor drag performance would "cost more," because if the drag show were outside, "the risk level goes up." *Id.* at 104:15-19.

After the meeting, Naples Pride inquired into the factors used to determine the security fee. Sergeant Matthew Doyle and Lieutenant O'Reilly met with two members of Naples Pride and showed them a copy of the City's written cost criteria. Soldavini

Decl. ¶¶ 61-64.[5]  Among those criteria was whether an event was "controversial." *Id.* ¶ 63.  If so, it could be considered a "Tier 1" event requiring a higher level of security and greater fees.  Although at the meeting Lieutenant O'Reilly claimed that Pridefest was classified as a "Tier 1" event for reasons besides its purported "controversial" nature, like Pridefest's size and location, *see id.* ¶ 62, that statement was in direct contrast to the written communications of both Lieutenant O'Reilly and the Chief of Police, and their statements on the public record at the January 15, 2025 City Council meeting, *see* Past Decl. Ex. 10; Past Decl. Ex. 12 at 6:2-6:13; 13:17-14:4; Soldavini Decl. Ex. 8.  It was also inconsistent with Defendants' decision to charge lower security fees to organizers of other recent events taking place in the same location as Pridefest, with many more attendees than anticipated at Pridefest.  *Supra* p. 10.

## II.    ARGUMENT

To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) that irreparable injury is likely if relief is not granted; (3) that the threatened injury outweighs the harm an injunction would inflict on the non-movant; and (4) that an injunction would serve the public interest.  *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024).  Naples Pride meets all these requirements.

---

[5] The Naples Police Department and City Manager refused to provide a copy of the written criteria they claimed to use to determine the "Tier 1" fees applied to Naples Pride.  *Id.* ¶ 64.  However, the criteria match the six factors in the Chief of Police's January 14, 2025 email.  Past Decl. Ex. 10.

A.    **Naples Pride Is Likely to Succeed on the Merits**

Naples Pride is likely to succeed on the merits of both its as-applied and facial First Amendment challenges.  The three restrictions Defendants placed on Naples Pride's permit are viewpoint-based, and thus *per se* forbidden.  *See Matal v. Tam*, 582 U.S. 218, 243 (2017).  Even if not viewpoint-based, they are at least content-based and cannot satisfy strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).  Furthermore, Naples' permitting scheme is unconstitutional on its face because it provides City officials with unbridled discretion to burden disfavored speech, including by imposing a "heckler's veto" in the form of content-based security fees.

1.    **As-Applied Challenge: Defendants Violated the First Amendment by Imposing Multiple Improper Restrictions on Naples Pride's Protected Speech**

a.    **Pridefest's drag performance constitutes speech and expression protected by the First Amendment.**

As made clear by recent decisions from courts across the country—including this Court—drag is a form of expression protected by the First Amendment.  *See, e.g.*, *HM*, 679 F. Supp. 3d at 1342; *S. Utah Drag Stars*, 677 F. Supp. 3d at 1286; *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820 (S.D. Tex. 2023); *Imperial Sovereign Ct. of Mont. v. Knudsen*, 684 F. Supp. 3d 1095 (D. Mont. 2023); *Texas A&M Queer Empowerment Council v. Mahomes*, No. 25-cv-992, 2025 WL 895836, at *6 (S.D. Tex. Mar. 24, 2025); *see also Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("[L]ive entertainment, such as musical and dramatic works fall within the First Amendment guarantee.").

In addition to being "an art form [and] a source of entertainment," drag is a

15

"form of activism and conveys a valuable political message . . . that individuals with gender presentation and identities outside the majoritarian norm are welcome in public places." *S. Utah Drag Stars*, 677 F. Supp. 3d at 1286; *see also Woodlands Pride*, 694 F. Supp. 3d at 843 (drag performances "express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles"); Desear Decl. ¶¶ 4-6; Craciun Decl. ¶ 17 (discussing expressive message of Pridefest's drag performance). The expressive nature of drag performance is even more pronounced given the current political discourse around drag itself and the acceptance of LGBTQ+ identities. *See S. Utah Drag Stars*, 677 F. Supp. 3d at 1286; *supra* pp. 6-8.

### b. Defendants' restrictions on Naples Pride's speech are forbidden viewpoint-based restrictions.

The level of scrutiny applied to the government's restriction on speech depends on the forum (traditional public forum, limited public forum, or nonpublic forum) and the type of restriction (viewpoint-based, content-based, or content-neutral). *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017).

Public parks, like Cambier Park, are traditional public forums—they "have immemorially been held in trust for the use of the public," including "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In such a forum, the state's powers to "limit expressive activity" are "sharply circumscribed." *Id.* Thus, any "[r]egulation of speech activity [in] parks[] is examined under strict scrutiny." *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275,

1278 (11th Cir. 2003).

