## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

NAPLES PRIDE,

      Plaintiff,

v.                                                          Case No. 2:25-cv-00291JES-KCD

CITY OF NAPLES; NAPLES CITY
COUNCIL; TERESA HEITMANN,
TERRY HUTCHISON, RAYMOND
CHRISTMAN, BETH PETRUNOFF,
BILL KRAMER, LINDA PENNIMAN,
and BERNE BARTON, in their official
capacities, as City Council members;
NAPLES POLICE DEPARTMENT; and
CIRO DOMINGUEZ, in his official
capacity as Naples Chief of Police,

      Defendants.

_____/

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendants, CITY OF NAPLES; NAPLES CITY COUNCIL; TERESA HEITMANN, TERRY HUTCHISON, RAYMOND CHRISTMAN, BETH PETRUNOFF, BILL KRAMER, LINDA PENNIMAN, and BERNE BARTON, in their official capacities, as City Council members; NAPLES POLICE DEPARTMENT; and CIRO DOMINGUEZ, in his official capacity as Naples Chief of Police, by and through the undersigned counsel, respond in opposition to Plaintiff's motion, and as grounds therefore state as follows:

1

**Introduction**

The City of Naples takes the safety and security of its special events and the public at large seriously. This is consistent with the Naples Police Department's ("Police" or the "Department") Mission Statement to "protect and serve our citizens, reduce crime, and improve the quality of life."[1] In order to effectuate its Mission Statement, the Naples Police follows a "best practices" approach. (Affidavit of O'Reilly , Ex. 18)  As part of these best practices, the Naples Police maintain accreditation with the Commission for Florida Law Enforcement Accreditation, Inc. (the "Commission"), which requires audits once every 3 years. (Ex 18). In order to maintain its accreditation, the Department must meet the Commission's standards, which include procedures for "Special Operations." Within the category of "Special Operations" are special events. (See Accreditation Standards Manual, Ex 1; Pg. 160).

In addition, with compliance to the Commission's standards for special events, the Naples Police's "best practices" are also guided by the Department of Justice's ("DOJ") Office of Community Oriented Policing Services ("COPS") which has provided its own "best practices" for law enforcement. (Ex. 2; DOJ COPS Guideline Report); as well as the National Tactical Officers Association's Public Order Response and Operations Standards. (Ex 3, NTOA Standards). For example, COPS' guidelines explicitly state that when planning and managing major special events, law enforcement must: "plan for worst-case scenarios," which include, but are not limited

---

[1] *See* Naples Police Department, https://www.naplesgov.com/police (last visited April 27, 2025).

to "extraordinary crimes, *violence by protestors*, and possible terrorist attack." (Ex. 2, Pg. v; 6) (emphasis added). Additional factors include the *security of perimeters*. (Ex. 2, Pg. 33) (emphasis added). These security perimeters are adopted by the Naples Police for their own events, and include an outer perimeter and an inner perimeter.  The Naples Police also utilizes Incident Management System ("IMS") for emergency responses as suggested by the Department of Homeland Security ("DHS"). (Ex. 18).

The Naples Police Tier System is modeled in part after the Department of Homeland Security's own Special Event Assessment Rating (SEAR). (Ex. 5, SEAR Fact Sheet). The FBI operates on a similar model, which uses eight factors to arrive at four Special Event Readiness Levels (SERLs). (Ex. 2, Pg. vii). The eight factors are also relevant to local law enforcement: size of event, threat (including known threats to the specific event); historical, political, or symbolic significance; duration; location; cultural, political, and religious backgrounds of attendees; media coverage; and dignitaries attending. *Id.*

Consistent with these "best practices" and accreditation standards, the Naples Police has its own unit, known as the Special Operations Unit. The Unit is supervised by Special Operations Lieutenant Michael O'Reilly, and encompasses special events, as well as community policing, SWAT, Traffic, and K-9 officers. (Ex. 6, Special Operations Unit Planning Sheet; Ex. 18). When a special event is applied for, Naples Police meet with the event planner and follow the Pre-Event Planning procedure to develop and draft an operational plan for each event. (See Event Plan, Ex. 7; Ex. 18).

3

The concern over public safety both to attendees of Plaintiff's event and the public as a whole is not simply a remote or speculative concern. Recently, Plaintiff's event has prompted calls for death threats, including lynching or the "hanging" of LGBTQ+ individuals associated with Naples Pride.[2] [3] (Death Threat Sign, Ex. 10) These threats have even garnered national media attention[4] and have prompted Naples Police to conduct an ongoing investigation. The threats have not ceased and are as recent as up to the date filing of this response.

Threats to LGBTQ+ events are not simply an isolated concern of the Naples Police. As recently as 2024, the federal government has warned of possible threats to LGBTQ+ events.[5] In a May 2024 report, the FBI and DHS issued a public service announcement providing awareness related to foreign terrorist organizations (FTOs) or their supporters potentially targeting LGBTQIA+ events during Pride Month.[6] Past Pride events nationwide have resulted in mass arrests and disruptions by protestors.[7]

---

[2] *See* Leader of Fringe Political Party Advocates Lynching to Stop LGBTQ+ Pride Event, https://www.splcenter.org/resources/hatewatch/leader-fringe-political-party-advocates-lynching-stop-lgbtq-pride-event/ (last visited April 27, 2025)
[3] *See* Fringe Political Leader Defends Lynching, Calling Violence Against LGBTQ+ Pride 'Acceptable,' https://www.advocate.com/news/extremist-jeffersonian-party-florida (last visited April 27, 2025)
[4] *See* Fringe Political Leader Defends Lynching, Calling Violence Against LGBTQ+ Pride 'Acceptable,'https://www.yahoo.com/news/fringe-political-leader-defends-lynching-105128366.html (last visited April 27, 2025)
[5] See Federal Agencies Warn Of Possible Threats To LGBTQ Events, Including Pride Month Activities, https://www.pbs.org/newshour/politics/federal-agencies-warn-of-possible-threats-to-lgbtq-events-including-pride-month-activities (last visited April 29, 2025)
[6] See FBI Brings Awareness to Safety Resources During Pride Month, https://www.fbi.gov/contact-us/field-offices/detroit/news/fbi-brings-awareness-to-safety-resources-during-pride-month (last visited April 29, 2025)
[7] See Protestors Arrested After Interrupting Pride Parade, https://slmpd.org/protestors-arrested-after-interrupting-pride-parade/ (last visited April 29, 2025)

4

In recent years, some Pride events have even been targeted by organizations that the Southern Poverty Law Center has described as hate groups.[8]

Plaintiff's motion attempts to paint their event as causing no stir in the community and has only prompted the arrest of one protestor in the past. This is not the full picture. Plaintiff's motion minimizes their own role and concern over safety. For years, Plaintiff's own organizer and Executive Director, Cori Craciun, has been in direct contact with officer(s) from the Naples Police Department over what she believed were credible security concerns. Ms. Craciun's own text messages to officer(s) within the Department indicate a consistent fear of threats to her organization, enough so that she felt the need to forward it to officer(s) for review. (See Craciun Text Messages; Ex 4).

