## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Fort Myers Division

| | |
|---|---|
| _____ ) | |
| NAPLES PRIDE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 2:25-cv-291 |
| v. ) | Judge: Hon. John E. Steele |
| ) | Magistrate Judge: Hon. Kyle C. Dudek |
| CITY OF NAPLES, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## BRIEF *AMICUS CURIAE* OF
## AMERICA'S FUTURE, INC.
## IN SUPPORT OF THE DEFENDANTS

William J. Olson
Jeremiah L. Morgan
  William J. Olson, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, Virginia  22180-5615
  (703) 356-5070
  wjo@mindspring.com

Counsel for *Amici Curiae*

Dated: April 30, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTEREST OF *AMICI* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

I.    DEFENDANTS HAVE BOTH THE AUTHORITY AND DUTY TO PROTECT
      CHILDREN FROM HYPER-SEXUALIZED MESSAGES . . . . . . . . . . . . . . . . . . . 4

II.   TEXTUALLY AND HISTORICALLY, THE FIRST AMENDMENT PROVIDES
      NO PROTECTION TO DRAG SHOWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  THIS COURT SHOULD AVOID USE OF BALANCING TESTS . . . . . . . . . . . . . 13

IV.   PLAINTIFF'S AFTER-SCHOOL PROGRAM REVEALS MUCH ABOUT
      PLAINTIFF AND IS FRAUGHT WITH DANGER . . . . . . . . . . . . . . . . . . . . . . 15

V.    PLAINTIFF CAN STILL SPREAD ITS HYPER-SEXUALIZED MESSAGE,
      JUST NOT IN FRONT OF CHILDREN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.   PLAINTIFF'S SECURITY COMPARATORS ARE NOT SIMILAR . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**

First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**CASES**

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) . . . . . . . . . . . . . . . . . . . 10
*Commonwealth v. Friede*, 271 Mass. 318, 171 N.E. 472 (1930) . . . . . . . . . . 11
*Commonwealth v. DeLacey*, 271 Mass. 327, 171 N.E. 455 (1930) . . . . . . . . . 11
*Commonwealth v. Sharpless*, 2 Serg. & Rawle 91 (1815) . . . . . . . . . . . . . . . 11
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . 13, 19
*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024) . . . . . . . . . . . 9
*Ginsberg v. New York*, 390 U.S. 629 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Jacobellis v. Ohio*, 378 U.S. 184 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Korematsu v. United States*, 323 U.S. 214 (1944) . . . . . . . . . . . . . . . . . . . . . 14
*New York State Rifle & Pistol Association, Inc. v Bruen*, 597 U.S. 1
    (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
*Reno v. ACLU*, 521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*Regina v. Hicklin*, L.R. 3 Q.B. 360, Court of Queen's Bench (1868) . . . . . . . 11
*Roth v. United States*, 354 U.S. 476 (1957) . . . . . . . . . . . . . . . . . . . . . . . 10, 11
*Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115 (1989) . . . . . . . . . . . . . . . . . . . 5
*Spectrum WT v. Wendler*, 693 F. Supp. 3d 689 (N.D. Tex. 2023) . . . . . 6, 12, 13
*United States v. O'Brien*, 391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . 12
*United States v. One Book Called "Ulysses,"* 5 F. Supp. 182
    (S.D.N.Y. 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**MISCELLANEOUS**

W. Anderson, LMHC, "What's Wrong With Drag Shows?" *Medium*
    (Mar. 21, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Australian Institute of Family Studies, "Children and young people's
    exposure to pornography" (May, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
B. Bushard, "Olympics Drag Queen 'Last Supper' Sparks Outrage From
    Musk, Rob Schneider, GOP Pundits," *Forbes* (July 29, 2024) . . . . . . . . . 6
Free Speech Coalition, "Frequently Asked Questions About Age
    Verification," (Apr. 11, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

M. Lungariello, "Video of drag queen gyrating in front of child has Texas pols
    pushing for legislative action," *New York Post* (Oct. 18, 2022) . . . . . . . . 6

"Risqué," *Mariam-Webster*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

G. Stone, et al., Constitutional Law (2d ed. Little, Brown: 1991). . . . . . . . . . 11

H. Titus, "The Freedom of Speech, An Introduction," *The Forecast*,
    vol. 2, no. 12 (Sept. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

UNICEF*, "*Protection of children from the harmful impacts of
    pornography" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## INTEREST OF *AMICI*[1]

The interest of the *amicus curiae* is set out in the accompanying motion for leave to file.

