UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

NAPLES PRIDE,

    Plaintiff,

v.                                         Case No. 2:25-cv-00291JES-KCD

CITY OF NAPLES; NAPLES CITY
COUNCIL; TERESA HEITMANN,
TERRY HUTCHISON, RAYMOND
CHRISTMAN, BETH PETRUNOFF,
BILL KRAMER, LINDA PENNIMAN,
and BERNE BARTON, in their official
capacities, as City Council members;
NAPLES POLICE DEPARTMENT; and
CIRO DOMINGUEZ, in his official
capacity as Naples Chief of Police,

    Defendants.
_____/

## DEFENDANTS' MOTION TO DISMISS

Defendants, CITY OF NAPLES; NAPLES CITY COUNCIL; TERESA HEITMANN, TERRY HUTCHISON, RAYMOND CHRISTMAN, BETH PETRUNOFF, BILL KRAMER, LINDA PENNIMAN, and BERNE BARTON, in their official capacities, as City Council members; NAPLES POLICE DEPARTMENT; and CIRO DOMINGUEZ, in his official capacity as Naples Chief of Police, by and through the undersigned counsel, pursuant to Federal Rule of Civil Procedure 12(b)(6), request this Honorable Court enter an order dismissing Plaintiff's complaint with prejudice, and as grounds state as follows:

1

## GROUNDS FOR MOTION

1. Official capacity claims against Defendants are duplicative and improper.
2. Defendant council members are entitled to legislative immunity.
3. Plaintiff fails to plead any viewpoint.
4. Plaintiff fails to assert a proper facial challenge.

## ARGUMENT

### I. Standard

In evaluating the sufficiency of a complaint, the court must accept well pleaded facts as true and resolve them in the light most favorable to the plaintiff. *Beck v. Deloitte & Touche,* 144 F.3d 732, 735 (11th Cir. 1998). However, if the plaintiff can prove no set of facts that would entitle him to relief, then the defendant is entitled to a dismissal for failure to state a claim. Although the plaintiff is not held to a very high standard on a Rule 12(b)(6) motion, the plaintiff is still required to "allege some specific factual bases for those conclusions or face dismissal" of the claim. *Jackson v. Bellsouth*, 372 F.3d 1250, 1263 (11th Cir. 2004). Moreover, in reviewing a motion to dismiss, the court need only accept well pleaded facts and reasonable inferences drawn from those facts. Unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a rule 12(b)(6) dismissal. *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003).

### II. Official Capacity Claims Are Improper

Plaintiff cannot bring an official capacity claim against all Defendants. This is the equivalent of suing the City itself. "[N]either a State nor its officers acting in their

official capacities are 'persons' under section 1983." *See Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989). Section 1983 suits against officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent," not against the officer individually. *Kentucky v. Graham*, 473 U.S. 159, 165, (1985) (*quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, (1978)). As long as the entity received notice and the opportunity to respond, an official capacity suit imposes liability only on the entity. *Graham*, 473 U.S. at 166. The *Graham* Court further proclaimed, 473 U.S. at 167 n.14: "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* ... local government units can be sued directly for damages and injunctive or declaratory relief." Here, Plaintiff's claims are duplicative and unnecessary – every other Defendant has been sued in their official capacity.

### III.   Council Members Are Entitled to Immunity

Moreover, the Court should also dismiss Defendants Heitmann, Hutchison, Christman, Petrunoff, Kramer, Penniman, and Barton as they are entitled to legislative immunity. Legislative immunity was established in the Speech and Debate Clause of the United States Constitution. U.S. Const. art. I, § 6, cl. 1. The clause protects not only the speech and debate of legislators, but also voting. *Woods v. Gamel,* 132 F. 3d 1417, 1419 (1998), (*citing Kilbourn v. Thompson,* 103 U.S. 168, 204 (1880)). This absolute legislative immunity has been extended by the Supreme Court, beyond federal legislators, to state and regional legislators. *Woods,* 132 F. 3d at