Viewpoint-based restrictions are "forbidden" in both traditional and limited public fora. *Matal*, 582 U.S. at 243. Such restrictions occur where the government discriminates based on the "motivating ideology or the opinion or perspective of the speaker." *Reed*, 576 U.S. at 168. When ideology, opinion, or perspective is the rationale for a restriction, the "government *must* abstain from regulating speech." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 864 (11th Cir. 2020) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)) (emphasis added).

As several courts have recently found, restrictions on drag performances are viewpoint-based. *See, e.g.*, *Texas A&M*, 2025 WL 895836, at *8. Such restrictions target "those who wish to portray or express a gender that is different from that assigned to them at birth." *Imperial Sovereign Ct.*, 699 F. Supp. 3d at 1038 (cleaned up). The laws therefore "target[] the viewpoint of [a] gender identity," *id.*, which "goes beyond [a] mere content-based" restriction on speech, *Woodlands Pride*, 694 F. Supp. 3d at 847. These restrictions are viewpoint-based because they are "directed at the specific act of impersonating or exaggerating a sex other than the one a performer is assigned." *Id.*; *cf. Otto*, 981 F.3d at 864 (explaining that speech regulations grounded in views about the (im)mutability of gender are "[v]iewpoint-based").

Here, Defendants imposed restrictions on the Pridefest drag performance due to subjective disapproval of the viewpoint that drag expresses regarding gender roles and gender presentation. Multiple City Council members explained their votes based

17

on their own, and/or their constituents', personal distaste for the particular ideology or perspective that drag conveys.  Past Decl. Ex. 12 at 84:10-85:11, 92:4-20, 94:23-95:18, 98:24-99:6, 102:22-103:12, 113:16-21; *supra* pp. 12-13.  Multiple representatives of the Naples Police Department further explained that the security fees resulted from public opposition to drag and the resulting potential for outside disruptors, which Defendant Barton found "helpful" before voting.  Past Decl. Ex. 10; Soldavini Decl. Ex. 8; *supra* p. 12.  That is viewpoint-based discrimination, and it is "forbidden." *Matal*, 582 U.S. at 243.

### c.    Defendants' restrictions are, at minimum, content-based and presumptively unconstitutional.

Even if a speech restriction does not qualify as viewpoint discrimination, it is still "presumptively unconstitutional" if it is content-based.  *Reed*, 576 U.S. at 163 (noting that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its *content*" (emphasis added)).  A restriction is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.*  Content-based restrictions are subject to strict scrutiny, *id.*—that is, they must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end," *Perry*, 460 U.S. at 45.

Here, the challenged speech restrictions (the indoors-only restriction, the 18+ restriction, and the exorbitant "security fees") are content-based.  Defendants did not impose them for reasons agnostic to the content of the intended performance—such as its running time, or the number of performers or expected attendees, or the logistical

complexity of the staging. Rather, the City Council and Naples Police Department justified the restrictions because Naples Pride intended to host a *drag* performance— that is, one where the performers dress and act in gender-atypical ways. *Supra* pp. 12-13. Such restrictions are content-based and presumptively unconstitutional. They can survive only if they withstand strict scrutiny. And, as discussed below, they do not.

It does not matter whether the City Council imposed these restrictions because they personally oppose the content of Naples Pride's drag performance, or because their constituents do. *See Reed*, 576 U.S. at 163. "Under our Constitution, aesthetic and moral judgments about art and literature are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (cleaned up); *see also Cohen*, 403 U.S. at 21 (explaining that the First Amendment prevents the "majority [from] silenc[ing] dissidents simply as a matter of personal predilections").

Nor does it matter that the City Council claimed to be motivated, at least in part, by a security threat posed by hostile protesters. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1294 (11th Cir. 2021). The First Amendment does not tolerate such "hecklers' vetoes," which are just another form of content-based discrimination. "A heckler's veto generally occurs when the government suppresses speech because of poor audience reaction, especially a reaction so negative that the threat of violence becomes imminent." *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076,

1109–10 (N.D. Fla. 2016).  In refusing to countenance "hecklers' vetoes," courts uphold "the First Amendment protection against the government effectuating a complaining citizen's viewpoint discrimination." *Id.* at 1110.  As the Supreme Court has emphasized, "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Forsyth*, 505 U.S. at 134-35; *see also Church of Am. Knights of Ku Klux Klan v. City of Gary, Ind.*, 334 F.3d 676 (7th Cir. 2003); *Gay & Lesbian Services Network, Inc. v. Bishop*, 832 F. Supp. 270 (W.D. Mo. 1993).