Additionally, during the course of past Naples Pride events, event organizers would be in constant coordination with law enforcement over the movements of protestors around the perimeter of the event, which created a constant, ever-evolving security situation, causing officers to constantly monitor and adjust their positions to monitor potential agitators. (Ex. 18) Naples Police have also documented that year-after-year, more and more protestors have appeared outside of Plaintiff's event, with 60-80 in the last year (2024) alone. (Ex. 18)

Additionally, when submitting its application for its 2025 festival, Naples Pride changed the proposed map of the event boundaries to reflect its security concerns.

---

[8]See 31 Patriot Front Members Arrested Near Idaho Pride Event, https://apnews.com/article/coeur-dalene-idaho-government-and-politics-arrests-01fd15f6d3b3bcab9404106c85f673c3 (last visited April 26, 2025)

Initially, Ms. Craciun proposed blocking off one of the streets next to Cambier Park, in order to create a "buffer" between her event and protestors. (Map Changes, Ex. 8). Ms. Craciun was informed that the closure of the street would not be possible. However, the festival map was still altered by Plaintiff to include a larger area than in years past. Proposed (and approved) changes by Plaintiff included moving vendors away from fences/barriers, only one access point, and moving the "kids area" away from the border of the event to avoid potential conflict with protestors standing on the outskirts of the event. (Ex 8, Ex. 9, Final Map)

On July 1, 2023, the City Manager at the time, Jay Boodheshwar, approved a new contract for Naples Police, authorizing a contract raise for off-duty law enforcement personnel that work special event. (*See* Ex. 11, July 23, 2023 Contract Rates). Among the factors that apply to the new contractual terms for officers working special events were qualifiers such as whether the event contemplated more than 2,500 attendees and included alcohol. *Id*. When working with the City to plan its event, Plaintiff was provided an itemized breakdown in costs. (Ex. 12, Cost Estimates). Not only has the cost of police resources gone up from 2023, and applied evenly to all groups that wish to hold a special event, but Plaintiff was informed that *some police resources had not been billed to them in the past*. This was explained to Ms. Craciun. (See Email from O'Reilly to Cori, Ex.13), and reflected in the invoices she received. (*See* Ex. 14, Ex. 15). Given this additional cost, it was no longer fiscally appropriate given the large number of events that take place in Naples each year. (Ex. 13). In essence, in past years, *Plaintiff received city resources for free*. However, some law enforcement

6

resources are provided by the Sheriff's Office, and do not reflect any decision of the Naples Police to impose costs. (Ex. 18).

More to the point, Plaintiff tries to compare its own past event with other past events, and ignores the fact that its preferred comparator – Cars on 5th, has also seen a comparative increase in security fees. (Ex. 16, Cars on 5th Estimate).

The City's best practices approach described above focuses on the location of the event, not the perspective of the event organizer. Each location requires a specific plan by law enforcement in the event of a mass casualty incident – whether it is a mass shooting[9], a vehicle driven into the crowd[10], or a sniper.[11] If Plaintiff chose to have its event at a different location, then this would likely result in a different price for security.

The City of Naples is also not a major municipality. It's population numbers under 20,000 people[12] – smaller than some universities within the State of Florida. Its sworn law enforcement personnel number just 76 officers. An event the size of Plaintiff's – which according to the Plaintiff - attracts potentially 5,000 people or more (Doc. 12-1, Pg. 5, ¶18)., and represents nearly 25% of Naples' population in a compact area in the heart of the City in a public park. The size of Plaintiff's event, combined

---

[9] *See* 3 Hours In Orlando: Piecing Together An Attack And Its Aftermath, https://www.npr.org/2016/06/16/482322488/orlando-shooting-what-happened-update (last visited April 29, 2025).
[10] *See* Super Bowl Honors Victims, First Responders of New Orleans Terror Attack, https://abcnews.go.com/US/victims-responders-new-orleans-terror-attack-honored-super-bowl/story?id=118431018 (last visited April 29, 2025)
[11] See 3 Key Findings On The Trump Assassination Attempt In Butler, https://www.cityandstatepa.com/politics/2024/12/3-key-findings-trump-assassination-attempt-butler/401632/ (last visited April 29, 2025)
[12] *See* Quick Facts Naples City Florida, https://www.census.gov/quickfacts/fact/table/naplescityflorida/PST045223 (last visited April 28, 2025).

with the presence of alcohol, and unique geographical characteristics, present significant challenges to law enforcement when preparing for the safety and security of an event such as this. Indeed, the city council considered the concerns of safety. (Doc. 12-18) (Pg. 24). And the City noted that the costs of security were being applied to everyone, not just Naples Pride. (Doc. 12-18, Pg. 24).

## ARGUMENT

### I. Standard

Federal Rule of Civil Procedure 65(b) states that a temporary restraining order or injunction may issue if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant." Fed. R. Civ. P. 65(b). A party seeking such an order must establish that: (1) there is a substantial likelihood that the moving party will prevail on the merits; (2) the moving party will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs the threatened harm the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001).

A preliminary injunction in advance of trial is an extraordinary and drastic remedy," and it may not be granted unless the movant "clearly established the burden of persuasion as to the four requisites.'" *ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F. 3d 1177, 1198 (11th Cir. 2009).

### II. Defendants Are Immune from Suit

8

As a threshold matter, Plaintiffs cannot bring an official capacity claim against all Defendants. This is the equivalent of suing the City itself. "[N]either a State nor its officers acting in their official capacities are 'persons' under section 1983." *See Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). Section 1983 suits against officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent," not against the officer individually. *Kentucky v. Graham*, 473 U.S. 159, 165, (1985) (*quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, (1978)). As long as the entity received notice and the opportunity to respond, an official capacity suit imposes liability only on the entity. *Graham*, 473 U.S. at 166. The *Graham* Court further proclaimed, 473 U.S. at 167 n.14, 105 S.Ct. 3099: "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* ... local government units can be sued directly for damages and injunctive or declaratory relief." Thus, Defendants respond herein as "The City" or "City."