## STATEMENT OF THE CASE

Plaintiff Naples Pride is an organization which hosts what it terms an annual "Pridefest celebration" in Naples which features a "drag performance." Complaint at ¶¶ 2-3. It admits that drag shows can involve "**risqué** elements." *Id*. at ¶ 5 (emphasis added). However, it asserts that "risqué elements" are "not inherently sexual or explicit...." *Id*. at ¶ 38. Plaintiff appears to set a higher bar for what it considers "sexual or explicit" than the rest of society, as the word "risqué" is defined by *Merriam-Webster* to mean "verging on impropriety or indecency." Nonetheless, the Complaint asserts that its "drag performances" are "family-friendly" (*id*. at ¶¶ 3, 5, 13, 32, 35, 75, 101) even though they may "verg[e] on impropriety or indecency."[2]

Plaintiff promises that it "**forbids** performers from incorporating any **nudity or vulgar, sexual, or obscene content** into their performances."

---

[1] Plaintiff consented to the filing of this brief, but Defendants took no position. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than this *amicus curiae*, its members or its counsel contributed money that was intended to fund preparing or submitting this brief.

[2] Plaintiff's repeated use of the term "family-friendly" is reminiscent of the line from the movie Princess Bride: "You keep using that word. I do not think it means what you think it means."

*Id.* at ¶ 35 (emphasis added).  The fact that such a strong warning is given, and given repeatedly, necessarily implies that (i) nudity, (ii) vulgarity, (iii) sexual content, and (iv) obscene content are routinely part of drag performances by the "performers" invited by Plaintiff to the Naples event. These "performers" would **not** need to be reminded **not** to engage in such gross conduct if it was **not** normal for them, and without the warnings, such behavior could be expected to occur in Naples.  Indeed, the Complaint admits that, in order to try to enforce these rules and the ban on tips, "Naples Pride expressly [i] makes performers aware of these requirements **when they are booked** and [ii] reminds them of these requirements up **until moments before** their performances," as apparently that is required to have the hope of compliance.  *Id.* at ¶ 35 (emphasis added).

Plaintiff is silent about the consequences to these "performers" if and when they break the rules and use nudity, vulgarity, sexual content, and obscene content of the sort apparently routinely included in their drag performances.  Plaintiff certainly does not mention the effect on minor children allowed to view such performances when these rules are broken. The very notion that these "performers" are forbidden to express themselves as they normally would seems inconsistent with the mission of Plaintiff — to celebrate those who enjoy cross-dressing to mock societal standards while

expressing their own sexual practices.

Plaintiff flatly asserts that drag shows are "indisputably protected speech" under the First Amendment. *Id.* at ¶¶ 4, 42. The Complaint describes those working with Naples Pride as involved not only in a celebration, but also in lauding their own role providing social services, while demeaning those officials and citizens opposing the drag performance as "anti-drag activists" who make false claims. *Id.* at ¶¶ 7, 9, 61.

Specifically, Plaintiff challenges the decision of the City Council to issue a permit "on the conditions that (1) the drag performance take place indoors at the Norris Center; and (2) no one under 18 be admitted to the drag performance, even if accompanied by an adult parent or guardian." *Id.* at ¶ 88. Plaintiff also objects to paying a security fee they deem to be excessive. *Id.* at ¶ 90.

## STATEMENT

Plaintiff seeks to invoke this Court's injunctive powers to protect what it believes to be its First Amendment right to host a two-hour drag show, on public property, outside, in front of children. Plaintiff's purported purpose is designed to be high sounding — to challenge "gender stereotypes by adopting dress or mannerism stereotypical of a different gender." *Id.* at ¶¶ 4, 37. However, Plaintiff does not plan to limit its participation in the marketplace

3

of ideas with words, but chooses to communicate some type of unclear ideas by dressing in overly exaggerated female costumes and makeup and "performing" on a stage. And for some unexplained reason, it demands this Court to order an outdoor performance and one where minor children can witness these performances. *See id*. at ¶ 13 (lamenting the prohibition on "anyone under age 18 from attending the family-friendly drag performance….").