1419 (*citing Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 732 (1980)). And, absolute legislative immunity has been extended further to include local legislators. *See Hernandez v. City of Lafayette,* 643 F.2d 1188, 1193 (5th Cir.1981). "Voting, debate, and reacting to public opinion are manifestly in furtherance of legislative duties." *Woods*, 132 F.3d at 1420; *see also PEN American Center, Inc. v. Escambia County School Board,* 745 F. Supp. 3d 1178, 1183 (N.D. Fla. Oct. 18, 2024) (holding school board members entitled to legislative immunity where votes were preceded by "public notice, the consideration of input from constituents and interested parties, and debate and discussion by Board members."); *Champ v. Hendry County Board of County Commissioners, Florida*, 2019 WL 1877312 *1 (M.D. Fla. April 26, 2019) (holding county commissioners entitled to legislative immunity); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 688 F. Supp. 1522, 1526 (S.D. Fla. June 10, 1988) ("Holding a city council meeting is an essential function of the legislative process for which council members and the mayor are entitled to absolute immunity.").

Here, the facts of the complaint clearly indicate Defendants were engaged in a legislative function. There was a "public meeting,"[1] where the Council met "officially,"[2] lasted "multiple days"[3] and included significant public comment and debate before being put to a vote.[4] In addition to the official capacity claims, the Court should dismiss Defendants on the basis of legislative immunity.

---

[1] Doc. 1, Pg. 19, ¶79.
[2] *Id.*
[3] *Id.* at ¶80.
[4] *Id.* at Pg. 20, ¶81.

### IV. Plaintiff Fails to Properly Allege an As-Applied Challenge

Where a plaintiff challenges the validity of a statute to vindicate plaintiff's own rights, the challenge is an "as-applied" challenge. *Jacobs v. The Florida Bar*, 50 F.3d 901, 906 (11th Cir. 1995). When an "as-applied" challenge is brought, the Court rules on whether that application alone is constitutionally invalid.

Count I does not specify which cause of action Plaintiff is proceeding under. It claims a "violation of 42 U.S.C. §1983," but this is not a proper claim. since § 1983 merely provides a mechanism for enforcing individual rights "secured" elsewhere, *i.e.,* rights independently "secured by the Constitution and laws" of the United States. *Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002). "[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979). At best, Count I is a viewpoint discrimination claim. However, Plaintiff presents no viewpoint.

    a. *Plaintiff's Festival is a Limited Public Forum*

The First Amendment does not guarantee access to property just because it is owned by the government, and it does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) (citations and quotations omitted); *see also U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 131 (1981) ("[T]he mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted.") The government, like

any private landowner, may preserve the property under its control for the use to which it is lawfully dedicated. *Id.* at 1231 (citations and quotations omitted). The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

In order to determine the extent to which a person has a right to free speech on government property, courts engage in a three-step analysis. First, a court must determine whether the speech is protected under the First Amendment. *Parkland Republican Club v. City of Parkland*, 268 F.Supp.2d 1349, 1352–1353 (S.D.Fla.2003) (*citing Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797, (1985)). Second, the court must determine the nature of the relevant forum, which in turn determines the extent to which the government may limit access to the forum. *Id.* Third, the court must determine whether the justifications proffered by the government for limiting access to the forum satisfy constitutional standards. *Id.*

"Courts use 'forum analysis to evaluate government restrictions on purely private speech that occurs on government property.'" *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) (*quoting Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250, (2015)). There are several different forums – traditional public forums, designated (or limited) public forums, and nonpublic forums. *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018); *McDonough v. Garcia*, 116 F.4th 1319, 1325 (11th Cir. 2024).