The Supreme Court and Eleventh Circuit have specifically prohibited restrictions on speech justified by the anticipated negative reaction of the public.[6]  In *Forsyth County, Georgia v. Nationalist Movement*, the Supreme Court addressed whether a county administrator could "assess a fee to cover the cost of necessary and reasonable protection of persons participating in or observing [the permitted] activity."  505 U.S. at 134 (cleaned up).  The problem, the Court observed, was that "[i]n order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed." *Id.*  The administrator would be required to "estimate the response of others to . . . judge the number of police necessary to meet that response." *Id.*  "The fee assessed will depend

---

[6] While *Forsyth* involved a facial challenge, its prohibition on justifying speech restrictions using outside agitators is equally applicable in the as-applied context.  *See Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1295 (finding *Forsyth* and other cases involving facial challenges also "control[] the as-applied . . . inquiry"); *McMahon*, 180 F. Supp. 3d at 1107 (finding likelihood of success for both facial and as-applied challenge to restriction on speech based on possible listener reactions).

on the administrator's measure of the amount of hostility likely to be created by the speech *based on its content*." *Id.* (emphasis added).

Similarly, in *Central Florida Nuclear Freeze v. Walsh*, the Eleventh Circuit addressed facial and as-applied challenges brought by an anti-nuclear organization seeking to host a parade and rally in Orlando. 774 F.2d at 1515, 1516, 1526 (11th Cir. 1985). The city determined that the event required 21 police officers and imposed a $1,435 fee to pay for the officers' time. *Id.* at 1517. The city's decision was based on the "belief that due to the controversial nature of the rally . . . the potential for hostile counter activity existed," which "necessitated the need for additional police protection." *Id.* The Eleventh Circuit held that the city could consider "the potential for hostile counter activity" in determining the level of police protection needed, but that such content-based protection costs could *not* be passed on to the speaker as a condition of being permitted to speak. *Id.* at 1525.

To be clear, *Forsyth*, *Walsh*, and their progeny allow reasonable permit fees for use of a public forum. But Defendants may not charge more than the actual logistical costs associated with the event. *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1205 (11th Cir. 1991). And those logistical costs must be limited to those *inherently* associated with the event, rather than those due to listeners' anticipated reaction to its message. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1282-83 (11th Cir. 2006) (approving permit fees that included insurance costs determined solely by the number of expected attendees). Indeed, even where a given event has a demonstrated history of provoking violent conflict, that cannot justify increased permit

fees.  *See Pinette v. Capitol Square Rev. & Advisory Bd.*, 874 F. Supp. 791, 794, 796 (S.D. Ohio 1994) (finding prepayment requirements unconstitutional for Ku Klux Klan march, despite history of disruptions).

### d.    The $30,697 "security fee" violates the First Amendment.

Defendants' imposition of a "security fee" in excess of $30,000 as a condition of granting Naples Pride's permit is subject to—and fails—strict scrutiny.  Defendants, as the parties defending a speech restriction, bear the burden of demonstrating that it is constitutionally permissible.  *See Dills v. Cobb Cnty., Ga.*, 755 F.2d 1473, 1474 (11th Cir. 1985).  They cannot meet that burden.

The Naples Police Department explicitly justified the fee by citing increased political opposition to drag and the expectation of protests.  Craciun Decl. ¶ 49; Soldavini Decl. ¶¶ 61-67 & Ex. 8; Past Decl. Ex. 10; Past Decl. Ex. 12 at 6:2-6:13, 13:17-14:4.  Naples Police stated on the public record that, when setting the fee, the Naples Police Department considered "the potential for conflict" associated with the "threat of outside actors."  *Id.*  Over email, Lieutenant O'Reilly was explicit: Naples Pride had to pay for at least two additional officers "based on best practices for planned events involving protesters or sensitive topics."  Soldavini Decl. Ex. 8.  The Chief of Police also listed in an email to the City Council the factors considered by the Naples Police Department, including "Risk/Threat Assessments" and the "Potential for conflict or protests (political/controversial issues)," which Councilman Barton found "helpful."  Past Decl. Ex. 10.  And, in casting her vote, Defendant Petrunoff stated

that the fees imposed here were due to the increased "risk level"—plainly referring to hostile protesters, not to any "risk" associated with the stage performance itself. Past Decl. Ex. 12 at 104:15-19.

Precedent is clear: the expected presence of hostile protesters "*cannot be considered* in fixing the costs" for permit applicants "asking to exercise their First Amendment rights." *Walsh*, 774 F.2d at 1525 (emphasis added). "Otherwise, the result would operate to charge more for speech which is unpopular or controversial." *Id.* That is precisely what happened here. The City Council, advised by the Chief of Police, imposed a fee of more than $30,000 because they expected protesters due to the content of Naples Pride's drag performance. That is unconstitutional. *See id.* ("The effect of the Orlando ordinance . . . is to charge more for First Amendment activity which may require more police protection than less controversial speech; such a result . . . is constitutionally unacceptable."); *see also Forsyth*, 505 U.S. at 134 (striking down permitting scheme under which "[t]hose wishing to express views unpopular with bottle throwers . . . [would] have to pay more").