## III.  Plaintiff Is Not Likely to Succeed on the Merits

Plaintiff's motion is not related to whether they can have their festival – they can. As the Plaintiff has provided to the Court, the City has already approved – and takes no issue with whether the festival occurs. Additionally, Plaintiff's motion is not related to whether the City has outright banned Plaintiff's planned drag performance – they can. Again, the City has already approved the performance. The motion, and thus the dispute, is related to *location* of the performance and its age restriction.

### a. *Cambier Park is a Limited Public Forum*

The First Amendment does not guarantee access to property just because it is owned by the government, and it does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) (citations and quotations omitted); see also *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 131 (1981) ("[T]he mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted.")  The government, like any private landowner, may preserve the property under its control for the use to which it is lawfully dedicated. *Id.* at 1231 (citations and quotations omitted). The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

In order to determine the extent to which a person has a right to free speech on government property, courts engage in a three-step analysis. First, a court must determine whether the speech is protected under the First Amendment. *Parkland Republican Club v. City of Parkland*, 268 F.Supp.2d 1349, 1352–1353 (S.D.Fla.2003) (*citing Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797, (1985)). Second, the court must determine the nature of the relevant forum, which in turn determines the extent to which the government may limit access to the

forum. *Id.* Third, the court must determine whether the justifications proffered by the government for limiting access to the forum satisfy constitutional standards. *Id.*

"Courts use 'forum analysis to evaluate government restrictions on purely private speech that occurs on government property.'" *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) (*quoting Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250, (2015)). There are several different forums – traditional public forums, designated (or limited) public forums, and nonpublic forums. *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018); *McDonough v. Garcia*, 116 F.4th 1319, 1325 (11th Cir. 2024).

Cambier Park is owned by the City. Plaintiff asserts that Cambier Park is a traditional public forum. But Cambier Park is not a park in the traditional sense. Traditional public fora are those places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n*, 460 U.S., at 45. Public streets and parks *normally* fall into this category. *See Hague v. CIO*, 307 U.S. 496, 515 (1939) (emphasis added). However, "Context matters in forum analysis." *Wright v. Incline Village General Improvement Dist.*, 665 F.3d 1128, 1136 (9th Cir. 2011). Simply because government owned land is open to the public does not make it a traditional public forum. *See e.g., Keister v. Bell*, 29 F. 4th 1239, 1255 (11th Cir. 2022) ("if government ownership were the deciding factor, then we would not need to perform forum analysis to differentiate among different types of government property").

The public accessibility or use of a forum doesn't automatically convert government property into a traditional public forum. In fact, the Supreme Court has stated the same. *See Greer v. Miller*, 424 U.S. 828 838 (1987); *U.S. v. Kokinda*, 497 U.S. 720, 728 (1990).

> In defining the relevant forum, the Supreme Court has stated that:
>
> [F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property.... In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property.
>
> *Cornelius,* 473 U.S. at 801.

Examples of this more "tailored approach" include *Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974), in which a political candidate sought to display a campaign advertisement on a city-owned bus and the Supreme Court defined the relevant forum as the advertising space on the bus, and *Perry,* where the Supreme Court defined the forum at issue as an interschool mail system and teacher mailboxes that a teacher group sought access to. *Perry,* 460 U.S. at 39.

Here, Cambier park contains multiple facilities and amenities, including the Norris Community Center and Shuffleboard, Bocce, and Basketball Courts. There is also a Bandshell, playground, and a covered pavilion.[13] Plaintiff's event for 2025 contemplates the use in whole or in part, of several of these structures. (Ex. 9). At best,

---

[13] https://www.naplesgov.com/parksrec/park/cambier-park (Last Accessed April 27, 2025).

Plaintiff can point to the grassy area in the center of the park as an area that is a traditional public forum, but Plaintiff wishes to utilize more than just a grassy knoll and, most importantly, control access to the event. (Ex. 17).

### b. *Plaintiff's Festival is a Limited Public Forum*

Because Plaintiff wishes to have a private ticketed event with clearly delineated borders, Plaintiff's festival changes the use of the park and is better described as a limited public forum. In order to transform a traditional forum into a more limited one, there must be some sort of visible, meaningful distinction setting the event apart from the venue on which it is held. There must be a change in the "nature," "use," "characteristics," "purpose," or "function" of the forum. *Bloedorn*, 631 F.3d at 1233–34.

Moreover, the major motivating purpose of Plaintiff's event is for financial gain and is its "largest fundraiser." (Doc. 12-1, Pg. 3, ¶ 9; Pg. 5, ¶ 18; Pg. 7-8, ¶ 30). Even if the remainder of the park may then remain a traditional public forum, Plaintiff's event is a private, ticketed event, whose primary purpose is to serve as a venue for commercial activity and the expression of the attendees whose message is consistent with the Plaintiff. Plaintiff naturally would not want protestors or individuals with viewpoints contrary to their own to enter the event. And Plaintiff's own understanding of their event reflects their ability to exclude those with contrary viewpoints. "[I]f the ability to exclude others from public property during the course of a limited, permitted use were found to be a constitutional violation, every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to

13

constitutional scrutiny." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir.2008).

Naturally, due to the exclusive, limited purpose of Plaintiff's event, the forum changes from a traditional public forum to a limited public forum. This is consistent with the Supreme Court's definition in *Rosenberger*. *Rosenberger* explained that in a "limited public forum"—one created "for certain groups or for the discussion of certain topics." 515 U.S. at 829.

The City's ability to create limited public forums out of traditional public forums is not without legal precedent. In *People for the Ethical Treatment of Animals v. Giuliani, NYC 2000,* 105 F.Supp.2d 294, 319 (2000). The Southern District of New York held that the City of New York created a nonpublic or limited public forum when it limited access to, and the expressive content of, painted fiberglass cows that were displayed throughout the five boroughs of New York City as part of a "cow parade." In *Giuliani,* the court undertook a lengthy discussion of the law concerning traditional public forums and First Amendment rights. *Id.* at 311–20. It recognized that streets and parks are generally open to all members of the public, and that the First Amendment requires that strict scrutiny be satisfied to justify restrictions on speech in such a forum. *Id.* at 314.