Plaintiff objects that Defendants are requiring these performances to take place indoors in front of adults. *Id*. at ¶¶ 12-13. Plaintiff also takes issue that Defendants require "over $30,000 in … security fees," which it claims is "grossly disproportionate to the fees Defendants have charged for other events" that do not constitute drag shows. *Id*. at ¶ 14. However, this event is not like other events on government property. Thus, Plaintiff **can** obtain a permit for this event, but on the terms it dislikes, which terms it labels as a First Amendment violation "burdening the protected speech of Naples Pride." *Id*. at ¶ 15.

## ARGUMENT

## I. DEFENDANTS HAVE BOTH THE AUTHORITY AND DUTY TO PROTECT CHILDREN FROM HYPER-SEXUALIZED MESSAGES.

Repeating that these "drag performances" are "family-friendly" does not

4

make them so.  And because the Supreme Court has ruled that government

has "a compelling interest in protecting the physical and psychological well-

being of minors," it possesses the authority to "shield[] minors from the

influence of literature that is not obscene by adult standards."  *Sable*

*Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).  The indoor location

required by the City will protect minors who just happen to be in the area.

The prohibition on minors being inside during the event will protect all

minors from being robbed of their innocence.  In a matter of weeks, the U.S.

Supreme Court may well decree that age verification laws to prevent minors

from access to various adult websites are fully constitutional, even if the

parents have no problem with their unfettered access to "adult" materials.

*See Free Speech Coalition v. Paxton*, U.S. Supreme Court, No. 23-1122 (oral

argument was heard on January 15, 2025).  By one count, 22 states have

enacted such age-verification laws.[3]

In the context of adults, the Supreme Court has asserted that "sexual

expression which is indecent but not obscene is protected by the First

Amendment."  *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (citation omitted).  If

Plaintiff here was challenging the denial of a drag show performance in front

---

[3] *See* Free Speech Coalition, Frequently Asked Questions About Age Verification
(Apr. 11, 2025).

of consenting adults, the issues would be decided under different case law.

But Plaintiff's chief complaint, beyond the security fee, is that the event

would exclude "anyone under age 18 from attending" their "family-friendly

drag performance — even with an approving parent or guardian present."

Complaint at ¶ 13.  But Plaintiff does not have a First Amendment right to

expose children to their hyper-sexualized message.

Drag queen shows are anything but cute and innocent.  Even if the drag

performers were to remain clothed, as promised, an injunction from this

Court could be seen as license for other shocking behaviors seen in drag

shows.[4]  Plaintiff's proposed course of conduct, performing drag shows in front

of children, is not protected by the First Amendment.  Plaintiff simply "cannot

prevail by invoking the atextual word 'expression,' as if the Free Speech

Clause obliterated all logical distinctions separating (1) thought, speech, and

conduct, (2) 'time, place, and manner,' and (3) children from sexualized

conduct.  It does not."  *Spectrum WT v. Wendler*, 693 F. Supp. 3d 689, 712

(N.D. Tex. 2023).  Plaintiff has not demonstrated it is likely to prevail on the

merits of its Complaint and thus should not prevail on its motion for

---

[4] *See, e.g.,* M. Lungariello, "Video of drag queen gyrating in front of child has Texas pols pushing for legislative action," *New York Post* (Oct. 18, 2022); B. Bushard, "Olympics Drag Queen 'Last Supper' Sparks Outrage From Musk, Rob Schneider, GOP Pundits," *Forbes* (July 29, 2024).

preliminary injunction.