The major motivating purpose of Plaintiff's event is for financial gain and is its "largest fundraiser." (Doc. 12-1, Pg. 3, ¶ 9; Pg. 5, ¶ 18; Pg. 7-8, ¶ 30). Plaintiff's festival is a private, ticketed event and charges admission for entry. (Doc. 1, Pg. 9, ¶ 34, Pg. 21, ¶ 89). Naturally, due to the exclusive, limited purpose of Plaintiff's event, the forum changes from a traditional public forum to a limited public forum. A limited public forum is limited and reserved "for certain groups or for the discussion of certain topics." *McDonough*, 116 F.4th at 1328.[5]

In a limited public forum, the government may impose restrictions on speech that are reasonable and viewpoint neutral. *Id*. And the government "is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Additionally, the limitation need not "be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808. The regulation is constitutional so long as it is "reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n,* 460 U.S. at 49. Restrictions "on the subject matter of the speech, on the identity or status of the speaker," and "[on] access for reasons of manageability or the lack of resources" may all be reasonable. *See Victory Through Jesus Sports Ministry Foundations v. Lee's Summit R-7 School Dist.*, 640 F.3d 329, 335 (8th Cir. 2011). The government may impose content-based restrictions on speech

---

[5] The City's ability to create limited public forums out of traditional public forums is not without legal precedent. *See, e.g.*, *Sistrunk v. City of Strongville*, 99 F.3d 194 (6th Cir. 1996), *People for the Ethical Treatment of Animals v. Giuliani, NYC 2000,* 105 F.Supp.2d 294 (2000); *Parkland Republican Club v. City of Parkland*, 268 F.Supp.2d 1349 (S.D. Fla. June 4, 2003).

as a means of "avoiding controversy that would disrupt" the forum. *Cornelius,* 473 U.S. at 809.

### b. Plaintiff Presents No Articulable Viewpoint

As mentioned above, the primary purpose of the forum is the festival – to raise money for Plaintiff's "mission" – the provision of social services. (Doc. 1, Pg. 7, ¶28). This should properly be understood as Plaintiff's "viewpoint." Plaintiff provides no facts as to what the drag show actually represents – merely that it is a "type of performance art." (*Id.* at Pg. 9, ¶37). There is no mention of who the performers are, the type of performance, the music played, or any indicia of what would constitute a viewpoint other than the performance assists Plaintiff's fundraising efforts. Plaintiff has already been granted the permit for its festival, so there is no viewpoint of the Plaintiff that is prevented from being expressed – the festival can occur.

Plaintiff's real complaint then, is simply where one event (out of many) at the festival can take place. However, this does not automatically create a First Amendment violation. A regulation is not viewpoint discriminatory simply because it has an "incidental effect" on a certain subset of views. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The performance is simply one of Plaintiff's attendees, and belongs to the same class as the rest of the festival's attendees, all who are attending the festival (forum) to "celebrate the LGBTQ+ community." (Doc. 1, Pg. 2, ¶2).

The City can properly regulate the use of the forum to reflect its security considerations. It has been firmly established as a matter of law that a state may regulate the use of its parks and streets for the protection of the public health, safety,

8

and welfare. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980). The caselaw makes clear that public safety and security are significant government interests. *See, e.g.*, *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376, (1997) (holding that ensuring public safety and order is a significant governmental interest); *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) (noting the "significant public interests in the maintenance of public safety, security, and order, including the physical protection of rally participants, spectators, passers-by, and law enforcement personnel" at a rally). Plaintiff cannot contest this general principle.

Security considerations for a large private event such as the Plaintiff's are appropriate given the context of the event as opposed to other forums of expression. *Heffron v. International Soc. For Krishna Consciousness, Inc,* 452 U.S. 640, 650-51 (1981). (finding that "[t]he flow of the crowd and demands of safety are more pressing in the context of" a *state fair* than of a public street) (emphasis added). The question before the Court in *Heffron* was whether it was a violation of the First Amendment when a religious organization wanted to disseminate religious literature and solicit donations at a state fair *anywhere* they pleased, when they had been assigned a specific location in the fair – even though this application limited the religious practices of the organization. *Id*. at 642.

In explaining its reasoning, the Court noted that the principal justification asserted by the State in support of its rule limiting speech location was the need to "maintain orderly movement of the crowd given the large number of exhibitors and

9

persons attending the fair." *Id*. at 649. Similar to the festival in the instant matter, Minnesota's fair "confined individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions…" *Id*. at 650. Additionally, because the fair attracted large crowds, it was a "substantial consideration" that the State had an interest in the "orderly movement and control of such an assembly of persons." *Id*.