Although Defendants' explicit admissions are enough to doom the security fee, additional record evidence confirms what Defendants admitted. As discussed above, Defendants charged far higher security fees for 2025 Pridefest than they charged for the same event in prior years, before the recent wave of anti-drag sentiment. *Supra* p. 10. Defendants charged far higher security fees for Naples Pride's permit than they charged for other events that last much longer, attract far larger crowds, require major street closures, and/or pose a much greater threat of property damage. *Id.*; Past Decl.

23

Ex. 8.  And Defendants charged far greater security fees than other nearby cities have charged for comparable Pride festivals, including those with outdoor drag performances.  Past Decl. Ex. 9.  Under these circumstances, it is not plausible that the $30,697 fee at issue consists *entirely* of permissible logistical costs inherently associated with Pridefest and excludes *all* impermissible costs associated with anticipated listener reaction.  *See Forsyth*, 505 U.S. at 136 (noting that the imposition of *any* content-based permit fee is unconstitutional, no matter how small that fee).[7]

### e.    Forcing the drag performance indoors violates the First Amendment.

As discussed above, Defendants bear the burden of demonstrating that forcing the Pridefest drag performance indoors serves a compelling state interest and is narrowly tailored to that end.  *See Dills*, 755 F.2d at 1474.  They cannot do so.

Again, Defendants may not justify a speech restriction because outsiders may react poorly to it.  Appeasing hostile outsiders opposed to a speaker's message is not a permissible state interest, let alone a compelling one.  *See Walsh*, 774 F.2d at 1524-25.

Similarly, Defendants cannot force Pridefest's drag performance indoors merely to keep passers-by from being exposed to it.  In *Erznoznik v. City of Jacksonville*, the Supreme Court struck down an ordinance that prohibited drive-in theaters from

---

[7] Given the express admissions and other evidence noted above, Lieutenant O'Reilly's assertion at the January 21, 2025 meeting that the Naples Police Department did not apply its "controversial" criterion in this case is not credible.  In any event, if Defendants did disregard their "controversial" criterion in this case, that would merely show that Naples' permitting scheme affords Defendants arbitrary discretion—which itself violates the First Amendment.  *See infra* pp. 29-34; *Forsyth*, 505 U.S. at 132-33 & n.10 (county administrator's testimony that, "in this instance, he chose not to include any charge for expected security expense" did not insulate statute from facial challenge, but rather, demonstrated that "how much to charge . . .—or even whether to charge at all—is left to [his] whim").

showing films that contained nudity.  422 U.S. 205 (1975).  The city justified the ordinance as protecting unwilling passers-by from being exposed to such films.  *Id.* The Court held that this content-based restriction did not satisfy strict scrutiny because it "seeks only to keep these films from being seen from public streets and places where the offended viewer readily can avert his eyes."  *Id.* at 212.  Like "the screen of a drive-in theater," Cambier Park's outdoor stage "is not so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it."  *Id.* (cleaned up).  "The limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content."  *Id.*  If that First Amendment principle applies to films featuring nudity, it applies to a family-friendly stage performance: those that do not wish to view it can simply look away.

Finally, even if reducing disruptions from outsiders or preventing passers-by from witnessing performers dressed in drag were compelling state interests, forcing the performance into a 200-seat indoor venue—thereby preventing much of its potential audience from attending and undermining the performance's expressive message of pride and openness—is not a narrowly tailored means of achieving those ends. Narrow tailoring requires that, "[i]f a less restrictive alternative would serve the Government's purpose, the [Government] must use that alternative."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *see Walsh*, 774 F.2d at 1526 (concluding that charging permit applicant overtime police rates was "not the least restrictive means of achieving the governmental concerns of protecting the public

safety"). "[T]he burden is on the Government to prove that the proposed alternatives will not be as effective." *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004).

Defendants could have addressed these purported concerns without restricting any speech at all. For example, they could have addressed protesters by providing additional police presence at the City's own expense. *Cf. Forsyth*, 505 U.S. at 135-36 ("[R]aising revenue for police services . . . does not justify a content-based permit fee"). And they could have addressed the sensibilities of passers-by by putting up a privacy fence surrounding the park's mainstage area, or by placing signs at park entrances noting that a drag performance would be taking place. Neither of these steps would decimate the performance's audience or subvert the performance's expressive message. Yet Defendants did not even consider these less-restrictive alternatives, let alone explain why they (or other less restrictive means) would not suffice.