The court went on to state, however, that:

[W]here the government, in order to serve legitimate purposes, *carves out, within traditional public forum property, a portion of space not open to the general public, either specifically or incidentally limiting some expressive activities to particular speakers or subjects*, the [Supreme] Court has recognized the

14

> resulting forum as a nonpublic forum where regulation of speech is subject to a lower grade of First Amendment review.

*Id.* (Emphasis added).

Most importantly, the *Giuliani* court noted the competing interests between the plaintiffs who sought general access to traditional public places and the City of New York's interest in exercising control over its public property. *Id.* at 312. The court noted that in cases where these two competing interests have met head on the Supreme Court has endeavored to reach an equilibrium that "promote[s] broad public access for expressive purposes, while at the same time allowing government discretion to achieve the purposes for which public properties are intended in light of the various conflicting interests that often simultaneously compete for their use." *Id.* at 312–13. The *Giuliani* court further noted that even in traditional public forums not all property is accessible to all persons for all expressive activities. *Id.* at 315.

The *Giuliani* court found that the First Amendment does not command such a limited view of the government's authority to control its property that it cannot create a limited public forum out of a traditional public forum. *Id.* To adopt such a ruling, the court stated, would create an "all-or-nothing choice" for the government that would lead it to refrain from undertaking expressive activities which would curtail the expressive rights of the many in the name of the few. *Id.* at 315–16.

The Supreme Court has raised the same concern as well. In *Lehman v. City of Shaker Heights,* where the Court upheld a ban on political advertising on city-owned buses, the Court stated that "[w]ere we to hold to the contrary, display cases

in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Lehman,* 418 U.S. at 304.

Florida's federal courts have ruled similarly. In *Parkland Republican Club v. City of Parkland*, 268 F.Supp.2d 1349, 1356 (S.D. Fla. June 4, 2003), the court agreed with the reasoning of the *Giuliani* court that the First Amendment does not command such a limited view of the City's authority to control its public property that it cannot temporarily reserve a portion of what is a traditional public forum for limited expressive purposes. At issue in *Parkland Republican Club* was whether a local Republican club could join a parade that allowed marching bands, youth and civic organizations, but excluded political organizations. *Id*. at 1351. The Court concluded that Parkland could do so - finding that the parade itself, not the street, was the forum at issue. *Id*. 1357. If the City of Parkland were so limited, it could never use public property for any event or purpose of a limited scope without proffering a compelling state interest. *Id*; *Giuliani,* 105 F. Supp. 2d at 315. The inevitable result would be that every public facility would, again, become a "Hyde Park[ ] open to every would-be pamphleteer and politician." *Parkland*, 268 F. Supp. 2d at 1356; *Lehman,* 418 U.S. at 304.

Therefore, Parkland could not sponsor a jazz festival in a park without having to allow a heavy metal, punk rock, or disco group the opportunity to perform as well. *Parkland*, 268 F. Supp. 2d at 1357. Such a result ignores the City's interests in exercising

control over its public property and achieving certain limited purposes in the face of the conflicting interests that compete for the use of public property. *Giuliani,* 105 F.Supp.2d at 312–13. The Court in *Parkland Republican Club* found that leaving the City with such an "all-or-nothing choice" would be detrimental to the expressive rights of the many and is not warranted by the Constitution. *See Lehman,* 418 U.S. at 304. This Court should follow the guidance of *Giuliani* and *Parkland*, and determine that Plaintiff's event is a limited public forum.

Finally, the Sixth Circuit, in *Sistrunk v. City of Strongville*, 99 F.3d 194 (6th Cir. 1996) also concluded that the government could grant an exclusive use permit for a private event to the exclusion of all others.

### c.  *The Bandshell is also a Limited Public Forum*

Assuming *arguendo* that the Court finds that the festival ground is traditional public forum. The bandshell Plaintiff seeks to use certainly is not. The use of the bandshell is separate from that of a "festival." The mere fact that the City owns a bandshell in a park does not mean that the stage is open to the public for any and all purposes. *See e.g.*, *Gilles v. Blanchard,* 477 F.3d 466, 469–70 (7th Cir.2007).  That the "Justice Department in Washington has a large auditorium, with a stage, and so would be a suitable venue for a theatrical production" does not compel the conclusion that the First Amendment requires the Justice Department to make that space available to the public for that purpose"). A bandshell can hardly be a place that traditionally has been maintained by governments for the open access of the public for free assembly and the open exchange of ideas.

### d.  Limited Public Forums are Entitled to a Lower Level of Scrutiny

In a limited public forum, the government "is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). In a limited public forum, the City's decision on any time, place, and manner restrictions made on expressive activity need only be viewpoint neutral and reasonable; and the restriction need not "be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808. The regulation is constitutional so long as it is "reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n,* 460 U.S. at 49. Restrictions "on the subject matter of the speech, on the identity or status of the speaker," and "[on] access for reasons of manageability or the lack of resources" may all be reasonable. *See Victory Through Jesus Sports Ministry Foundations v. Lee's Summit R-7 School Dist.*, 640 F.3d 329, 335 (8th Cir. 2011). The government may impose content-based restrictions on speech as a means of "avoiding controversy that would disrupt" the forum. *Cornelius,* 473 U.S. at 809.

Here, the purpose of the limited forum is Naples Pride's intention to host a festival and raise funds in a safe manner. In applying this level of scrutiny, there is a distinction drawn by the Supreme Court between content discrimination, which is *permissible* if it preserves the purpose of the limited forum, and viewpoint discrimination. *Cornelius, 473 U.S.* at 830.  In placing limits on the forum, the government cannot engage in viewpoint discrimination, but it can engage in content discrimination to preserve "the purposes of that limited forum." *Id.* at 829–

30. The difference between viewpoint discrimination and content discrimination is, at times, " 'slippery.' " *Iancu v. Brunetti*, 139 S. Ct. 2294, 2313 (2019) (Sotomayor, J., concurring in part). "Content discrimination occurs whenever a government regulates 'particular speech because of the topic discussed or the idea or message expressed.' " *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163, (2015)). Viewpoint discrimination occurs whenever a government targets "particular views taken by *speakers* on a subject." *Rosenberger*, 515 U.S. at 829 (emphasis added).[14]

Again, the only issue presented is the location of the drag show and its attendant age restriction – not whether Plaintiff is permitted to have a drag show or a festival. The purpose of the forum is the safe and efficient function of a festival, much like the operations of a carnival or state fair. Consistent with Plaintiff's own motion,[15] the drag show (and its messages) belongs to the same class as any other attendees within the forum. Moreover, the City does not know who the performers are at Plaintiff's event or what their individual music tastes, dance moves, speech, or costumes entail. Plaintiff provides no evidence to assert the contrary. The City's restriction on the location of the drag show does not reflect any choice based on viewpoint but on reasonable calculations made due to safety and resources.