The problems caused by childhood exposure to sexual images and behavior along a continuum of sexuality are obvious and have been well documented. These observations are not limited to the publications of conservative and Christian organizations. One mental health professional who opposes restrictions is still willing to admit the following about drag shows:

> As a mental health counselor, I see this behavior as a hybrid of several conditions identified in the Diagnostic and Statistical Manual of Mental Disorders — The **Paraphilia Transvestitism** (cross-dressing), an **almost-Paraphilia Exhibitionism** (showing off in an erotic or sexually provocative way), and personality traits known as narcissism and histrionics (also pleasure from showing off in a theatrical manner).[5]

To be sure, there is a continuum, but the lessons learned about exposure to pornography are not entirely inapplicable to their exposure to performances by drag queens. Once having become hyper-sexualized by such performance, would it not seem unlikely that these minors would seek out even more intense forms of sexuality to observe and participate in? A study by the Australian Government's Institute of Family Studies on "Children and young people's exposure to pornography" found that nearly half of children ages 9 to 16 experience exposure to pornographic images, detailing their

---

[5] W. Anderson, LMHC, "What's Wrong With Drag Shows?" *Medium* (Mar. 21, 2023).

negative effects.  Additionally, UNICEF has issued a report calling for the

"Protection of children from harmful impacts of pornography":

> Pornographic content can harm children.  Exposure to pornography at a young age may lead to poor **mental health, sexism and objectification, sexual violence, and other negative outcomes**.  Among other risks, when children view pornography that portrays **abusive and misogynistic acts**, they may come to view such behaviour as normal and acceptable....

> Efforts to regulate content and restrict children's access to pornography have not kept pace with technological shifts that have profoundly altered the landscape for the consumption of pornography. While many jurisdictions have effectively **restricted children's access to pornography in non-digital media**, including by making it illegal to distribute pornography to children or **knowingly expose them to it**, efforts to do the same in digital environments have not been effective.  [Emphasis added.]

Early viewing of pornography is linked to earlier loss of virginity,

promiscuity, incest, participation in group sex and anonymous sex, sexual

abuse of children, minors forcing other minors to perform sexual acts, sexual

violence, sexual brutality, and rape.  Studies about drag queens may not have

been conducted, but exposure to hyper-sexuality creates a disconnect between

the physical and emotional aspects of sexuality, causing women, and also

men, to be viewed as objects, not people.

## II.    TEXTUALLY AND HISTORICALLY, THE FIRST AMENDMENT PROVIDES NO PROTECTION TO DRAG SHOWS.

In important respects, the federal courts have strayed from the First

Amendment as written and understood by the Framers.  Fortunately,

protection for minors is still recognized.  Even in the modern era, the U.S.
Supreme Court has asserted:  "The State has an interest to protect the
welfare of children and to see that they are safeguarded from abuses."
*Ginsberg v. New York,* 390 U.S. 629, 640 (1968).  The Court stated that the
state could protect minors from the material deemed "harmful to minors"
even when the matter was not deemed to be "obscene" for adults.  *Id*. at 633.
*See also Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024)
(review pending in U.S. Supreme Court).  While neither case involved drag
shows, those authorities should be enough for the Court to deny relief to
Plaintiff.  Beyond that, it is instructive to return to First Amendment first
principles to see how radical Plaintiff's First Amendment demand truly is.

Beginning with the text, the First Amendment uses the definite article
"**the**" to describe the precise type of speech and press it protects:  "Congress
shall make no law ... abridging **the** freedom of speech or of **the** press...."
Thus, the First Amendment protects not all speech or all press — but protects
only **the** speech and **the** press that those terms were understood to protect
when used in that Amendment.  In an effort to urge judges to sanction that
which those terms did not cover, courts have conflated these two terms with
fixed meanings into the new, atextual term "**freedom of expression**" — a
term devoid of fixed meaning.  With that act of legerdemain, federal courts

9

feel free to protect anything they wish to protect, unburdened by the
constitutional text or its traditional understanding.  In this way, courts have
undermined the role of the states to protect the health, safety, and morals of
their citizens by deeming almost anything a form of "expression," without any
care to follow the text or its historical meaning.  Indeed, what act could not be
described as an "expression" by the person seeking First Amendment
protection?

   To test this proposition, Plaintiff could be challenged to provide
authorities from the common law, or from the founding era, that support its
assertion that the First Amendment protects drag shows.

   It has not always been this way.  In 1942, a unanimous Supreme Court
emphatically affirmed that there were "certain well-defined and narrowly
limited classes of speech, the prevention and punishment of which have never
been thought to raise any Constitutional problem."  *Chaplinsky v. New
Hampshire*, 315 U.S. 568, 571-72 (1942).  Among Justice Murphy's list of five
enumerated classes were the lewd and obscene.  The Court proclaimed that
neither was an "essential part of any exposition of ideas," and "of such slight
social value as a step to truth that any benefit that may be derived from them
is clearly outweighed by the social interest in order and morality."  *Id.* at 572.