As Plaintiff's own complaint points out, the expected attendance of the event is approximately 5,000. (Doc. 1, Pg. 9, ¶34). Such a large public event undoubtedly presents valid security and logistical considerations. Plaintiff has provided no viewpoint to support a discriminatory claim. Its event permit was granted. Plaintiff simply wishes to have one element of its festival where it chooses, but this is not enough to properly plead a First Amendment claim.

## V. <u>Plaintiff Fails to Properly Allege a Facial Challenge</u>

A facial challenge requires a heavier burden of proof than an as-applied challenge. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998). A facial challenge is one that seeks to invalidate a law even though the law's application in the case under consideration may be constitutionally unobjectionable. *Jacobs v. The Florida Bar*, 50 F.3d 901 (11th Cir. 1995). "The Supreme Court has expressed disfavor for facial challenges because they 'often rest on speculation' and 'raise the risk of premature interpretation of statutes on the basis of factually barebones records.' " *Sons of Confederate Veterans, Inc. v. Atwater*, 2011 WL 1233091, at *7 n.13 (M.D. Fla. Mar.

30, 2011) (Antoon, J.) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

When a plaintiff pursues a facial attack, plaintiff bears the burden of proving that the law could never be constitutionally applied, or is constitutionally overbroad. When a facial challenge is brought, the Court rules on whether the entire Ordinance is constitutionally invalid. To establish that a facial challenge to a governmental act presents a real and substantial controversy, a plaintiff must show he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act. *See Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298 (1979).

The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes. "The doctrine seeks to avoid entangling courts in the hazards of premature adjudication." *Felmeister v. Office of Attorney Ethics,* 856 F.2d 529, 535 (3d Cir.1988). Courts must resolve "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision making by the court." *Cheffer v. Reno,* 55 F.3d 1517, 1524 (11th Cir. 1995).

Here, Plaintiff presents no immediate injury. Plaintiff has not yet been required to pay any fee. Nor has Plaintiff pled that they have attempted or otherwise appealed any assessment of fees. Again, Plaintiff has already been granted a permit and has received one every year since it first began to hold festivals. Its drag show performance

11

is still allowed to take place. Plaintiff has not provided sufficient facts to illustrate that the permitting process is facially invalid and relies on conclusory allegations.

### a. The Permit Process is Neutral

Count II of Plaintiff's complaint appears to combine multiple claims, alleging that the permit and the security fee issue are one and the same. The City's permit process is a content neutral time place and manner restriction. It does not target communicative activity per se, but all activity that is conducted within a public park. Consequently, the analysis set forth by the Supreme Court in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002) applies. In *Thomas*, the Supreme Court reviewed an ordinance that required individuals to obtain a permit before "conduct[ing] a public assembly, parade, picnic, or other event involving more than fifty individuals" or engaging in an activity such as "creat[ing] or emit[ting] any Amplified Sound." *Thomas*, 534 U.S. at 318. Upon examining the law, the Supreme Court found that it was "not even directed to communicative activity as such, but rather to *all* activity conducted in a public park." *Id.* at 322 (emphasis in original). Thus, the Supreme Court determined that the ordinance amounted to a content-neutral time, place, and manner restriction. *Id.* at 323.

In order to survive scrutiny, the Supreme Court held, the content-neutral time, place, and manner restriction embodied in the *Thomas* ordinance had to "contain adequate standards to guide the official's decision [regarding whether to issue a permit] and render it subject to effective judicial review." *Id.* Additionally, *Thomas* appears implicitly to reaffirm that content-neutral time, place, and manner restrictions must (1)

12

not be based on the content of the message, (2) be narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternatives for communication. *Id.* at 323 n.3

The City's permit process is analogous. The City's Special Events Manual ("Manual") states that "festivals" and "carnivals" require a special event permit. (Doc. 12-20, Pg. 4). The Manual also provides that an event requires city council approval if it contemplates the following content-neutral considerations: street closings, off-site parking, amplified entertainment, city co-sponsorship, crowd attendance in excess of 1,500, and fireworks. *Id*. Plaintiff's event contemplates nearly all of these considerations. Once reviewed, the Special Events Committee makes a recommendation to the City Council based on these guidelines. *Id*. at ¶4. Contrary to Plaintiff's assertion, the Manual defines "impact on the community" on objective criteria – the number of participants. *Id*. at Pg. 6.