### f.    The age restriction violates the First Amendment.

The government does not have "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Content-based restrictions on minors' access to protected expression are permissible only in two circumstances. First, minors may be barred from receiving expression that is protected for adults but obscene as to minors. *See id.* at 795, 804. Second, minors may be barred from receiving expressive content if the restriction survives strict scrutiny. *See id.* at 799, 804-05.

Pridefest's drag performance is plainly not obscene as to minors. That standard is met only where expressive material: "(i) predominantly appeals to the prurient, shameful or morbid interest of minors, *and* (ii) is patently offensive to prevailing

standards in the adult community as a whole with respect to what is suitable material for minors, *and* (iii) is utterly without redeeming social importance for minors." *Ginsberg v. State of N.Y.*, 390 U.S. 629, 633 (1968) (emphases added). The Pridefest drag performance does not come close to meeting these criteria.

As discussed above, Naples Pride categorically forbids performers from incorporating any nudity or vulgar, sexual, or obscene content. Desear Decl. ¶¶ 9-12. The dance moves performers use are akin to those performed at children's dance recitals or by cheerleaders at a high-school football game. Soldavini Decl. ¶ 16. The Naples Police Department even investigated previous Pridefest drag performances and found that they were neither "lewd" nor "sexual," and that the "way the [performers] were dressed was no more revealing than being in a bathing suit at a public pool or beach." Past Decl. Ex. 13 at 12. Finally, as a form of performance art that comments on and challenges societal gender roles, celebrates the history of marginalized communities, and encourages pride and acceptance, drag—including the performance here—plainly has literary, artistic, and/or political value. Desear Decl.¶¶ 4-6; *supra* pp. 15-16.

This Court recently made clear that blanket prohibitions on children witnessing drag performances cannot be justified on obscenity grounds. *See HM*, 679 F. Supp. 3d at 1342-43. In defending Florida's Drag Law, the State argued that it sought "to protect children generally from obscene live performances." *Id.* at 1335. In analyzing the argument, the Court noted that Florida's Drag Law was more restrictive than the statute at issue in *Ginsberg*, which outlines the test for obscenity as to minors. The

statute in *Ginsberg* also included an exception—not present in Florida's Drag Law—for parents who wanted their children to view the restricted content. *Id.* at 1342-43. Further, the law analyzed in *Ginsberg* applied only to commercial speech. *Id.* Thus, this Court held that Florida's Drag Law restricted speech beyond what can be justified as obscene as to minors. *See id.*

Here, the City Council's age restriction sweeps even more broadly than the age restriction in the enjoined Florida Drag Law. That law restricted children's attendance at drag performances that included nudity, sexual content, "lewd conduct," or "the lewd exposure of prosthetic or imitation genitals or breasts." *Id.* at 1336 (cleaned up) (quoting Fla. Stat. § 827.11(1)(a)). But none of those elements are present, or have ever been present, in Pridefest's drag performances. *See* Desear Decl. ¶¶ 7, 10-12; Past Decl. Ex. 13. Moreover, there is no exception for parents who want their children to attend Pridefest's drag performances, another infirmity this Court found in enjoining Florida's Drag Law. *See HM*, 679 F. Supp. 3d at 1342-43.

Where speech or expression is not obscene as to minors, a prohibition on minors receiving it must survive strict scrutiny. *Brown*, 564 U.S. at 804-05. Again, Defendants bear the burden of showing that strict scrutiny is met—and, again, they cannot meet that burden here. The only rationale Defendants ever provided for the age restriction was that protests would be less likely, or less severe, if minors were not allowed to attend the drag performance. Craciun Decl. ¶ 41. As discussed above, that is an unconstitutional "heckler's veto," not a narrowly tailored measure necessary to serve a compelling state interest—and Defendants could have addressed their stated concern

about protesters without burdening Naples Pride's speech.  *Supra* pp. 19-21.

Moreover, Defendants' invocation of potential protesters is especially disingenuous

here, given that multiple members of the City Council have fomented the very public

opposition Defendants relied upon to justify these restrictions.  *Supra* pp. 11-13.

*    *    *

Finally, even if the Court found that each restriction Defendants imposed on

Naples Pride's permit was narrowly tailored on its own, together they cannot possibly

meet that demanding test.  This series of additive restrictions—one on top of another—

is plainly not the "least restrictive means" of accomplishing any compelling

government interest.  *See Graveline v. Benson*, 992 F.3d 524, 544-45 (6th Cir. 2021)

(affirming district court determination "that the combined effect of Michigan's laws

imposes a severe burden on the First Amendment rights" at issue and noting

defendants' failure to "demonstrate how the provisions as applied in combination are

the least restrictive means by which they could achieve their compelling interests").