---

[14] Plaintiff suggests that the decision to move the event was enacted by members of the council with illicit motives; however, "the search for the 'actual' or 'primary' purpose of council's decision is likely to be elusive," because "individual legislators may have voted for the statute for a variety of reasons." *Michael M. v. Superior Ct.*, 450 U.S. 464, 469-70 (1981). "Inquiries into congressional motives or purposes are a hazardous matter," and the "Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. "U*nited States v. O'Brien*, 391 U.S. 367, 383 (1968). Importantly, courts look to the law's stated "justification for the government regulation," not isolated "statements" by legislators purportedly showing "an illicit motive in enacting the law." *Erie v. Pap's A.M.*, 529 U.S. 277, 292- 95 (2000); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citing *United States v. Eichman*,496 U.S. 310, 314-15 (1990) (looking to the government's "asserted interest")).
[15] (Doc. 12, Pg. 9).

###### e. *The Location of the Drag Show is Based on Realistic Security Concerns*

Since the drag performance belongs to the same class as the festival's attendees, the movement of the show does not reflect any viewpoint – merely the location of one forum of conduct within the forum as a whole. This can be done for safety considerations. It has been firmly established as a matter of law that a state may regulate the use of its parks and streets for the protection of the public health, safety, and welfare. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, (1980). The caselaw makes clear that public safety and security are significant government interests. *See, e.g.*, *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376, (1997) (holding that ensuring public safety and order is a significant governmental interest); *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) (noting the "significant public interests in the maintenance of public safety, security, and order, including the physical protection of rally participants, spectators, passers-by, and law enforcement personnel" at a rally). Plaintiff cannot contest this general principle.

Plaintiff's motion attempts to assert that there is no credible threat to justify the imposed restrictions. But assuming *arguendo* a decision was made due to viewpoint - the government is permitted to craft restrictions relying on past experience and potential threats. *See Reform America v. City of Detroit*, 542 F. Supp. 3d 628, 640 (E.D. Mich. June 1, 2021); *see also See Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8, 13–14 (1st Cir. 2004) ("We do not believe a per se rule barring the government from using past experience to plan for future events is consistent with the approach adopted in the

Court's time-place-manner jurisprudence."); *Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012) ("Because security protocols exist to deal with hypothetical risks"—and "security planning is necessarily concerned with managing potential risks, which sometimes necessitates consideration of the worst-case scenario—it is appropriate for governments to consider possible security threats and the role that protesters may play in causing such threats or inadvertently preventing the authorities from thwarting or responding to such threats." (internal quotations omitted)). Nor can law enforcement ignore trends in violence or the world as it is. For example, in 2025 alone there have been at least 84 mass shootings in the United States.[16]

In cases involving other high profile or controversial events, courts have repeatedly acknowledged that these types of events inherently create significant security concerns, even when there are *no known specific threats. See, e.g.*, *Citizens for Peace in Space v. City of Colo. Springs,* 477 F.3d 1212, 1223 (10th Cir. 2007) ("Here, the security zone directly advanced the City's interest in keeping explosives away from the NATO conference because it limited access near the [conference site] to identified and screened individuals who were less likely to pose any threat to the delegates."); *Bl(a)ck Tea Soc'y,* 378 F.3d 8, 12 (1st Cir. 2004) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Nat'l Council of Arab Americans v. City of New York,* 331 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("[T]his Court cannot blind itself to

---

[16] https://www.gunviolencearchive.org/reports/mass-shooting (last visited April 26, 2025).

the daunting security concerns facing [New York City] during the [2004] Republican National Convention."); *Coal. to Protest Democratic Nat. Convention v. City of Bos.*, 327 F. Supp. 2d 61, 77 (D. Mass.), *aff'd sub nom. Bl(a)ck Tea Soc'y v. City Of Bos.*, 378 F.3d 8 (1st Cir. 2004) (reasoning in the context of the Democratic National Convention that "We have come to a point where it may be anticipated, at this and similar national security events, that some significant portion of the demonstrators, among those who want the closest proximity to delegates or participants, consider assault, even battery, part of the arsenal of expression. And as a consequence, those responsible for event safety must plan for violence.").

Law enforcement must plan for every contingency. Plaintiff themselves admit the event can approach nearly 5,000 attendees. (Doc. 12-1, Pg. 5, ¶18). And the Supreme Court has made plain that when a "clear and present danger" of disorder or other "immediate threat to public safety" appears, "the power of the state to prevent or punish is obvious." *Cantwell v. State of Connecticut,* 310 U.S. 296, 308 (1940). No court has ever recognized a First Amendment right that is so absolute that it can stymie police efforts to cope with highly volatile situations.

Plaintiff's reasons for moving the drag show indoors in 2023 were voluntary and reflected their own concerns of safety and security of their event, and Florida's state law. (Doc. 12-1, Pg. 6, ¶24-25, Pg. 7, ¶28; Pg. 8, ¶35; Doc. 12-18, Pg. 10 (33:4-6)). In addition, the Council's comments reflect a serious concern about the safety of the event. For example, Councilwoman Petrunoff's primary concern was about the security of the event and actual threat of lynching. (Doc. 12-18, Pg. 27(104-108).

As Plaintiff points out, the show is its main feature, and they associate it with attracting guests to their festival. This also it makes it a likely target for any attack. The decision of the City to keep the drag show indoors in order to protect the performers, attendees, including children, and City proper is a legitimate security concern in light of Plaintiff's event attracting ever greater numbers of protestors, the threats of violence, and the City's limited resources. This concept is known as "target hardening" and is well known in public safety circles.[17] The Naples Police considers target hardening a necessary given the recent terror attack in New Orleans.[18] (Ex 18).