   Fifteen years after *Chaplinsky*, the Supreme Court reiterated its view

10

that, even though "obscenity was outside the protection intended for speech and press," it asserted a new rule:  that it was for the Court to define "obscenity."  *See Roth v. United States*, 354 U.S. 476, 483 (1957).  Prior to *Roth*, it was understood that obscenity, a common law offense, was governed by state law, not by federal law.  *See Commonwealth v. Sharpless*, 2 Serg. & Rawle 91 (1815).[6]  Before *Roth*, definitions of what constituted obscenity varied, the most widely accepted of which was the Hicklin test,[7] allowing a finding of obscenity based upon the effect of "isolated passages on the most susceptible readers or viewers."  *See Commonwealth v. Friede*, 271 Mass. 318, 171 N.E. 472 (1930); *Commonwealth v. DeLacey*, 271 Mass. 327, 171 N.E. 455 (1930).  Rejecting the Hicklin test, the U.S. District Court for the Southern District of New York adopted instead a standard focusing on the effect on the average person of the dominant theme of the work as a whole.  *See United States v. One Book Called "Ulysses,"* 5 F. Supp. 182 (S.D.N.Y. 1933), *aff'd*, 72 F.2d 705 (2d Cir. 1934).

In his *Roth* opinion, Justice Brennan leveraged this modernized test into a First Amendment rule, thereby launching the Supreme Court on a

---

[6] This statement and the following narrative is a paraphrase of a note on obscenity appearing on p. 1203 of G. Stone, *et al.*, <u>Constitutional Law</u> (2d ed. Little, Brown: 1991). *See also* Herbert W. Titus, "<u>Obscenity: Perverting the First Amendment</u>," *The Forecast*, vol. 3, nos. 7-9 (1966).

[7] *See <u>Regina v. Hicklin</u>*, L.R. 3 Q.B. 360, Court of Queen's Bench (1868).

constitutional odyssey searching for a principled definition of obscenity.  By 1964, the Court's quest was in such disarray that Justice Potter Stewart gave up the effort entirely, urging his colleagues to censor only "hard-core pornography," all the while reassuring them that:  "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

But as the Supreme Court warned, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  What is the "message" here?  Plaintiff asserts that "[d]rag allows marginalized individuals to express pride in their identities … by challenging societal gender norms and expectations." Complaint at ¶ 39.  "Though apparel and attire 'are certainly a way in which people express themselves, clothing as such is not — not normally at any rate — constitutionally protected expression.'" *Spectrum WT* at 703 (quoting *Brandt v. Bd. of Educ. of City of CV*, 480 F.3d 460, 465 (7th Cir. 2007) (Posner, J.)).

Plaintiff claims that these performances "express a litany of emotions and purposes…."  Complaint at ¶ 40.  And then Plaintiff opaquely claims that the performances and "LGBTQ+ Pride celebrations … and the expressive message that these events send are all closely connected."  *Id.* at ¶ 41.  But

12

what is the message?  Plaintiff does not make the message clear, other than to claim that its message is protected — not only for the drag show performers to perform, but also for children to watch.  But simply gyrating around a stage, dressed as no woman would actually dress, does not communicate any message of the sort the Framers sought to protect in the American marketplace of ideas.  *See Spectrum WT* at 703 ("an objective viewer observing biological men 'performing' while dressed in attire stereotypically associated with women — without accompanying political speech or dialogue — would not necessarily discern an 'unmistakable' or 'overwhelmingly apparent' communication of 'LGBTQ+ rights.'").