The First Amendment's protections are not absolute, however, since First Amendment right must be harmonized with the "existence of an organized society maintaining public order without which liberty itself would be lost...." *Cox v. State of New Hampshire,* 312 U.S. 569, 574 (1941). The Supreme Court went on to say in *Cox* that regulating the use of the public streets and restricting the use of highways to promote the public convenience, "cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection." *Id.* at 574. The Court thus upheld in *Cox* a municipality's right to require marchers to obtain a license and pay a fee (not more than $300, at the time) before parading on public

13

streets. The Court stated that "the question in a particular case is whether … [the City's] control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.*

As a matter of common sense and logic, the Manual designates the Naples Police as the "primary subject matter experts on the safety and security for all events in the City of Naples." (Doc. 12-20, Pg. 7). That Plaintiff criticizes this point is surprising. It certainly begs the question – if the local police are not in the best position to evaluate the safety and security of an event in their jurisdiction, then who would be? Plaintiff proposes no alternative.

While Plaintiff attempts to connect the "unfettered discretion" of *Forsyth* to the instant matter, but the Manual clearly lays out that any event organizer must provide a security plan. *Id.* at Pg. 7. When a special event is applied for, Naples Police meet with the event planner and follow the Pre-Event Planning procedure to develop to draft an operational plan for each event. Such a procedure is not without legal precedent. The City's permit process also provides an extra layer of review on First Amendment grounds in the event a special event permit application is denied. *See* Naples, Fla., Code of Ordinances §2-167 et seq. Plaintiff did not take advantage of this process.

### b. The Assessment of Security Fees is an Appropriate Law Enforcement Function[6]

Simply alleging the police should not have discretion to assess security fees is contrary to logic and the weight of the law. A city may charge a cost-based fee for the burden on public services from an event. *See Cox v. State of New Hampshire*, 312 U.S. 569, 576–77 (1941). Further, in determining the personnel, resources, and costs needed for public safety and convenience (and in determining whether a permit should issue), the government may properly consider the professional judgments of police and other officials about the personnel, resources, and costs needed for public safety and convenience, including for traffic control and clean-up. *See Sullivan v. City of Augusta*, 511 F.3d 16, 37 (1st Cir. 2007).

The city's assessment of the services required for an event may reasonably vary. "Parades and marches obviously vary enormously in terms of size, timing, duration and location, resulting often in quite different traffic control needs." *Id.* at 36. "[A] concern with the burden on public services that parades and other open-air assemblies impose ... would be entirely legitimate and would permit the charging of a cost-based fee." *Church of American Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) (citing *Cox* and other cases). [F]ees based upon a sliding scale considering the anticipated attendance of the festival are not content-based but, instead, are reasonably related to the expenses of policing the activities in question." *Coal. for the*

---

[6] Defendants incorporate by reference all arguments and exhibits mentioned in their response to Plaintiff's motion for a preliminary injunction. (Doc. 39).

*Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1321 (11th Cir. 2000)("CAMP").

The court in *Sullivan* also noted that there was "no evidence that there exists any meaningful advance 'formula' that could be inserted in an ordinance to determine the number of needed officers and vehicles in a given case … and parades and marches obviously vary enormously in terms of size, timing, duration and location…" 511 F.3d. at 37. Just as the plaintiffs in *Sullivan*, the Plaintiff here presents no example of the sort of 'formula' to properly address safety and logistical concerns for a 5,000-person event - or any other event.

*Sullivan* conclusively held that the police may make "professional judgment[s]" on how to "calculate the costs of traffic control and clean up." *Id*. at 37. These "professional judgments" particularly in regards to "public safety and convenience are paradigmatically permissible considerations in the issuance of permits." *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 26 (1st Cir. 2002). And judgments about public safety are inherently within the competence of permitting officials. *Id*. As a result, given the unique security considerations with planning a large event, the City's permit is reasonable and leave open alternatives for communication.