**2.**    **Facial Challenge: Naples' Permitting Regime Lacks
Safeguards Required by The First Amendment and Permits
an Unconstitutional "Heckler's Veto"**

**a.**    **Naples' permitting scheme is facially unconstitutional
because it provides City officials with unbridled
discretion to restrict speech.**

"A government regulation [of speech] that allows arbitrary application is

inherently inconsistent with a valid time, place, and manner regulation because such

discretion has the potential for becoming a means of suppressing a particular point of

view."  *Forsyth*, 505 U.S. at 130.  Therefore, permitting schemes are facially invalid "in

29

the absence of narrowly drawn, reasonable and definite standards for the officials to follow." *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004). "Even if a particular restriction or condition is an otherwise permissible content-neutral regulation of the time, place, or manner of speech, it is unconstitutional if a government official has unbridled discretion to apply it." *Id.*; *see Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1295 (holding ordinance unconstitutional because it gave city officials discretion to deny a permit request for any reason or "for no reason at all").

In *Forsyth*, the Supreme Court addressed a permitting scheme enacted following violent clashes between civil rights marchers and white supremacists. 505 U.S. at 125. After those incidents, a white supremacist group applied for a permit to hold a demonstration in opposition to Martin Luther King Day. *Id.* at 127. Pursuant to its permitting scheme, Forsyth County imposed a $100 permit fee. *Id.* The white supremacists brought a facial challenge to the permitting regime and sought a preliminary injunction. *Id.* at 127, 129.

The Supreme Court granted the injunction, holding that Forsyth County's scheme gave too much discretion to county officials. "The decision how much to charge for police protection or administrative time—or even whether to charge at all—[was] left to the whim of the administrator." *Id.* at 132-33. There were "no articulated standards either in the ordinance or in the county's established practice and the administrator was not required to rely on any objective factors." *Id.* at 133 (cleaned up). The permitting scheme therefore was not "narrowly drawn" and lacked "reasonable and definite standards guiding" government officials. *Id.* at 132-133. And

30

without such standards, the scheme was facially unconstitutional. *Id.* at 137.

Here, too, Naples' permitting scheme grants unfettered discretion to city officials. Any special event permit must be approved by a City Council resolution "incorporating reference to the special events manual." Naples, FL., Municipal Code § 46-39(c)(2). The City Council can impose "*[a]ny* event specific conditions" that it desires "as conditions of approval," including "hours of operation, operational controls, site plans, *etc.*" *Id.* (emphases added). No statute, ordinance, or other source of law limits the nature or scope of these conditions or provides any binding procedure or guidelines for determining when they should be imposed. As relevant here, for example, nothing guides or cabins the City Council's discretion to restrict disfavored speech to an indoor venue, or to impose age limits on attendance.

The aforementioned Special Events Manual ("Manual") briefly explains the permit application process. Past Decl. Ex. 14 at 3. After an organization applies for a permit, the Special Events Committee reviews the application and makes a recommendation to the City Council "based on the guidelines/policies/ordinances in place, and the impact on the community." *Id.* No standards set forth how this consideration is to take place or what is meant by the "impact on the community." The City Council then meets and decides whether to deny the permit, approve the permit, or to approve it subject to any special conditions of their choosing. *Id.*; Naples, FL., Municipal Code § 46-39(c)(1). Moreover, aside from the City Council's authority to approve or deny the permit, the Manual grants the City Manager authority to approve or deny a permit based on, *inter alia*, whether "[t]he event is generally

31

compatible with the character of the city." Past Decl. Ex. 14 at 9. No standards guide this determination.

The Naples Municipal Code provides a fee schedule for use of the city's parks, including Cambier Park. Naples, FL., Code, App'x A § 28-32. But the Municipal Code also allows the City Council to assess additional fees for using city parks by passing a resolution. Naples, FL., Code § 28-32(a). Through that authority, the City Council adopted additional fee requirements in the Manual. *See* Naples, FL, Ordinance No. 2023-15181 (codified at Naples, FL., Municipal Code § 46-39); Past Decl. Ex. 14.

The Manual sets forth certain fixed fees, including a $150 non-refundable processing fee and a $500 refundable damage deposit. Past Decl. Ex. 14 at 4, 10. It also provides that the "City may require Police, Fire, . . . barricades, etc.," with the cost of "all services provided for the event [to] be paid for by the [event organizer]." *Id.* at 4. By its terms, the Manual provides the City Council with unbridled discretion to determine what services should be provided—and charged to the event organizer— to "ensure the safety of participants, minimize the inconvenience to residents and reduce the liability exposure to the City." *Id.* Neither the Manual, nor any code provision, ordinance, or City Council resolution, sets forth the criteria that the City Council should use for determining "necessary" additional services, or how their costs should be determined.