### f. *The Location of the Drag Show is not a Heckler's Veto and Content Neutral*

Additionally, Plaintiff mischaracterizes the City's concern over safety as a heckler's veto. As stated above, state's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." *Heffron v. International Soc. For Krishna Consciousness, Inc,* 452 U.S. 640, 650 (1981)., (internal quotation marks omitted); *see also Thomas,* 534 U.S. at 323, ("Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties ....") (internal quotation marks omitted). Furthermore, "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light

---

[17] *See* The Balancing Act: How Soft Targets Can Attract Guests While Discouraging Attacks, https://www.asisonline.org/security-management-magazine/articles/2024/03/site-hardening/soft-target-balancing-act/ (last visited April 29, 2025)

[18] *See* Super Bowl Honors Victims, First Responders of New Orleans Terror Attack, https://abcnews.go.com/US/victims-responders-new-orleans-terror-attack-honored-super-bowl/story?id=118431018 (last visited April 29, 2025)

of the characteristic nature and function of the particular forum involved." *Heffron,* 452 U.S. at 650–51, (finding that "[t]he flow of the crowd and demands of safety are more pressing in the context of" a *state fair* than of a public street) (emphasis added). And, in making this analysis, government entities may focus not just on ensuring the safety of the community, but also on *protecting the safety of the speaker himself. See Bloedorn,* 631 F.3d at 1239.  As the Eleventh Circuit noted in *Bloedorn*, it is appropriate to consider the "attributes" of the forum – its "outdoor location" "highly trafficked area" with "limited number of security personnel." *Id.*

As mentioned *ad nauseum* above, Plaintiff's event is not a traditional public forum and does not share characteristics with events designed solely for the conferral of ideas. The primary focus of Plaintiff's event is to raise of funds and host a festival. Part and parcel to this event is the desire to sell and serve alcohol and provide for vendors. The drag show is incidental to festival's primary purpose and intended audience.

In rendering its decision, this Court should look to and follow the guidance of the United States Supreme Court in *Heffron v. International Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640 (1981). The question before the Court in *Heffron* was whether it was a violation of the First Amendment when a religious organization wanted to disseminate religious literature and solicit donations at a state fair *anywhere* they pleased, when they had been assigned a specific location in the fair – even though this application limited the religious practices of the organization. *Id.* at 642.

24

In explaining its reasoning, the Court noted that the principal justification asserted by the State in support of its rule limiting speech location was the need to "maintain orderly movement of the crowd given the large number of exhibitors and persons attending the fair." *Id*. at 649. Similar to the festival in the instant matter, Minnesota's fair "confined individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions…" *Id*. at 650. Additionally, because the fair attracted large crowds, it was a "substantial consideration" that the State had an interest in the "orderly movement and control of such an assembly of persons." *Id*.

The Court also noted that the State has a valid interest in protecting the "safety and convenience" of persons using a public forum, and is considered a valid government objective. *Id*. Further, consideration of a forum's "attributes" is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved. *Id*. at 650-51.

Similarly, the drag show is not denied access to the festival nor may it be prohibited from conducting its activity within the forum – but it must do so in a place that is best designated by the City as a secure area.

### g. *The Imposition of a Security Fee is not a Heckler's Veto*

Given the complex logistics, expected attendance, the history of Plaintiff's desire for security, Plaintiff's concern for attendees, anticipated protestors, strain on City resources, and the continued need to provide essential public safety services to

the public at large - the imposition of a security fee is rational, logical, and viewpoint neutral. It is not tailored to any viewpoint of the Plaintiff, but to the location and logistics of Plaintiff's event.

A city *may* charge a cost-based fee for the burden on public services from an event. *See Cox v. State of New Hampshire*, 312 U.S. 569, 576–77 (1941). Further, in determining the personnel, resources, and costs needed for public safety and convenience (and in determining whether a permit should issue), the government may properly consider the professional judgments of police and other officials about the personnel, resources, and costs needed for public safety and convenience, including for traffic control and clean-up. *See Sullivan v. City of Augusta*, 511 F.3d 16, 37 (1st Cir. 2007). The city's assessment of the services required for an event may reasonably vary. "Parades and marches obviously vary enormously in terms of size, timing, duration and location, resulting often in quite different traffic control needs." *Id.* at 36. "[A] concern with the burden on public services that parades and other open-air assemblies impose ... would be entirely legitimate and would permit the charging of a cost-based fee." *Church of American Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) (citing *Cox* and other cases). [F]ees based upon a sliding scale considering the anticipated attendance of the festival are not content-based but, instead, are reasonably related to the expenses of policing the activities in question." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1321 (11th Cir. 2000)("CAMP").

Plaintiff's motion focuses – on one thing – themselves. It ignores or willfully disregards any evidence that suggests that the City's security fee is not tailored to any "viewpoint" of the Plaintiff, and relies on the subjective interpretation of the Plaintiff's organizer and attorney. Moreover, it ignores the previous comments of Ms. Craciun herself. At the January 15, 2025 council meeting, Plaintiff's executive director, Cori Craciun, stated that they did *not* accuse the City, vis-a-vis its police, of discrimination. (Doc. 12-18, Pg. 9, Pg. 9 (29:18-19)). Now, just months later, Plaintiff has changed its mind, filed a lawsuit, and accused the City of discriminating against its viewpoint.

Plaintiff hangs its hat on two cases – *Walsh* and *Forsyth*. But both are distinguishable for very clear reasons. Cambier Park and Plaintiff's event are not traditional public forums. For example, *Walsh* and *Forsyth* involved demonstrating through the public streets and conducting an assembly or parade. *Walsh* involved political speech over the issue of nuclear arms – which the Eleventh Circuit noted was the type of speech which is constitutionally protected in the highest order. *Id.* Forsyth involved the anticipated reaction that the Nationalist's Movement's rally would have on any other passerby from the rally on the courthouse steps. *Forsyth*, 505 U.S. at 127.

Additionally, cases involving a "heckler's veto" contemplate silencing speech in its entirety. Naples Pride's speech has not been silenced, so a heckler's veto is an inappropriate analogy in the present matter. Naples Pride's festival is a private event, and thus the intended "audience" are not outside heckler's but attendees of the festival itself. There is no "hostile crowd" within the festival. As a limited public forum

designed to host the speech of its attendees and performers, Plaintiff cannot claim that the security issue is tailored to any one viewpoint or in response to a proposed hostile reaction from the crowd – they can exclude anyone they please that they disagree with.