## III.   THIS COURT SHOULD AVOID USE OF BALANCING TESTS.

Most First Amendment litigation begins an evaluation of which balancing test to use, and that choice often is outcome-determinative.  Nonetheless, the possibility of the courts returning to a search for the meaning of the First Amendment according to "text, history and tradition" was hinted at by Chief Justice Roberts during oral argument in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  There, he resisted any effort to apply First Amendment balancing tests to the Second Amendment.  During oral argument, he noted that **balancing tests were "just kind of developed over the years as sort of baggage that the First**

13

**Amendment picked up.**"[8]  The Court followed the Chief Justice's lead and rejected the use of balancing tests as urged in dissent by Justice Breyer.[9]  The Court also explained why balancing tests have great appeal to judges — because they were "judge-empowering," allowing judges flexibility to decide cases without being tied down by the text, history, and tradition of a constitutional provision.[10]  *See Heller* at 634.

It is submitted that, even under a reasonable balancing approach, protecting minors from the corrosive influence of obscenity certainly should trump Plaintiff's desire to capture a younger demographic, or free itself from some burden in disseminating its activity.  However, the simpler, more direct, and more historically correct approach to protecting minors would be to challenge Plaintiff to provide all its evidence that the Framers and the ratifiers meant that "**the** freedom of speech and of **the** press" (emphasis added) protected hyper-sexualized "drag performances" and mandating access

---

[8]  Statement of Roberts, C.J., Tr. of Oral Arg. at 44, *Dist. of Columbia v. Heller*, 554 U.S. 570 (U.S. Supreme Court No. 07-290) (emphasis added).

[9]  *Heller* at 689 (Breyer, J., dissenting).  The Supreme Court's commitment to searching out the meaning of constitutional text without balancing was re-affirmed in Justice Thomas' opinion in *New York State Rifle & Pistol Association, Inc. v Bruen*, 597 U.S. 1 (2022).

[10]  Indeed, from the very first use of an enhanced judicial balancing test — then termed "the most rigid scrutiny" — it should have been clear these tests could not be relied on to correctly interpret the Constitution.  *See Korematsu v. United States*, 323 U.S. 214, 216 (1944).

by minors.  Also, the Plaintiff could be asked, as in *Bruen*, to demonstrate,

through relevantly similar illustrations from the founding era, where such

shows were protected by the First Amendment.

From the founding of the Republic until the middle of the twentieth

century, defining and controlling obscenity and pornography were the

exclusive responsibility of the several states.  It was unquestioned that

neither the text nor the ratification-era authorities provided any support for

the notion that obscenity was protected under the First Amendment.  Then,

federal courts understood they had no authority whatsoever to override state

laws protecting the morals of their citizens.  Today, the general proposition

that only states have the police power to regulate behavior to advance health,

safety, morals, and general welfare is honored only in the breach by many

federal judges who feel empowered to exercise federal constitutional power to

override state authority by invoking decades of decisions that badly need to

be re-examined.

## IV.  PLAINTIFF'S AFTER-SCHOOL PROGRAM REVEALS MUCH ABOUT PLAINTIFF AND IS FRAUGHT WITH DANGER.

It is deeply disturbing that while Plaintiff adamantly denies any

"grooming" of children (Complaint at ¶¶ 8, 64, 80), it admits to running "an

after-school program" for children.  *Id*. at ¶¶ 8, 72.  For most families, an

"after-school program" would give Plaintiff's drag queens unsupervised access to these children while their parents are still at work.  Such programs appear to be fraught with danger for children, providing the type of access that is conducive for the very grooming which Plaintiff denies.  A meme reveals the central issue in this case in a very few words:    The question isn't

> "Why do young children need to see a 'drag queen' at school?"

> The real question is

> "Why do 'drag queens' need an audience of young school

> children?"

## V.    PLAINTIFF CAN STILL SPREAD ITS HYPER-SEXUALIZED MESSAGE, JUST NOT IN FRONT OF CHILDREN.

Defendants have agreed to permit the Plaintiff to hold its "pride fest" upon payment of security fees and limited to a viewership of those who are 18 years or older.  While Plaintiff obviously does not like the conditions implemented on its permit, Plaintiff retains a choice.  It can either limit its drag performances to consenting adults, hold its performances indoors, and pay a security fee, or it can simply move its "pride fest" to some other location. That likely would be unacceptable, because part of the message that is intended here is that the power of those who flaunt immorality is on the ascendency, and the will of the public, expressed through its elected

16

representatives, cannot stop them.  The more traditionally moral that a given city may be, the greater incentive to hold its event there, to thrust its performance into the face of the people and their children.