Courts have repeatedly acknowledged that large events inherently create significant security concerns, even when there are no known specific threats. *See, e.g.*, *Citizens for Peace in Space v. City of Colo. Springs,* 477 F.3d 1212, 1223 (10th Cir. 2007) ("Here, the security zone directly advanced the City's interest in keeping explosives away from the NATO conference because it limited access near the

16

[conference site] to identified and screened individuals who were less likely to pose any threat to the delegates."); *Bl(a)ck Tea Soc'y,* 378 F.3d 8, 12 (1st Cir. 2004) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Nat'l Council of Arab Americans v. City of New York,* 331 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("[T]his Court cannot blind itself to the daunting security concerns facing [New York City] during the [2004] Republican National Convention.").

As noted in response to Plaintiff's motion for preliminary injunction, Plaintiff was informed that there was logical, viewpoint neutral reasons for the increase in security fees. Plaintiff was informed that some police resources had not been billed to them in the past. Security for all events had increased. Some resources were also provided by the Sheriff's Office, and do not reflect any decision of the City to impose costs. (Doc. 39-18).

The City was and is also required to limit the permit of Naples Pride given the uncertainty in the law. As Plaintiff pointed out the Middle District, in *HM Florida-ORL, LLC v. Griffin,* 679 F.Supp.3d 1332,1335 (M.D. Fla. June 23, 2023) recently determined that Florida Statute - Fla. Stat. § 827.11—which prohibits any person from knowingly admitting a child to an "adult live performance" was overbroad. *Id.* at 1344. However, the preliminary injunction was *only* granted to Plaintiff and against Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation. *Id.* at 1345.

There is a concern, given the state of the law as it is, that the City or its employees are susceptible to prosecution if the permit is granted. "Federal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (*citing California v. Texas*, 593 U.S. 659, 672 (2021)); and the law may remain binding as applied to Naples.

Wherefore, Defendants respectfully request this Court dismiss Plaintiff's complaint.

## LOCAL RULE 3.01(g) CONFERRAL

Pursuant to Local Rule 3.01(g), the undersigned, David Jadon, and counsel for Plaintiff, Samantha Past, have conferred in good faith via phone and email on May 5, 2025. Plaintiff is opposed to relief requested in this motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF on this 30th day of April, 2025, to: Samantha J. Past, Esquire, Daniel B. Tilley, Esquire, **AMERICAN CIVIL LIBERTIES, UNION FOUNDATION OF FLORIDA,** 4343 West Flagler Street, Suite 400, Miami, FL 33134, spast@aclufl.org; dtilley@aclufl.org; Anthony J. Wong, Esquire, Daniel B. Tilley, Esquire, Jonah M. Knobler, Esquire, Joshua M. Goldman, Esquire, Justin Zaremby, Esquire, Maxwell K. Weiss. Esquire, Thomas P. Kurland, Esquire, **PATTERSON BELKNAP WEBB & TYLERLLP,** 1133 Ave. of the Americas, New York, NY 10036, awong@pbwt.com; dtilley@pbwt.com; jknobler@pbwt.com; jgoldman@pbwt.com;. jszaremby@pbwt.com; maweiss@pbwt.com; tkurland@pbwt.com. (*Attorneys for Plaintiff*).

*/s/ David R. Jadon*
David R. Jadon, Esquire
Florida Bar No.: 1010249
Roper, Townsend & Sutphen, P.A.

18

255 S. Orange Avenue, Suite 750
Orlando, FL 32801
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Primary: djadon@roperpa.com
Secondary: lramirez@roperpa.com
Attorney for Defendants CITY OF NAPLES; NAPLES CITY COUNCIL; TERESA HEITMANN, TERRY HUTCHISON, RAYMOND CHRISTMAN, BETH PETRUNOFF, BILL KRAMER, LINDA PENNIMAN, and BERNE BARTON, in their official capacities, as City Council members; NAPLES POLICE DEPARTMENT ; and CIRO DOMINGUEZ, in his official capacity as Naples Chief of Police