This system affords the City Council absolute discretion to approve or deny a permit, or to impose whatever conditions and fees it desires, without "narrow,

objective, and definite standards"—indeed, without *any* standards—"to guide the licensing authority." *Forsyth*, 505 U.S. at 131. That is facially unconstitutional. *See id.*; *Bourgeois*, 387 F.3d at 1317.

With respect to security in particular, the Manual states that, for events "deemed to have specific safety requirements, the hiring of law enforcement officers may be required." Past Decl. Ex. 14 at 6. The Manual delegates all security-related authority to the Naples Police Department, stating that "[t]he organizer must comply and resolve all safety concerns of the Naples Police Department." *Id.* The Manual does not provide criteria for assessing security needs or calculating security costs. Instead, the Chief of Police retains complete discretion to impose whatever security fee he sees fit, even if (as here) it amounts to tens of thousands of dollars. The Chief of Police is not required to rely on or provide any objective justification for the amount imposed.[8]

This is precisely the type of uncabined discretion that poses an unacceptable risk "of suppressing a particular point of view" and renders a permitting scheme facially unconstitutional. *Forsyth*, 505 U.S. at 130; *see, e.g.*, *Bourgeois*, 387 F.3d at 1317 (finding permitting system facially unconstitutional where it lacked "narrowly drawn,

---

[8] As noted above, Sergeant Doyle and Lieutenant O'Reilly showed a written list of factors to Naples Pride that the Naples Police Department purported to use when determining the level of security necessary for an event. Soldavini Decl. ¶ 64. The Chief of Police communicated the same set of criteria to the City Council. Past Decl. Ex. 10. The criteria have no basis in any binding statute, regulation, or ordinance, and on information and belief, the Chief of Police can disregard them at will. Moreover, to the extent the criteria does guide Defendants' exercise of discretion, it expressly requires consideration of whether an event is "political" or "controversial." *Id.*

reasonable and definite standards for the officials to follow"); *Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1295 (same); *Bledsoe v. City of Jacksonville Beach*, 20 F. Supp. 2d 1317, 1325 (M.D. Fla. 1998) (finding permitting system facially unconstitutional where police chief had sole discretion to "determine when a police presence will be required at an event" and to "require . . . any number of officers that he may designate," and "this [police] presence [would] be paid for by the event sponsor").

### b.    Naples' permitting scheme is facially unconstitutional because it permits an unlawful "heckler's veto."

One particular aspect of Naples' permitting system is especially noxious to the First Amendment: it allows Defendants to consider the anticipated negative reaction of outside observers in setting a permit fee.  As discussed above, this "heckler's veto" is prohibited.  *Supra* pp. 19-21.  The First Amendment may not "be abridged by a governmental regulation which requires the speakers to prepay the costs of police protection, based on the content of the speaker's views."  *Walsh*, 774 F.2d at 1524.

*Forsyth* and *Walsh* addressed this exact issue.  In *Forsyth*, the ordinance required permit applicants to pay "a fee to cover the cost of necessary and reasonable protection of persons participating in or observing [the permitted] activity." 505 U.S. at 134 (cleaned up).  The problem, the Supreme Court observed, was that "[i]n order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed."  *Id.*  "Such an inquiry into the content of the speakers' views in determining . . . how much the speakers would have to pay" is "impermissible."  *Walsh*, 774 F. 2d at 1524.  The

Supreme Court therefore struck down the permitting system on its face, without regard to whether such improper costs had actually been charged to the plaintiff in that case. *See Forsyth*, 505 U.S. at 133 n.10 ("The District Court's finding that in this instance the Forsyth County administrator applied legitimate, content-neutral criteria, even if correct, is irrelevant to this facial challenge.").

This Court faced a similar permitting system in *Bledsoe*, 20 F. Supp. 2d 1317. That case involved a permitting regime under which the city had unfettered discretion to charge for "a police presence for those events that are likely to result in some form of civil danger." *Id.* at 1325. The Court observed that this included "a possible violent reaction from the gathered crowd" to "a speaker's unpopular message." *Id.* The Court thus struck down the permitting ordinance on its face, without requiring a showing that content-based fees had been imposed on the plaintiff. *Id.*