Because the forums at issue in *Walsh* and *Forsyth* were traditional public forums, the scrutiny used to evaluate the forums was strict scrutiny. Plaintiff wishes to use a traditional public forum and convert it into a private event to raise funds, sell alcohol, and host vendors, which is more akin to commercial activity. As such the City's decisions regarding the use of its land are not subject to strict scrutiny. It can thus make reasonable content neutral decisions regarding the proper use of the land, including safety. The City has no obligation to simply turn a blind eye when anticipating the impact that Plaintiff's event will impose both in terms of attendance and its location as a target for criminal elements.

Regulations that are justified for reasons independent of the content of the speech they affect are subject to less stringent review that is more deferential to the government. This is because "[c]ontent-neutral regulations do not pose the same inherent dangers to free expression that content-based regulations do." *Turner Broadcasting System, Inc. v. F. C.C.,* 520 U.S. 180, 213, (1997) (internal quotes and cites omitted). Thus, the government is granted more latitude in designing a regulatory solution to perceived problems. *Id.*

In determining whether a restriction is content-neutral, a court focuses upon the government's purpose in imposing the restriction, not the effect that the restriction has

upon a given speaker. *Ward,* 491 U.S. at 791. If the justification for the restriction does not pertain to the content of the regulated speech, then the restriction is considered content-neutral. *Id.* A content-neutral regulation is permissible, even though it may operate to affect only certain speakers but not others. *Id., citing Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48 (1986) (regulation of only those movie theaters that specialized in adult films was content-neutral; even though regulation was *defined* by the content of the theater-owners' speech, the *justification* for the regulation was the "secondary effects"—increased crime and reduction of property values—that flowed from such speech); *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 763, (1994) (conduct-based injunction that tended to affect people with a particular viewpoint does not itself render the injunction content-or viewpoint-based).

Payment for appropriate security for a large event is not unlike the liability insurance requirements imposed by the City of Atlanta in *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). There, the Eleventh Circuit found that the insurance requirement, like the issue of security fees in the instant matter, is the least restrictive method to further the goal of public safety. *Id*. at 1238.

Here, the only concern related by the Plaintiff reflects concerns over lost income and the projected size of their message, not that they may not speak at all or that their message will not reach its intended audience. These are ancillary, secondary effects and it does not override the City's subject matter expertise on proper event security.

### h. *The Location of the Show Still Survives Strict Scrutiny*

Even if the Court determines the City's change of location is a decision subject to strict scrutiny, the location change is still a reasonable time, place, and manner restriction. "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799. "[T]he regulation need not be the least restrictive or least intrusive means of promoting a substantial government interest, nor is there any stringent duty of calibration." *Lexington H-L Services, Inc. v. Lexington-Fayette Urban County Government*, 879 F.3d 224, 229 (6th Cir. 2018) (internal quotations omitted). "There must be a sufficient basis – more than mere speculation or conjecture – to demonstrate that the restriction will further the governmental interests." *Id.* at 228. (internal quotation omitted). "In all but the most 'exceptional case' ... 'the requirement of narrow tailoring is satisfied so long as the substantial government interest would be achieved less effectively absent the regulation.' " *Id.* at 229 (quoting *McCullen*, 134 S.Ct. at 2535-37 and *Ward*, 491 U.S. at 799.

It is undisputed that the City has a substantial interest in protecting the safety of the patron and the public as a whole. As a matter of common sense and logic, an outdoor performance is less secure and more susceptible to a violence incident than an indoor one.

### i. *Age Restriction is Justifiable in Light of Uncertainty in the Law*

Alternatively, the City was and is also required to limit the permit of Naples Pride given the uncertainty in the law. As Plaintiff pointed out the Middle District, in *HM Florida-ORL, LLC v. Griffin,* 679 F.Supp.3d 1332,1335 (M.D. Fla. June 23, 2023) recently determined that Florida Statute - Fla. Stat. § 827.11—which prohibits any person from knowingly admitting a child to an "adult live performance" was overbroad. *Id.* at 1344. However, the preliminary injunction was *only* granted to Plaintiff and against Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation. *Id.* at 1345.

There is a concern, given the state of the law as it is, that the City or its employees are susceptible to prosecution if the permit is granted. "Federal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson,* 141 S. Ct. 2494, 2495 (2021) (*citing California v. Texas,* 593 U.S. 659, 672 (2021)); and the law may remain binding as applied to Naples. As such, the State, or the State Attorney, is an indispensable party to this action that the Plaintiff has not joined. This case should stop there until the indispensable party is joined in the matter. In determining whether a party is indispensable, a district court may base its findings "on stated pragmatic considerations, especially the effect on parties and on litigation." *In re Torcise,* 116 F.3d 860, 865 (11th Cir.1997)

### j.   *City's Permit Process is Content Neutral and Reasonable*

"The Supreme Court has expressed disfavor for facial challenges because they 'often rest on speculation' and 'raise the risk of premature interpretation of statutes on

the basis of factually barebones records.' " *Sons of Confederate Veterans, Inc. v. Atwater*, 2011 WL 1233091, at *7 n.13 (M.D. Fla. Mar. 30, 2011) (Antoon, J.) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

The City's permit process is a content neutral time place and manner restriction. It does not target communicative activity per se, but all activity that is conducted within a public park. Consequently, the analysis set forth by the Supreme Court in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002)    applies.    In *Thomas*,    the Supreme Court reviewed an ordinance that required individuals to obtain a permit before "conduct[ing] a public assembly, parade, picnic, or other event involving more than fifty individuals" or engaging in an activity such as "creat[ing] or emit[ting] any Amplified Sound." *Thomas*, 534 U.S. at 318. Upon examining the law, the Supreme Court found that it was "not even directed to communicative activity as such, but rather to *all* activity conducted in a public park." *Id.* at 322 (emphasis in original). Thus, the Supreme Court determined that the ordinance amounted to a content-neutral time, place, and manner restriction. *Id.* at 323.

In order to survive scrutiny, the Supreme Court held, the content-neutral time, place, and manner restriction embodied in the *Thomas* ordinance had to "contain adequate standards to guide the official's decision [regarding whether to issue a permit] and render it subject to effective judicial review." *Id.* Additionally, *Thomas* appears implicitly to reaffirm that content-neutral time, place, and manner restrictions must (1) not be based on the content of the message, (2) be narrowly tailored to serve a

significant governmental interest, and (3) leave open ample alternatives for communication. *Id.* at 323 n.3

The City's permit process is analogous. The City's Special Events Manual ("Manual") states that "festivals" and "carnivals" require a special event permit. (Doc. 12-20, Pg. 4). The Manual also provides that an event requires city council approval if it contemplates the following content-neutral considerations: street closings, off-site parking, amplified entertainment, city co-sponsorship, crowd attendance in excess of 1,500, and fireworks. *Id.* Plaintiff's event contemplates nearly all of these considerations. Once reviewed, the Special Events Committee makes a recommendation to the City Council based on these guidelines. *Id.* at ¶4. Contrary to Plaintiff's assertion, the Manual defines "impact on the community" on objective criteria – the number of participants. *Id.* at Pg. 6.