Plaintiff chooses to force its "message" upon individuals who are either too young to consent to receive it, or force it on a general public who have not consented to receive it, and from the allegations in the Complaint, appears to disapprove strongly.  *See* Complaint at ¶ 9 ("constituents' opposition to drag…"); ¶ 15 ("some members of the Naples community disapprove of its message"); ¶ 85 ("the vast, vast majority, more than ten to one, do not want a drag show in Cambier Park").

All this being said, and even though the community opposes Plaintiff's "message," Plaintiff can still hold its event, just like they did last year, but Plaintiff demands that all barriers must be torn down.

## VI.    PLAINTIFF'S SECURITY COMPARATORS ARE NOT SIMILAR.

Plaintiff lists a number of alleged comparators, purportedly detailing differences between itself and other organizations that received more favorable treatment when applying for an event permit.  Complaint at ¶¶ 92-95.  For instance, Plaintiff claims that the City of Naples issued a permit for "an annual car show that closes many local streets and fills them with luxury vehicles, which pose a significant risk of theft or property damage."

17

Complaint at ¶ 93.  Plaintiff alleges that the event was charged $16,276.25 in 2024 for a security fee.  *Id.*  Another event, the Naples' Fifth Avenue Tree Lighting and Christmas Walk, which is alleged to be "four to six times Pridefest's 2024 attendance," was charged $18,000.00 in 2024.  *Id.* at ¶ 94. And then the Naples Art Institute's New Years Art Festival "with approximately 20,000 attendees" was charged $12,970.00 for 2024.  *Id.* at ¶ 95.  This, Plaintiff alleges, demonstrates that its $15,520.00 for security fees in 2024 was "grossly disproportionate" to the other issued permits.

But all this demonstrates is that different events are charged different fees, based on different permit requirements.  Plaintiff concedes that the Naples Police Department expects that "due to political opposition" the necessity of adding two additional officers is "based on best practices for planned events involving protestors or sensitive topics."  Complaint at ¶¶ 97-98.  A car show, a Christmas Tree lighting, and an art show obviously do not draw the protestors or public outrage that a drag show with children in attendance can be expected to elicit.  It appears perfectly reasonable for the City to charge the necessary costs of issuing this permit, or else the taxpayers of Naples will be subsidizing the drag queen show for Plaintiff.

Plaintiff attempts to compare the 2024 security fees to the 2025 security fee, but it is not a valid comparator.  Plaintiff's own allegations

18

demonstrate that security fees, year over year (except for 2019), continued to rise. In 2017, Plaintiff alleges it was charged a $1,125.00 security fee. Complaint at ¶ 91. The next year, the permit fee almost doubled to $1,942.50. *Id*. For whatever reasons, the security fee in 2019 was reduced, but then more than doubled in 2022. *Id*. Even taking 2025's security fee of $30,000.00, this sort of doubling of the previous year's security fee has happened before.

Second, Plaintiff does not provide any information about the security fees for comparators in 2025. But even if Plaintiff provided other proof of other security fees, it would need to be similar to Plaintiff's. Plaintiff comes up short. For instance, Plaintiff claims that Lieutenant O'Reilly claimed "Pridefest was classified as a 'Tier 1' event…" *Id*. at ¶ 104. Plaintiff provides no information as to whether its other identified comparators are also "Tier 1" or some other classification. Without this additional information, it is impossible to analyze Plaintiff's comparators, other than finger pointing and saying that other permit applicants were treated differently, without providing the Court with enough information to determine what accounts for any perceived differences.

## CONCLUSION

The Court should deny injunctive relief to the Plaintiff and dismiss its

Complaint.

Respectfully submitted,

 */s/ William J. Olson*
William J. Olson
Jeremiah L. Morgan
  William J. Olson, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, Virginia  22180-5615
  (703) 356-5070
  wjo@mindspring.com

Counsel for *Amici Curiae*

Dated: April 30, 2025

20

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I caused a true and correct copy of

the foregoing to be filed electronically with this Court.  Service will be

effectuated on all counsel of record via email to counsel for the parties.


_/s William J. Olson_____

William J. Olson
Counsel for *Amici Curiae*