As in *Forsyth* and *Bledsoe*, Naples's permitting regime allows security fees to be imposed based on the anticipated reaction of those opposed to the event's message. The Manual permits the City to charge event organizers for all expenses deemed necessary to "ensure the safety of participants, minimize the inconvenience to residents and reduce the liability exposure to the City"—whether the danger or inconvenience stems inherently from the event itself, or from the hostile reaction of outsiders opposed to its message. Past Decl. Ex. 14 at 6. This is indistinguishable from *Forsyth*, where the ordinance allowed the county to charge event organizers for "the costs . . . needed for 'necessary and reasonable protection of persons participating in or observing the speech'" and "the maintenance of public order," even if the alleged

threat to safety or order was due to outside protesters.  505 U.S. at 127, nn.9, 12.
Indeed, here—unlike in *Forsyth*—Defendants' procedures *explicitly require*
consideration of, *inter alia*, the "[p]otential for conflict or protests
(political/controversial issues)."  Past Decl. Ex. 10.  Finally, just as in *Forsyth* and
*Bledsoe*, the fact that "[n]othing in the law or its application prevents" the imposition
of such improper "heckler's veto" fees renders the permitting regime facially invalid,
whether or not such fees were actually charged here.  *Forsyth*, 505 U.S. at 133 n.10.

### B.    Absent An Injunction, Naples Pride Will Continue to Suffer Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373
(1976).  As discussed above, unless an injunction is granted, Naples Pride's protected
speech will be unconstitutionally restricted; it will be unable to attract the caliber of
performers it intends to present; and its expressive message of pride, liberation, and
openness will be subverted.  Craciun Decl. ¶¶ 8-9, 14, 17-18, 32, 36, 42.

### C.    The Balance of Harms Favors Naples Pride and an Injunction Is in the Public Interest

"[W]hen . . . the government is the [party] opposing" a motion for a preliminary
injunction, the "balance of harms" and "public interest" factors merge.  *Gonzalez v.
Governor of Ga.*, 978 F.3d 1266, 1271-72 (11th Cir. 2020).  The same facts show both
that the threatened injury outweighs whatever damage the proposed injunction may
cause, and that the injunction would be in the public interest.  *See Scott v. City of Daytona
Beach Fla.*, 689 F. Supp. 3d 1160, 1170 (M.D. Fla. 2023).

As already discussed, the harm that Naples Pride would suffer absent a preliminary injunction would be severe and irreparable.    On the other hand, Defendants would suffer no cognizable injury if the improper restrictions were enjoined.  Defendants "ha[ve] no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Even if the City were required to absorb some additional cost to ensure that Pridefest can take place both securely and without unconstitutional restrictions, the First Amendment wins out.  *See Forsyth*, 505 U.S. at 135-36 ("[R]aising revenue for police services . . . does not justify a content-based permit fee"); *New Century Found. v. Robertson*, 18-cv-00839, 2018 WL 11486932, at *16 (M.D. Tenn. Nov. 5, 2018) ("While it is undoubtedly in the public interest for . . . state parks to be financially self-sufficient, that interest is not commensurate with the public's interest in protecting rights guaranteed by the First Amendment.").

The balance of harms therefore tips sharply in favor of Naples Pride, and an injunction is in the public interest.  *See Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1319 (S.D. Fla. 2014) (finding lack of substantial government interest meant balance of harms favored plaintiff); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) ("The First Amendment, in particular, serves significant societal interests."); *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000) ("The public interest is served by the maintenance of First Amendment freedoms and could not possibly be served by the enforcement of an unconstitutional Ordinance.").

III.    CONCLUSION

For the reasons stated above, Naples Pride respectfully requests that the Court grant its motion for a preliminary injunction and require Defendants to issue Naples Pride a revised permit for Pridefest free of the unconstitutional restrictions challenged here.  *See* Proposed Preliminary Injunction Order.[9]

Dated: April 12, 2025

Respectfully submitted,

   /s/ *Samantha J. Past*

Samantha J. Past (FBN 1054519)
Daniel B. Tilley (FBN 102882)

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2714
spast@aclufl.org
dtilley@aclufl.org

Jonah M. Knobler*
Thomas P. Kurland*
Justin Zaremby*
Maxwell K. Weiss*
Joshua M. Goldman*
Anthony J. Wong*

**PATTERSON BELKNAP WEBB &
TYLER LLP**
1133 Ave. of the Americas
New York, NY 10036
Tel: 212-336-2000
jknobler@pbwt.com
tkurland@pbwt.com
jszaremby@pbwt.com
maweiss@pbwt.com
jgoldman@pbwt.com
awong@pbwt.com

*Attorneys for Plaintiff Naples Pride*
*\*Motions for special admission forthcoming*

---

[9] While courts in this circuit generally require a bond before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), it is within the Court's discretion to waive that requirement.  *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2018).  Because Naples Pride is a nonprofit with very limited resources, *see* Craciun Decl. ¶ 7, constitutional rights of public interest are at stake, and damage to Defendants resulting from a wrongful issuance of a preliminary injunction cannot be shown, Naples Pride respectfully requests that this Court waive the bond requirement here.