The First Amendment's protections are not absolute, however, since First Amendment right must be harmonized with the "existence of an organized society maintaining public order without which liberty itself would be lost...." *Cox v. State of New Hampshire,* 312 U.S. 569, 574 (1941). The Supreme Court went on to say in *Cox* that regulating the use of the public streets and restricting the use of highways to promote the public convenience, "cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection." *Id.* at 574. The Court thus upheld in *Cox* a municipality's right to require marchers to obtain a license and pay a fee (not more than $300, at the time) before parading on public

streets. The Court stated that "the question in a particular case is whether ... [the City's] control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.*

As a matter of common sense and logic, the Manual designates the Naples Police as the "primary subject matter experts on the safety and security for all events in the City of Naples." (Doc. 12-20, Pg. 7). That Plaintiff criticizes this point is surprising. It certainly begs the question – if the local police are not in the best position to evaluate the safety and security of an event in their jurisdiction, then who would be? Plaintiff proposes no alternative.

While Plaintiff attempts to connect the "unfettered discretion" of *Forsyth* to the instant matter, but the Manual clearly lays out that any event organizer must provide a security plan. *Id.* at Pg. 7. When a special event is applied for, Naples Police meet with the event planner and follow the Pre-Event Planning procedure to develop to draft an operational plan for each event. (See Event Plan, Ex ). Such a procedure is not without legal precedent. The City's permit process also provides an extra layer of review on First Amendment grounds in the event a special event permit application is denied. *See* Naples, Fla., Code of Ordinances §2-167 et seq. Plaintiff did not take advantage of this process.

In determining the personnel, resources, and costs needed for public safety and convenience (and in determining whether a permit should issue), the government may

properly consider the professional judgments of police and other officials about the personnel, resources, and costs needed for public safety and convenience. *See Sullivan v. City of Augusta*, 511 F.3d 16, 37 (1st Cir. 2007). The court in *Sullivan* also noted that there was "no evidence that there exists any meaningful advance 'formula' that could be inserted in an ordinance to determine the number of needed officers and vehicles in a given case … and parades and marches obviously vary enormously in terms of size, timing, duration and location…" *Id*. Just as the plaintiffs in *Sullivan*, the Plaintiff here presents no example of the sort of 'formula' to properly address safety and logistical concerns for a 5,000 person event - or any other event.

*Sullivan* conclusively held that the police may make "professional judgment[s]" on how to "calculate the costs of traffic control and clean up." *Id*. at 37. These "professional judgments" particularly in regards to "public safety and convenience are paradigmatically permissible considerations in the issuance of permits." *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 26 (1st Cir. 2002). And judgments about public safety are inherently within the competence of permitting officials. *Id*. As a result, given the unique security considerations with planning a large event, the City's permit is reasonable and leave open alternatives for communication.

## IV.    The Other Equitable Factors Favor the City

### a. *Plaintiff Cannot Establish Irreparable Harm*

Plaintiff cannot demonstrate irreparable harm. For one, Plaintiff's claim lacks merit – Plaintiff wishes to have a purely private event, a limited public forum, and

wishes to exercise exclusive control over the City's reasonable restrictions on security and resources. Moreover, because the drag show element of Plaintiff's event contains the same class of speakers – the focus is content and where the content is located – Plaintiff can still have the festival and its performance regardless.

### b. *The Equities Favor Denying Injunctive Relief*

The remaining factors – harm to the opposing party and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors also favor Defendants. Generally, where "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). This point is important because the City has attempted to provide appropriate security measures to protect the safety and well-being of its community, both event attendees and the public-at-large. Moreover, the guideline that courts "should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction" should be especially prominent where the public consequence includes legitimate security concerns from both the Plaintiff and the City. *Winter v. Nat. Res. Def. Counsil*, 555 U.S. 7, 24 (2008). Just as the First Circuit recognized in Sullivan, this Court should properly consider the professional judgments of police and other officials about the personnel, resources, and costs needed for public safety and convenience. *See Sullivan v. City of Augusta*, 511 F.3d at 37.

### CONCLUSION

36

Wherefore, Defendants respectfully request this Court deny Plaintiff's motion for preliminary injunction and enter judgment in favor of Defendants.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF on this 30th day of April, 2025, to: Samantha J. Past, Esquire, Daniel B. Tilley, Esquire, **AMERICAN CIVIL LIBERTIES, UNION FOUNDATION OF FLORIDA,** 4343 West Flagler Street, Suite 400, Miami, FL 33134, spast@aclufl.org; dtilley@aclufl.org; Anthony J. Wong, Esquire, Daniel B. Tilley, Esquire, Jonah M. Knobler, Esquire, Joshua M. Goldman, Esquire, Justin Zaremby, Esquire, Maxwell K. Weiss. Esquire, Thomas P. Kurland, Esquire, **PATTERSON BELKNAP WEBB & TYLERLLP,** 1133 Ave. of the Americas, New York, NY 10036, awong@pbwt.com; dtilley@pbwt.com; jknobler@pbwt.com; jgoldman@pbwt.com;. jszaremby@pbwt.com; maweiss@pbwt.com; tkurland@pbwt.com. (*Attorneys for Plaintiff*).

<u>*/s/ David R. Jadon*</u>
David R. Jadon, Esquire
Florida Bar No.: 1010249
Roper, Townsend & Sutphen, P.A.
255 S. Orange Avenue, Suite 750
Orlando, FL 32801
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Primary: djadon@roperpa.com
Secondary: lramirez@roperpa.com
Attorney for Defendants CITY OF NAPLES; NAPLES CITY COUNCIL; TERESA HEITMANN, TERRY HUTCHISON, RAYMOND CHRISTMAN, BETH PETRUNOFF, BILL KRAMER, LINDA PENNIMAN, and BERNE BARTON, in their official capacities, as City Council members; NAPLES POLICE DEPARTMENT ; and CIRO

DOMINGUEZ, in his official
capacity as Naples Chief of Police