UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NAPLES PRIDE, INC.,

       Plaintiff,

v.                     Case No.  2:25-cv-291-JES-KCD

CITY OF NAPLES; NAPLES CITY
COUNCIL; TERESA HEITMANN,
TERRY HUTCHISON, RAYMOND
CHRISTMAN, BETH PETRUNOFF,
BILL KRAMER, LINDA PENNIMAN,
and BERNE BARTON, in their
official capacities as City
Council members; NAPLES
POLICE DEPARTMENT; and CIRO
DOMINGUEZ, in his official
capacity as Naples Chief of
Police,

       Defendants.

---

## OPINION AND ORDER

Plaintiff Naples Pride, Inc. ("Naples Pride" or Plaintiff) filed this action for monetary, declaratory, and injunctive relief against the City of Naples; the Naples City Council (the "City Council"); each member of the City Council in their official capacity (Teresa Heitmann, Terry Hutchison, Raymond Christman, Beth Petrunoff, Bill Kramer, Linda Penniman, and Berne Barton); the Naples Police Department ("NPD"); and the Naples Chief of Police, Ciro Dominguez, in his official capacity (the "Chief of

Police") (collectively, Defendants or the "City").[1]  The Complaint (Doc. #1) asserts an as-applied (Count I) and a facial (Count II) challenge to the permitting process for organized gatherings in a public park in Naples, Florida.  Both counts are brought pursuant to 42 U.S.C. § 1983 and allege violations of the First Amendment of the United States Constitution.

Currently before the Court is Plaintiff's Time-Sensitive Motion for Preliminary Injunction (Doc. #12) filed on April 12, 2025.  Defendants filed a Response In Opposition (Doc. #39) on April 30, 2025.  With leave of Court (Doc. #33), Liberty Counsel and three individuals filed an Amicus Brief (Doc. #38) on April 30, 2025.  Also with leave of Court (Doc. #45), America's Future, Inc. filed an Amicus Brief. (Doc. #54.)  Plaintiff filed a Reply (Doc. #48) to Liberty Counsel's brief.  At the Court's request, Naples Pride filed copies of pertinent parts of the Naples Municipal Code.  (Doc. #55.)  The Court heard oral arguments on May 2, 2025, and a transcript has been docketed.  (Doc. #52.)

For the reasons set forth below, Naples Pride's request for a preliminary injunction is **GRANTED IN PART** and **DENIED IN PART.**

I.

Based on the record and arguments presented, the Court makes the following findings of fact for purposes of the preliminary

---

[1] The Court adopts this nomenclature from Defendants.

injunction motion:

### A. Naples Pride, Pridefest, and Its Drag Performance

Naples Pride describes itself as a small, volunteer-based 501(c)(3) nonprofit corporation that provides social services to the greater Naples, Florida LGBTQ+ community. Naples Pride has hosted a festival known as "Pridefest" each summer since 2017 (except for 2020 and 2021 due to COVID-19). Naples Pride describes Pridefest as a celebration of the LGBTQ+ community, which encourages LGBTQ+ individuals to express themselves without fear. Pridefest features music, speeches, and performances; lasts about five hours during a single day in June (historically LGBTQ+ Pride Month); and is Naples Pride's largest fundraising event. Pridefest's centerpiece is what Naples Pride describes as "a family-friendly drag performance lasting between two and two-and-a-half hours." (Doc. #1, ¶ 32.)

Naples Pride describes "drag performances" in the following way: Drag is a type of performance art where performers caricature or challenge gender stereotypes by adopting dress or mannerisms associated with a different gender. Drag allows marginalized individuals to express pride in their identities, and combat shame and social stigma, by challenging societal gender norms and expectations. While drag can include risqué elements, it is not inherently sexual or explicit and is a popular form of entertainment for all ages. Pride festivals such as Pridefest typically occur

- 3 -

during LGBTQ+ Pride Month in June and reflect the historical and current importance of drag performance in the LGBTQ+ community. (Doc. #1, ¶¶ 4-5, 37-41.)

While Naples Pride concedes that not all drag performances can be classified as "family-friendly,"[2] it takes steps to ensure that Pridefest drag performances meet that standard.  Naples Pride forbids performers from incorporating nudity or vulgar, sexual, or obscene content into their performances; instructs attendees not to tip performers; expressly makes performers aware of these requirements when they are booked; and reminds performers of those conditions before their performances.  (Doc. #1, ¶ 35.)  Notwithstanding those precautions, some members of the public have found past performances not to be "family friendly."  (Doc. #38-1.)

For Pridefest's first four years (2017, 2018, 2019, and 2022), all events, including the drag performance, took place outdoors on the mainstage in Cambier Park.  Cambier Park, owned and operated by the City of Naples, is the most prominent public space in downtown Naples and is widely used by the public and for organized special events.  Naples Pride reports that it has sought minimal street closures for past events and has been praised by the City for the event's organization and operation.

---

[2] Naples Pride defines "family friendly" as being "devoid of any nudity, explicit content, or adult themes."  (Doc. #12, p. 2.)

Naples Pride asserts that holding Pridefest, including the drag performance, in a prominent public space has symbolic and expressive, as well as financial, importance.  It is symbolically important because it furthers Naples Pride's mission of "bringing the Naples LGBTQ+ community 'out of the closet' and into the public square" and reinforces Pridefest's "message of acceptance and living openly and without fear as an LGBTQ+ person." (Doc. #1, ¶ 33.)  In addition, the outdoor drag performance is significant to Naples Pride's fundraising efforts because it is the main draw for Pridefest attendees, and Cambier Park's outdoor venue allows up to 5,000 paying ticketholders to attend.

Despite the history of permitted outdoor drag performances at Cambier Park, Naples Pride asserts that things changed in 2022, after citizen complaints triggered an investigation into Naples Pride's drag performances.  Naples Pride reports that after a thorough investigation, NPD concluded that the complaints were unfounded, that the drag performances were not lewd or sexual, and that the performers' clothing "was no more revealing than being in a bathing suit at a public pool or beach." (Doc. #1, ¶ 36.)

The only security or public safety incident associated with Pridefest was a single arrest in 2022 of an unaffiliated protester for disorderly conduct.  As the City points out, however, in recent years there have been far too many horrific events at public gatherings across the nation and globe.

**B. Naples' Permitting Procedures**

Like any organization that sponsors a festival or special event, Naples Pride must apply for and receive a permit to hold Pridefest in Cambier Park.  The current permitting process and its standards and criteria are set forth in City of Naples Ordinance No. 2023-15181 ("Ord. No. 15181") (Doc. #55-1), which adopted the City's Special Event Permit Manual ("the Manual"). (Doc. #12-20.) Among other items, Ord. No. 15181 and the Manual set forth which events require a permit and/or City Council approval, the process for obtaining a permit, the timeline for submitting certain items, the various fees required, special guidelines for certain events, and security requirements.  (Doc. #12-20; Doc. #55-1 to #55-4.)

After an organization submits its permit application, a Special Events Committee comprised of representatives from various City departments (including Parks, Police, and Fire) reviews the application.  The Committee makes a recommendation to the City Council "based on the guidelines/policies/ordinances in place, and the impact on the community." (Doc. #12-20, p. 4.)  The City Council then decides whether to approve or deny the permit.  (Id.) Permits are approved or denied by City Council resolutions, which must expressly state any event-specific conditions placed on the events.  Ord. No. 15181(c)(2).

The Manual also provides that for events "deemed to have specific safety requirements, the hiring of law enforcement

- 6 -

officers may be required." (Doc. #12-20, p. 6.) The Manual
delegates all such security-related matters to NPD, stating that
"[t]he organizer must comply [with] and resolve all safety concerns
of the Naples Police Department," which is "the primary subject
matter expert[] on the safety and security for all events in the
City of Naples." (Id. at 7.) The Manual does not provide criteria
for assessing security needs. Instead, as identified in a January
14, 2025, email to the City Council, the Chief of Police uses six
criteria to determine staffing needs and protocols at special
events:

(1) "Risk/Threat Assessments";

(2) "Real time intelligence/current events in the country/world";

(3) "Venue size, location, and capability/capacity";

(4) "Potential for conflict or protests (political [or] controversial issues)";

(5) "Expected attendee crowd size"; and

(6) "Event particulars (i.e. night/day, alcohol involved, street closures etc.)."

(Doc. # 12-16, p. 2.) The City has recently identified several
law enforcement "best practice[s]" that NPD follows. (Doc. #39,
pp. 3-8.)

The Manual also provides for various fees for use of the
City's parks, including Cambier Park. (Doc. #12-20, pp. 5-6.)
These include a $150 non-refundable processing fee and a $500
refundable damage deposit, both of which are due when the applic-

ation is submitted.  There is a $900 per day fee for large events in a park; and a $80 per hour fee to use Cambier Park's bandshell. Id. § 28-32(2)(l) & (7)(a).

As to security, the Manual provides that the "City may require Police, Fire, . . . barricades, etc." for the event, and that the cost of "all City services provided for the event will be paid for by the organizing agency."  (Doc. #12-20, p. 5.)  "The City will determine services required to ensure the safety of participants, minimize the inconvenience to residents and reduce the liability exposure to the City and organizing agency."  Id.

An estimate of the cost of these services is provided to the applicant to sign and return prior to the event.  The applicant is invoiced for the actual costs after the event.  Payment is due sixty days after receipt of that invoice.  Id.

**C. Permitting of Pridefest in 2023 and 2024**

In early 2023, Naples Pride applied for a Pridefest permit, including an outdoor drag performance, as it had in prior years. Naples Pride received atypical increased scrutiny from the City Council during the application process, but the Council initially voted 5-2 to approve Naples Pride's 2023 permit application.  There was significant public backlash.  The City informed Naples Pride that it had two choices:  the drag performance could be moved indoors, or the permit could be denied.  Naples Pride modified its permit application by moving the drag performance indoors and

restricting attendance to adults (18 years or older). The 2023 Pridefest drag performance took place in the 200-seat Norris Center adjacent to Cambier Park.

In May 2023, while the Pridefest negotiations were ongoing, the State of Florida enacted a statute forbidding "[a] person [from] knowingly admit[ting] a child to an adult live performance." Fla. Stat. § 827.11(3). The statute provided that violations were a first-degree misdemeanor. Id. § 827.11(4). An "adult live performance" was defined as:

> (a) any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Id. § 827.11(1). A "child" is defined as "any person under the age of 18 years." Id. § 827.01(2). Naples Pride refers to this statute as the "Florida Drag Law" because the "statute is specifically designed to suppress the speech of drag queen performers." HM Florida-ORL, LLC v. Griffin, 679 F. Supp. 3d 1332,

1335 (M.D. Fla. 2023).

On June 24, 2023, the Florida Drag Law was found unconstitutional under the First Amendment, and the state official charged with its enforcement was enjoined from instituting, maintaining, or prosecuting any enforcement proceedings under the statute. Florida-ORL, LLC, 679 F. Supp. 3d at 1335. An interlocutory appeal of that injunction is currently pending. A request by the State of Florida for a partial stay limiting the scope of the injunction to only the establishment involved in that case was denied on October 11, 2023. HM Florida-ORL, LLC v. Governor of Florida, 2023 WL 6785071 (11th Cir. 2023). The Supreme Court also refused to grant a partial stay. Griffin v. HM Florida-ORL, LLC, 144 S. Ct. 1 (2023).

In 2024, Naples Pride again hosted Pridefest with its drag performance indoors and only adults in attendance. Naples Pride states that it understood that its permit application would only be approved under those conditions, and was uncertain whether the Florida Drag Law would be in effect at the time of 2024 Pridefest. The 2024 Pridefest drag performance took place at the Naples Woman's Club, which holds about 180 people.

Naples Pride asserts that the two restrictive conditions in the 2023 and 2024 permits adversely impacted Pridefest's attendance, fundraising, and the expressive message conveyed. Attendance at Pridefest declined from about 5,000 people in 2022 (when

Case 2:25-cv-00291-JES-KCD     Document 66     Filed 05/12/25     Page 11 of 49 PageID
1499

the drag performance was last held outdoors) to 2,400 in 2024.
Only 200 people attended the drag performance in 2024 despite
multiple performances. Naples Pride attributes the decline mostly
to the limited capacity of the indoor venues and the inability of
parents to attend the drag performances with their children.

Naples Pride also felt an adverse financial impact from the
two permit conditions. Due to decreased Pridefest attendance,
Naples Pride suffered an approximately 46% decrease in its annual
budget from 2022 to 2024. That reduction affected Naples Pride's
ability to provide certain social services it had planned for 2025.
The smaller indoor venues also adversely impacted Naples Pride's
ability to attract well-known drag performers from outside the
Southwest Florida area. Additionally, Naples Pride believes that
forcing the "family friendly" drag performances indoors undermines
their intended symbolic message and replaces it with an undesired
message that drag performances and LGBTQ+ identities are shameful
and should be hidden out of sight.

### D. 2025 Pridefest Permitting

2025 Pridefest is scheduled for June 7, 2025, and Naples Pride
sought to host its drag performance outdoors at the mainstage in
Cambier Park, open to persons of all ages. (Doc. #12-2.) The
City Council denied such a permit but approved a permit (the
"Permit") with three conditions that Naples Pride contends are
unconstitutional: an indoors-only restriction for the drag perfor-

- 11 -

mance (but not the rest of the festival), an adults-only restric-
tion (18 years or older) for the drag performance, and an
"arbitrary and exorbitant" security fee for the festival.

### (1)   The Indoors-Only and Adults-Only Restrictions

Naples Pride asserts that in November and December 2024, it
was informed by City personnel that its 2025 Pridefest permit
application would not be approved if Naples Pride sought to hold
the drag performance outdoors.   Naples Pride asserts that it was
also told that the City Council would probably impose an "indoors
only" condition pursuant to the authority granted in the Manual,
which Naples Pride contends allows the City Council to impose any
conditions on a permit that it sees fit.

At a January 2025 public meeting, the City Council considered
Naples Pride's permit application for 2025 Pridefest.   The multi-
day meeting was well-attended, and from Naples Pride's point of
view "overflowed with anti-drag and anti-LGBTQ+ sentiment." (Doc.
#1, ¶ 80.)   Various members of the City Council expressed views
that an outdoor drag performance would:   equate to "targeting
children"; expose unwilling members of the public to lewdness; be
offensive to many in the community; pose a public safety risk; and
not represent the views of most Naples residents.   The City Council
ultimately voted 5-2 to issue the Permit, but only with the con-
ditions that:   (1) the drag performance take place indoors at the
Norris Center; and (2) no one under 18 years of age be admitted to

the drag performance.

### (2) Security Fee

The City told Naples Pride that, in addition to other permit fees, it would be charged $30,697.50 in security fees to hold the performance indoors, and $44,160.00 in security fees to hold it outdoors. Those amounts were recommended by NPD. (Doc. #12-3, p. 2.) Naples Pride asserts that the indoor-performance fee represents about two-thirds of Pridefest's total proceeds in 2024, while the proposed outdoor-performance fee is about equal to the total amount that Pridefest raised in 2024.

These security fees are a sharp increase from what Naples Pride was previously charged in connection with Pridefest:

- 2017: $1,125.00;

- 2018: $1,942.50;

- 2019: $1,627.50;

- 2022: $3,867.00;

- 2023: $5,513.75;

- 2024: $15,520.00.

Naples Pride asserts that the increased fees are grossly disproportionate to what the City charges other events that are larger, more disruptive, and/or pose greater risks. The other events and their respective fees include:

- The annual Naples Car Show ("Cars on 5th") that closes many local streets and fills them with luxury

vehicles; its organizers were charged $16,276.25 in security fees in 2024.

- The Naples' Fifth Avenue Tree Lighting and Christmas Walk, which attracts 10,000 to 15,000 people, takes place over two days, and requires major street closures; its organizers were charged $18,000.00 in security fees in 2024.

- The Naples Art Institute's New Year's Art Festival, a multi-day event with approximately 20,000 attendees; its organizers were charged $12,970.00 in security fees in 2024.

Naples Pride also asserts that the quoted security fees are grossly disproportionate to what neighboring Cape Coral, Florida charged for a comparable Pride event in 2024. That event, which included an outdoor drag performance, required only $7,682.59 in security fees. Naples Pride further asserts that the proposed security fee improperly includes increases due to potential disruption by protesters opposed to the drag performance's viewpoint and content.

Additional facts will be set forth below as needed to address specific issues raised by the parties.

## II.

A federal court has inherent authority to issue an injunction to remedy a violation of constitutional rights. Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004); see also Fed. R. Civ. P. 65; M.D. Fla. Loc. R. 6.02.

"A preliminary injunction is an extraordinary remedy never awarded as of right." Norwegian Cruise Line Holdings Ltd v. State

- 14 -

Surgeon Gen., Fla. Dep't of Health, 50 F.4th 1126, 1134-35 (11th Cir. 2022) (citation omitted).  To obtain a preliminary injunction, a moving party "must establish that [it] is [substantially] likely to succeed on the merits, . . . to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Grayson v. Comm'r, Alabama Dep't of Corr., 121 F.4th 894, 896 (11th Cir. 2024), quoting Ramirez v. Collier, 595 U.S. 411, 421 (2022) (internal quotation marks and citation omitted); see also Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  The burden of persuasion for each of the four requirements is generally on the party seeking the preliminary injunction.  Siegel, 234 F.3d at 1176.  "Failure to show any of the four factors is fatal." Grayson, 121 F.4th at 896 (citation omitted).  But where a non-moving party would bear the burden of proof at trial, that party also bears the burden at the preliminary injunction stage. Ashcroft v. ACLU, 542 U.S. 656, 666 (2004); Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006).

### III.

#### A. Substantial Likelihood of Success on the Merits

To satisfy the first requirement for a preliminary injunction, Naples Pride must show that it is substantially likely to succeed on the merits of at least one of the two First Amendment counts in its Complaint.  For the as-applied claim, Naples Pride

asserts that the three permitting conditions are viewpoint-based and therefore *per se* forbidden, or at least content-based and unable to survive strict scrutiny. (Doc. #12, p. 15.) For the facial claim, Naples Pride asserts that the City's permitting scheme is unconstitutional because it gives the City unbridled discretion to burden unfavored speech, including by imposing a "heckler's veto" through content-based excessive security fees. (Id.) Defendants respond that Naples Pride has failed to establish a substantial likelihood of success on either count.[3]

For the reasons set forth below, the Court finds that Naples Pride has satisfied its burden on the as-applied challenge in Count I for two of the three conditions (the indoors-only restriction and the age restriction), but not for the third (excessive security fees). The Court also finds that Naples Pride has not satisfied its burden on the facial challenge in Count II.

**(1)  Section 1983 Claims**

Naples Pride brings both counts of its Complaint pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

---

[3] After oral arguments on the motion for preliminary injunction, Defendants filed a motion to dismiss the Complaint, which is awaiting a response. The plausibility standard for review of a complaint is, of course, much different than the substantial likelihood of success standard for a preliminary injunction.

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.   In short, Section 1983 "provides judicial remedies to a claimant who can prove that a person acting under color of state law committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States."   Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995) (citations omitted).

Defendants are "persons" within the meaning of Section 1983. See 1 U.S.C. § 1 ("the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1277 (11th Cir. 2021) ("We also know that the word 'person' in § 1983 extends to corporations, both municipal and otherwise" (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 687 (1978))).

Claims against individuals in their official capacities 'generally represent only another way of pleading an action against an entity of which an officer is an agent,' and are 'in all respects other than name, to be treated as a suit against the entity.' That's because an award of damages in an official capacity suit is paid by the government entity itself, so that entity is the real party in interest in that type of lawsuit.

Rodemaker v. City of Valdosta Bd. of Educ., 110 F.4th 1318, 1328 (11th Cir. 2024) (quoting Kentucky v. Graham, 473 U.S. 159, 165–

66 (1985)).

Defendants assert that they cannot be sued due to their legislative immunity. (Doc. #39, pp. 8-9.) It is true that "local legislators are [] absolutely immune from suit under § 1983 for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998). But legislative immunity is an affirmative defense that only applies to conduct that is legislative in nature, not to the administrative application of existing policies. Crymes v. DeKalb Cnty., 923 F.2d 1482, 1485 (11th Cir. 1991); Woods v. Gamel, 132 F.3d 1417, 1419 (11th Cir. 1998). Defendants have not been sued in their individual capacities, nor have they established that this affirmative defense applies to either count in the Complaint or to any Defendants in their official capacities.

As a nonprofit Florida corporation, Naples Pride is an "other person" within the meaning of Section 1983. Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 319 (2010) (nonprofit corpora-tion allowed to challenge federal law on First Amendment grounds); Food Not Bombs, 11 F.4th at 1275-77 (nonprofit unincorporated ass-ociation allowed to challenge park regulation on First Amendment grounds); 1 U.S.C. § 1.

**(2)  Overview of the First Amendment Right to Free Speech**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. 1. "At the heart of the First Amendment lies the principle that each

person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Government action that suppresses speech because of its message contravenes this essential right." TikTok Inc. v. Garland, 604 U.S. __ , 145 S. Ct. 57, 66–67 (2025) (citations and internal punctuation omitted). "The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" 303 Creative LLC v. Elenis, 600 U.S. 570, 584 (2023). "The First Amendment prohibits laws 'abridging the freedom of speech,' which, 'as a general matter . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" Nevada Comm'n on Ethics v. Carrigan, 564 U.S. 117, 121 (2011) (citations omitted). "[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided,' and likely to cause 'anguish' or 'incalculable grief.'" 303 Creative LLC, 600 U.S. at 586 (citations omitted). "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are [] offensive to some of their hearers.'" Matal v. Tam, 582 U.S. 218, 244 (2017) (citations omitted).

Nonetheless, "the [First] Amendment has no application when what is restricted is not protected speech." Carrigan, 564 U.S. at 121. Additionally,

the Constitution does not require the government to grant
access to all who wish to exercise their right to free
speech, no matter the setting, without regard to the
nature of the property or to the disruption that might
be caused by the speaker's activities. Disallowing any
limits whatsoever in all government spaces would often
lead to chaos, and could even keep the government from
fulfilling its lawful functions. But that is not a
license to evade the First Amendment, which demands a
close look when the government restricts speech.

McDonough v. Garcia, 116 F.4th 1319, 1322 (11th Cir. 2024) (en
banc) (internal citations and punctuation omitted).

**(3)  The First Amendment Applies to Municipal Governments**

The First Amendment applies to States and municipalities
through the Fourteenth Amendment.  Members of City Council v.
Taxpayers for Vincent, 466 U.S. 789, 792 n. 2 (1984); Wacko's Too,
Inc. v. City of Jacksonville, 134 F.4th 1178, 1184 (11th Cir.
2025); Cooper v. Dillon, 403 F.3d 1208, 1221 n.8 (11th Cir. 2005)
("As a municipality, pursuant to Florida law, Key West is not
insulated from suit in this case by sovereign immunity under the
Eleventh Amendment" (citing Will v. Michigan Dep't of State Police,
491 U.S. 58, 70 (1989))).  No party disputes that the City is
subject to the First Amendment.

**(4) Validity of Permit Restrictions**

To decide if government restrictions are valid under the First
Amendment, a court employs a three-step process: (1) determine
whether the case involves "speech" protected by the First Amend-
ment; (2) identify the type of forum where the protected speech is

set to occur; and (3) assess whether the government's justifications for restricting the protected speech satisfy the applicable legal standard.  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985); see also Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc., 942 F.3d 1215, 1236 (11th Cir. 2019).  The City agrees that this is the proper analytical framework.  (Doc. #39, pp. 10-11.)

**(a) Naples Pride's Drag Performance Is Protected Speech**

"At the threshold, we consider whether the challenged provisions are subject to First Amendment scrutiny."  TikTok Inc., 145 S. Ct. at 65; see also DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1265 (11th Cir. 2007) ("we must ask whether the First Amendment protects the conduct at issue").  If the conduct at issue is not protected by the First Amendment, "we need go no further."  Cornelius, 473 U.S. at 797.

The conduct at issue is Naples Pride's drag performance, not the Pridefest event as a whole.  The City "takes no issue with whether the festival occurs." (Doc. #39, p. 9.)  As the City sees it, "the only issue presented is the location of the drag show and its attendant age restriction – not whether Plaintiff is permitted to have a drag show or a festival."  (Doc. #39, p. 19.)  Naples Pride bears the burden of establishing that the First Amendment protects its drag performance.  Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5 (1984); United States v.

- 21 -

Gilbert, 920 F.2d 878, 883 (11th Cir. 1991). "Whether certain activity or speech is protected by the first amendment is a question of law for the district court." Sykes v. McDowell, 786 F.2d 1098, 1103 (11th Cir. 1986).

Naples Pride asserts that its anticipated "family friendly" drag performance is protected by the First Amendment. The City does not argue that the drag performance falls outside the First Amendment's protection, only that the restrictions it has imposed in the Permit comply with the First Amendment. (Doc. #39, pp. 19-35.) However, Amici Liberty Counsel and America's Future, Inc. both assert that drag performances are not protected by the First Amendment, especially when performed in front of children. (Doc. #38, p. 16-18, 24; Doc. #54, pp. 6, 8-13.)

"The First Amendment guarantees 'all people [ ] the right to engage not only in 'pure speech,' but 'expressive conduct' as well.'" Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1240 (11th Cir. 2018) (citations omitted). Some, but not all, forms of symbolic conduct are deserving of First Amendment protection. United States v. O'Brien, 391 U.S. 367, 376 (1968). The Supreme Court has rejected the view that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," and has thus limited First Amendment protection to conduct that is "inherently expressive." Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S.

47, 65-66 (2006) (citations omitted).

To determine whether conduct is inherently expressive, "we
ask whether [a] reasonable person would interpret it as *some* sort
of message, not whether an observer would necessarily infer a
*specific* message." Food Not Bombs, 901 F.3d at 1240 (emphasis in
original). In making that determination, a court looks to the
context and circumstances surrounding the conduct. Id. at 1241-
42. For example, the Supreme Court has found that nudity is not
protected by the First Amendment, but that nude dancing is protec-
ted expressive conduct. City of Erie v. Pap's A.M., 529 U.S. 277,
289 (2000).[4]

No party has cited any binding authority on the question of
whether a "family friendly," or any, drag performance is protected
by the First Amendment. Several district courts have found that
drag performances can be protected by the First Amendment. E.g.,
HM Florida-ORL, LLC, 679 F. Supp. 3d at 1342; S. Utah Drag Stars
v. City of St. George, 677 F. Supp. 3d 1252 (D. Utah 2023);
Woodlands Pride, Inc. v. Paxton, 694 F. Supp. 3d 820 (S.D. Tex.
2023); Imperial Sovereign Ct. of Mont. v. Knudsen, 694 F. Supp. 3d
1095 (D. Mont. 2023); Texas A&M Queer Empowerment Council v.
Mahomes, No. 25-cv-992, 2025 WL 895836, at *6 (S.D. Tex. Mar. 24,

---

[4] As the Supreme Court has been careful to point out, however,
nude dancing "falls . . . within the outer ambit of the First
Amendment's protection." City of Erie, 529 U.S. at 289.

- 23 -

2025); but see Spectrum WT v. Wendler, 693 F. Supp. 3d 689, 705 (N.D. Tex. 2023).

For purposes of this preliminary injunction motion, the Court finds that Naples Pride's drag performance is symbolic conduct that is inherently expressive and constitutes "speech" within the meaning of the First Amendment. The circumstances surrounding the drag performance would lead a reasonable person to view the performance as conveying some sort of message. The performance is part of a festival conducted in a month associated with LBGTQ+ issues. Pridefest and the drag performance raise matters of concern to the community, as shown by the vigorous debate before the City Council regarding this year's Permit and those of prior years. Those who weighed in on the proposed drag performance understood that their disagreement was with the performance's inherently expressive meaning. Some strenuously oppose the performance's symbolic message, others are ardently in favor of it. The City Council made its permitting decision after considering the expressive meaning conveyed by the anticipated drag performance. The very nature of the restrictions imposed by the City Council — the indoor-only and age restrictions and a portion of the increased security fees — indicate that the performance's message was a motivation for the restrictions.

**(b) Forum Analysis for Cambier Park:**

While the "family friendly" drag performance is speech pro-

tected by the First Amendment, that is only the first step in the analysis. The Supreme Court has long recognized the commonsense principle that the Constitution does not mandate access to property merely because it is government owned. Cornelius, 473 U.S. at 799-800. The second step, therefore, is to determine the type of forum in which the protected speech will take place. While the forum analysis has evolved in the Supreme Court and the Eleventh Circuit, see McDonough, 116 F.4th at 1323-28, it is now settled that there are "four types [of forums]: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." Id. at 1322. The type of forum determines the governing legal standards. Barrett v. Walker Cnty. Sch. Dist., 872 F.3d 1209, 1223-24 (11th Cir. 2017) ("Courts use 'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property") (citation omitted). "Content restrictions in the first two categories are reviewed under strict scrutiny, while regulations in the latter two survive [if] they are viewpoint neutral and reasonable." McDonough, 116 F.4th at 1322.

Only two options are pressed for Pridefest and its drag performance in Cambier Park: Naples Pride asserts that the park is a traditional public forum (Doc. #12, p. 16), while the City asserts that the whole park, or at least the portion of the park where Pridefest (and its drag performance) are being hosted, is a limited

public forum.  (Doc. #39, pp. 10-17.)  Under either legal standard, two of the Permit conditions are clearly invalid.

Cambier Park consists of approximately 12 acres of land owned by the City in the heart of downtown Naples.  The property has served as a public park since 1926, almost a century.[5]  Cambier Park contains the Norris Community Center, shuffleboard courts, bocce courts, a tennis center, a basketball court, a bandshell for live performances and activities, a playground, and open green spaces.  (Doc. #39, p. 12.)  Much of the park is available to the public for a wide variety of activities without admission fees or permits.  However, the City also rents exclusive access to the park, or portions of the park, for special events.  Special events require permits.  Some permits may be issued by the City Manager and others require City Council approval.  The proposed "footprint" of 2025 Pridefest is depicted at Docs. #39-8, #39-9.

The Court finds that Cambier Park is a traditional public forum.  Numerous cases have held that public parks are venues historically associated with free speech and expressive activity, and therefore, traditional public forums.  E.g., Hague v. CIO, 307 U.S. 496, 515, 516 (1939) ("streets and parks . . . have immemorially been held in trust for the use of the public and, time out

---

[5] (Doc. #39, p. 12 n.13) (citing Cambier Park, NAPLESGOV, https://www.naplesgov.com/parksrec/park/cambier-park (last accessed May 12, 2025).

of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); Naturist Soc'y, Inc. v. Fillyaw, 958 F.2d 1515, 1522 (11th Cir. 1992) ("The Supreme Court and the Eleventh Circuit have consistently held that parks are public forums"); Keister, 879 F.3d at 1288 ("Quintessential examples [of traditional public forums] are parks and streets"); Occupy Fort Myers v. City of Fort Myers, 882 F. Supp. 2d 1320, 1329 (M.D. Fla. 2011) (Steele, J.) (Fort Myers' Centennial Park "is a [traditional] public forum").

The City agrees that public parks are *normally* traditional public forums. (Doc. #39, p. 11.) But Cambier Park is a limited public forum, the City contends, under the "more tailored approach to ascertaining the perimeters of a forum within the confines of government property" endorsed by Cornelius, 473 U.S. at 801. (Id.)

> [A] limited public forum is established when governmental entities open their property but limit its use to certain groups or dedicate it solely to the discussion of certain subjects. It is plain that governments may exclude a speaker if he is not a member of the class of speakers for whose especial benefit the forum was created. Indeed, implicit in the idea that a government forum has not been opened widely and intentionally to the general public is the government's right to draw distinctions in access based on a speaker's identity.

Keister, 879 F.3d at 1288 (internal punctuation and citations omitted); see also Barrett, 872 F.3d at 1225. The City asserts that "[a]t best" Naples Pride can point to the grassy area in the park's center as an area that is a traditional public forum, but

that Naples Pride wishes to use and control access to more than just that grassy area during Pridefest, (id. at 12–13):

> Because Plaintiff wishes to have a private ticketed event with clearly delineated borders, Plaintiff's festival changes the use of the park and is better described as a limited public forum.  In order to transform a traditional forum into a more limited one, there must be some sort of visible, meaningful distinction setting the event apart from the venue on which it is held.

(Id. at 13.)

The City further argues that even if the remainder of the park continues to be a traditional public forum, the area used for Pridefest is a limited public forum because it is a private, ticketed fundraiser whose sponsor can exclude persons expressing contrary viewpoints.  (Id.)  As the City sees it:  "Naturally, due to the exclusive, limited purpose of Plaintiff's event, the forum changes from a traditional public forum to a limited public forum." (Id. at 14) (citing Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995)).

The City concludes that its "ability to create limited public forums out of traditional public forums is not without legal precedent."  (Id. at 14–15.)  It cites a New York district court case addressing access to painted fiberglass cows;[6] a Supreme Court case

---

[6] People for Ethical Treatment of Animals v. Giuliani, 105 F. Supp. 2d 294, 319 (2000).

addressing a ban on political advertising on city-owned buses;[7] a
Supreme Court case addressing a school mail system;[8] a Florida
district court case finding that a city could preclude a political
party from joining a parade;[9] and an appellate case upholding the
dismissal of a challenge to a city's lease of public property to
a political committee for a rally that excluded those with opposing
viewpoints.[10]  (Id. at 12–17.)

Finally, the City argues that even if the Court finds that
the park and the festival area are traditional public forums, at
least the bandshell that Naples Pride seeks to use for the drag
performance is only a limited public forum because its use "is
separate from that of a 'festival.'"  (Id. at 17.)  As the City
argues, "[a] bandshell can hardly be a place that traditionally
has been maintained by governments for the open access of the
public for free assembly and the open exchange of ideas."  (Id.)

The Court finds none of the City's arguments persuasive.  All
the cases cited by the City as precedent for creating a limited
public forum out of a traditional public forum are nowhere near

---

[7] Lehman v. City of Shaker Heights, 418 U.S. 298 (1974).

[8] Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37,
39 (1983).

[9] Parkland Republican Club v. City of Parkland, 268 F.Supp.2d
1349, 1356 (S. D. Fla. 2003).

[10] Sistrunk v. City of Strongsville, 99 F.3d 194, 200 (6th Cir.
1996).

the factual circumstances of this case.  One of the City's theories
would transform the entire park, apparently forever, because the
City has decided to rent out portions of the park for temporary
special events.  Traditional public forums are not so easily trans-
formed, especially here, at a location that has served as a public
park for ninety-nine years.  Under the City's alternate theory,
persons outside a special event's temporary fencing would be gov-
erned by a stringent First Amendment standard, while persons at
the special event would be protected by a lower standard.  And the
parameters of the less protected areas would constantly change,
depending on the "footprint" of each new special event.  The Court
is not convinced.  Finally, the City's view that a bandshell is
not a location conducive to public access, assembly, and exchange
of ideas is not supported by the record or by common experience.

While the Court finds Cambier Park to be a traditional public
forum, the Court will also examine the Permit conditions under the
standard applicable to a limited public forum.

### (c) Alternate Legal Standards Governing Permit Conditions:

To assess the constitutionality of the Permit's restrictions,
the Court must determine what level of constitutional scrutiny to
apply.  Wacko's Too, Inc., 134 F.4th at 1184.  The government's
ability to restrict speech in a traditional public forum

> is highly constrained. Regulations that depend on the
> content of speech need to satisfy strict scrutiny, which
> means they must be necessary to serve a compelling state

> interest and narrowly drawn to achieve that end. As for
> content-neutral time, place, and manner regulations—
> when, where, and how speech can happen, regardless of
> the speaker's message—the standard is somewhat looser.
> Even so, such rules must be narrowly tailored to serve
> a significant government interest, and leave open ample
> alternative channels of communication.

McDonough, 116 F.4th at 1323 (internal quotation marks removed).

In a limited public forum, by contrast, restrictions on speech

must be viewpoint neutral and reasonable in light of the forum's

purpose.  Id. at 1328.

To determine what level of scrutiny to apply, a court must

determine whether the restriction is "content-based" or "content-

neutral."  Wacko's Too, Inc., 134 F.4th at 1184.  The Eleventh

Circuit has summarized recent Supreme Court guidance on the matter:

> As the Supreme Court has recently explained, a law is
> content-based either (1) if it applies on its face to
> particular speech because of the topic discussed or the
> idea or message expressed or (2) if, though facially
> neutral, it cannot be justified without reference to the
> content of the regulated speech or was adopted by the
> government because of disagreement with the message the
> speech conveys. Content-based laws are subject to strict
> scrutiny, meaning that they are presumptively
> unconstitutional and may be justified only if the
> government proves that they are narrowly tailored to
> serve compelling state interests.
>
> By contrast, a content-neutral restriction is one that
> is justified without reference to the content of the
> regulated speech. Content-neutral laws . . . are subject
> to an intermediate level of scrutiny because in most
> cases they pose a less substantial risk of excising
> certain ideas or viewpoints from the public dialogue. In
> broad brushstrokes, a court applying intermediate
> scrutiny will sustain a content-neutral law if it
> advances important governmental interests unrelated to
> the suppression of free speech and does not burden

substantially more speech than necessary to further
those interests.

<u>Wacko's Too, Inc.</u>, 134 F.4th at 1184–85.

### (d) Application of Legal Standards

Permitting ordinances often constitute classic examples of prior restraints on expression because the government can deny access to a forum before the expression occurs. <u>Barrett</u>, 872 F.3d at 1223. The Court uses forum analysis to evaluate such restrictions on purely private speech that occurs on government property. <u>Id.</u> at 1223–24. The Court applies the legal standards discussed above to each of the two Permit restrictions, then to the anticipated security costs.

### (1) Indoor Location of Drag Performance

Naples Pride argues that its drag performance has been shunted to a tiny building alongside Cambier Park because of public opposition to the performance's expressive content. The City responds that the indoor restriction is not content based, but driven by realistic security concerns that are proper matters of consideration for local government. (Doc. #39, p. 20.) Experience, the possible impact of protesters, potential and credible threats, and trends in violence worldwide may all properly be considered, the City asserts, and in this case, justify the level of security planned for Pridefest. (<u>Id.</u> at 20–23.) The City also asserts that it "must plan for every contingency," given the potential

number of the attendees.  (Id. at 22–23.)  The City disputes the contention that it has given way to a "heckler's veto," and asserts that it has properly engaged in "target hardening."  (Id. at 23–24.)  The City argues that even if strict scrutiny applies, the location condition survives because it is a reasonable time, place, and manner restriction.  (Id. at 29–30.) Finally, the City contends that "[a]s a matter of common sense and logic, an outdoor perfor-mance is less secure and more susceptible to a violence incident than an indoor one."  (Id. at 30.)

Naples Pride does not dispute that safety and security are proper government interests, and indeed, agrees that the City should provide adequate levels of security.  Naples Pride is not against the use of security measures, but objects to concealing the performance in a small building due to the City's concerns that an outdoor performance may inflame others who are exercising their First Amendment rights to protest the drag performance.  The City's valid concerns of "best practices" and "target hardening" in the name of security cannot overcome the First Amendment.

The City's requirement of an indoor location for the drag performance, even if a good faith attempt to mitigate risk, is clearly viewpoint and content based.  It is the perceived expres-sive conduct of the drag performance, and the potential hostile reaction it may engender in others, that caused the City to res-trict the drag performance to the inside of a small building, and

to disallow a performance at Cambier Park's bandshell.

### (2) Age Restriction – Adults Only

"To assess the age restriction's constitutionality, we must first determine what level of constitutional scrutiny to apply. And to do that, we must determine whether the restriction is 'content-based' or 'content-neutral.'" Wacko's Too, 134 F.4th at 1184. Here, the age restriction is clearly viewpoint and content based. The City argues that the age restriction is based on security needs caused by the anticipated reaction of others to the drag performance's content, while Amici argue that the age restriction is justified by the impropriety of the performers' conduct for viewers, especially children. A restriction imposed on speech deemed immoral or scandalous is clearly a viewpoint-based restriction. Iancu v. Brunetti, 588 U.S. 388, 394–99 (2019).

The City argues that the age restriction is justified by its concern that the City, its agents, and/or employees may be prosecuted under the Florida Drag Law if the permit is granted without an age restriction. The City asserts that since the district court in HM Florida-ORL only enjoined a single state official in her official capacity, the law may still bind the City of Naples. For this reason, the City asserts that the State of Florida or State Attorney are indispensable parties to this action, and notes that they have not been joined by Plaintiff. (Doc. #39, pp. 30–31.)

The City is simply wrong on this score. Naples Pride does

- 34 -

not challenge the Florida Drag Law's constitutionality.  (Doc.
#12, pp. 1–38); see also (Doc. #48, p. 4 (stating that the Drag
Law is "[i]rrelevant")).  Moreover, the City's current position of
concern about the Florida Drag Law's continuing force is a *post
hoc* rationale — not the true reason for the the permit conditions
that the City imposed.  As Mr. Matthew R. McConnell, the City's
counsel of record, informed the City Council on January 15, 2025:

> I heard references to 847.0134. That is specific to adult
> entertainment establishments, which are defined in
> Chapter 847, which do not include what we're talking
> about today. I heard references to 827.11 and arguments
> that it's still effective, even though a federal court
> found it unconstitutional and the Supreme Court decided
> not to take it up. I don't agree with that. I think it
> is unconstitutional. I don't think we have to abide by
> it. And if we got sued over it, I would just file judicial
> notice of this federal opinion. which already deemed it
> unconstitutional.

(Doc. #12-18, p. 31, 119:25–120:11) (emphasis added).

Additionally, there is no uncertainty about the law's current
lack of binding effect:  the statute has been declared unconsti-
utional; the official charged with enforcing it has been enjoined
from doing so; and both the Eleventh Circuit and Supreme Court
have so far declined to stay or modify the injunction.  Further-
more, nothing in the record establishes that the anticipated
"family friendly" drag performance meets the requirements of the
statute or justifies a prior restraint.

### (3)  Amount of Security Fee

The Court agrees with the City that it may charge a fee for

the actual burden on public services arising from Pridefest.  Cox v. State of New Hampshire, 312 U.S. 569, 576–77 (1941).  (Doc. #39, p. 26.)  The Court also agrees that the City may properly consider the professional judgments of police and law enforcement officials about the need for security measures.  (Id. at 26.)

The City asserts that the imposition of the security fee in this case "is rational, logical, and viewpoint neutral" and has been tailored to the location and logistics of Pridefest after considering "the complex logistics, expected attendance, the history of Plaintiff's desire for security, Plaintiff's concern for attendees, anticipated protestors, strain on City resources, and the continued need to provide essential public safety services to the public at large[.]"  (Doc. #39, pp. 25–26.)  The City rejects the idea that the amount of the security fee constitutes a "heckler's veto" because that concept contemplates silencing speech in its entirety, which has not occurred here.  (Doc. #39, p. 27.)  Additionally, the City asserts that there will be no hostile crowd, and hence no hecklers, within the festival because as a limited private forum, Pridefest "can exclude anyone they please that they disagree with."  (Id. at 27–28.)

The City also asserts that the sharp security-fee increases between 2022 to 2024 — $3,867, $5313.75, and $15,520 (Doc. #12-1, ¶ 45) — are attributable to content-neutral factors.  First, the City approved a new contract with NPD on July 1, 2023, which raised

rates for off-duty law enforcement personnel who work special events. (Doc. #39-11). Second, in 2024, the City abandoned its prior policy of writing off the cost of SWAT deployments for large-event organizers, as it was no longer fiscally responsible to do so. (Doc. #39, p. 7) (citing Docs. #39-13, #39-14, #39-15.) The City thus asserts that invoices charged to other large events, like Cars on 5th, show similar security-fee increases. (Doc. #39, p. 7.) Indeed, the February 8, 2025, estimate provided to Cars on 5th has an almost identical security-fee of $33,070, which covers the cost of 31 personnel. (Doc. #39-16.)

The Court finds that Naples Pride is substantially likely to show that a portion of the security fee estimate is viewpoint and content based. Even so, the Court declines to grant a preliminary injunction as to the estimate because such an injunction would exceed what is needed at this time. It is undisputed that Naples Pride and the public are entitled to security at Pridefest, and that some security fee can be properly assessed. The precise amount subject to dispute cannot be accurately computed at this time. It will be necessary to determine what portion of the security fee is attributable to concerns over other individuals' exercises of First Amendment rights (e.g., protesters) and may not be shifted to Naples Pride. However, no amount is due until after Pridefest, and even then, only 60 days after the City invoices Naples Pride. If at that point, the parties cannot agree to a

delay of the payment due date until after this matter is litigated, the Court may consider by motion a stay of the payment deadline.

**(5) Facial Challenge to Permitting System:**

Naples Pride challenges the City's "permitting scheme" as facially unconstitutional, contending that it gives City officials "unbridled discretion" to restrict speech.  (Doc. #12, p. 29.) "[A] plaintiff has standing to facially challenge a law that allegedly grants unbridled discretion as long as the plaintiff 'is subject to' or 'imminently will be subject to' that particular law." Barrett, 872 F.3d at 1220.

> [T]he plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided. In these circumstances, the official can grant or deny a permit for any reason she wishes. Such a grant of unconstrained power is unconstitutional under the First Amendment for two reasons: first, it creates an incentive for speakers to self-censor in hopes of being granted a permit, and second, it is difficult for courts to determine whether an official's standardless permit decision was impermissibly based on content or viewpoint.

Id. (citations omitted). The unbridled-discretion doctrine applies to both traditional public forums and limited public forums.  Id. at 1225–26.

Generally, a plaintiff bringing a facial challenge bears the burden of proving that the challenged law could never be applied in a constitutional manner.  See Jacobs v. The Fla. Bar, 50 F.3d 901, 906 n. 20 (11th Cir. 1995).  That is an intentionally heavy

burden, because a party who asserts a facial challenge to a law
seeks not only to vindicate his own rights, but to alter the rights
of others who may be impacted by the law's invalidation.  <u>Moody v.</u>
<u>NetChoice, LLC</u>, 603 U.S. 707, 723 (2024).

When a law is challenged under the First Amendment, however,
the burden is altered to create "breathing room" for free speech.
<u>United States v. Hansen</u>, 599 U.S. 762, 769 (2023).  The question
becomes whether "a substantial number of [the law's] applications
are unconstitutional, judged in relation to [its] plainly legit-
imate sweep."  <u>Americans for Prosperity Foundation v. Bonta</u>, 594
U.S. 595, 615 (2021); <u>Hansen</u>, 599 U.S. at 770.  In other words, in
the First Amendment context, a law may be struck down only if its
unconstitutional applications "substantially outweigh" its con-
stitutional ones.  <u>Moody</u>, 603 U.S. at 723-24.  As the language of
that test suggests, the burden is slightly lower but remains
rigorous.

Additionally, even if a statute violates the Constitution in
some applications, a court cannot "erase a duly enacted law from
the statute books."  <u>Jacobson v. Fla. Sec'y of State</u>, 974 F.3d
1236, 1255 (11th Cir. 2020) (citation omitted).  If only a portion
of an ordinance is likely unconstitutional, a court cannot enjoin
the enforcement of the entire ordinance.  <u>Brockett v. Spokane</u>
<u>Arcades, Inc.</u>, 472 U.S. 491, 503 (1985) ("[A] federal court should
not extend its invalidation of a statute further than necessary to

dispose of the case before it").

Naples Pride asserts that the City's permitting scheme is analogous to the one in Forsyth Cnty., Ga. v. Nationalist Movement, which the Supreme Court struck down. 505 U.S. 123 (1992). (Doc. #12, p. 29–30) (also citing Bourgeois v. Peters, 387 F.3d 1303, 1317 (11th Cir. 2004) and Food Not Bombs, 11 F.4th at 1295). The scheme in Forsyth Cnty. was invalidated because it left "[t]he decision [of] how much to charge for police protection or administrative time — or even whether to charge at all — [] to the whim of the administrator," there were "no articulated standards either in the ordinance or in the county's established practice," and "the administrator was not required to rely on any objective factors." Id. at 132–33.

Naples Pride argues that the City's permitting scheme is similarly unconstitutional, contending that "[n]o statute, ordinance, or other source of law," in fact, "nothing," "guides or cabins the City Council's decision to restrict disfavored speech to an indoor venue, or to impose age limits on attendance." (Id.) Naples Pride avers that the Manual provides the City Council "unbridled discretion to determine what services should be provided — and charged to the event organizer — to 'ensure the safety of participants, minimize the inconvenience to residents[,] and reduce the [City's] liability exposure." (Id.) Finally, Naples Pride asserts that the Manual provides no "criteria for assessing security needs or

calculating security costs." (Id. at 33.)  Instead, according to Naples Pride, the Chief of Police has "complete discretion to impose whatever security fee he sees fit" without relying on or providing "any objective justification for the amount imposed." (Id. at 33.)[11]

The City responds that its permitting process is content neutral and constitutes a reasonable time, place, and manner rest- riction (Doc. #39, pp. 31), citing the analysis set forth in Thomas v. Chicago Park District, 534 U.S. 316 (2002) and Cox, 312 U.S. at 569, (id. at 32-33.)  The City further contends that Sullivan v.

---

[11] Naples Pride also asserts that the permitting scheme allows the City Council to "impose '[a]ny event specific conditions" that it desires "as conditions of approval." (Doc. #12, p. 31) (emphasis original) (citing Naples, Fl. Mun. Code § 46-39(c)(2)).  Section 46-39(c)(2) clearly does not on its face grant the City Council such power.  It states: "Any event specific conditions placed on the event by city council as conditions of approval (e.g., hours of operation, operational controls, site plans, etc.) shall be included in, or attached to, the Resolution of approval." Naples, Fl. Mun. Code. § 46-39(c)(2).

In addition, Naples Pride contends that the permitting scheme allows the City Manager to "approve or deny a permit based on, inter alia, whether 'the event is generally compatible with the character of the city.'" (Id. at 31-32.)  According to Naples Pride, there are "[n]o standards" to guide the City Manager's exercise of that power. (Doc. #29, p. 32.)  In Forsyth Cnty., the plaintiffs provided evidence that the county administrator had exercised his power to decide whether or not to impose administrative fees.  505 U.S. at 132.  Naples Pride does not contend that the City Manager has exercised any alleged power here, nor indeed does it provide evidence of the City Manager having ever done so.  Thus, Naples Pride has not met its burden of showing that the unconstitutional applications of this alleged power "substantially outweigh" its constitutional ones.

- 41 -

City of Augusta, 511 F.3d 16 (1st Cir. 2007) and New England
Regional Council of Carpenters v. Kinton, 284 F.3d 9 (1st Cir.
2002) support its reliance on the Naples Police Department to make
"professional judgments" about personnel, resources, and costs
needed for public safety and convenience.  (Id. at 35.)   In
addition, the City contends that the City Council's permitting
decisions are guided by "the following content-neutral consider-
ations: street closings, off-site parking, amplified entert-
ainment, city co-sponsorship, crowd attendance in excess of 1,500,
and fireworks." (Id. at 33) (citing Doc. #12-20, p. 4.)  The City
also asserts that the criterion of "impact to the community" is
based on an objective consideration — "the number of participants."
(Doc. #39, p. 33) (citing Doc. #12-20, p. 6.)

Furthermore, the City notes that NPD is required to follow
certain "best practices" in security deployments for large events.
NPD must do so, the City contends, to maintain its status with the
Commission for Florida Law Enforcement Accreditation.  (Doc. #39,
pp. 2-3) (citing Doc. #39-1, p. 160; Doc. #39-18.)   NPD also
follows Department of Justice ("DOJ") Office of Community Oriented
Policing Services ("COPS"), Department of Homeland Security
("DHS"), Federal Bureau of Investigation ("FBI"), and National
Tactical Officers Association ("NTOA") standards and guidelines.
(Doc. #39, pp. 2-3) (citing Doc. #39-2, #39-5, #39-18.)

Finally, the City emphasizes that its permitting process is

safeguarded by "an extra layer of review on First Amendment grounds" should an applicant "contend[] that the denial of [a] permit or [its] determination . . . under [] normal procedures [] is likely to constitute an impermissible prior restraint."[12]  (Doc. #39, p. 34) (citing Naples, Fla. Code of Ordinances § 2-167, et seq.)[13]

The Supreme Court has advised that "[i]n evaluating [a] facial challenge," a court "must consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it."  Forsyth Cnty., 505 U.S. at 131. Here, Naples Pride has not shown that it is substantially likely that the potentially unconstitutional applications of the City's

---

[12] Prior restraints are presumptively unconstitutional and face strict scrutiny.  Burk v. Augusta-Richmond County, 365 F.3d 1247, 1251 (11th Cir. 2004).

The Supreme Court's decision in FW/PBS, Inc. v. City of Dallas establishes the ground rules applicable here. There, the Court held that a prior restraint arising out of a licensing regime is not unconstitutional provided that two procedural safeguards are observed: (1) [T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained; and (2) there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

Wacko's Too, Inc., 2025 WL 1174659, at *8 (internal citations and quotation marks removed).

[13] The City contends that Naples Pride did not take advantage of that opportunity for review at any time after its special event permit was issued in January 2025.

permitting scheme "substantially outweigh" its constitutional
ones. <u>Moody</u>, 603 U.S. at 723–24. Naples Pride asserts that the
City has applied its permitting scheme (constitutionally) to faci-
litate, among other events, the annual Naples Car Show ("Cars on
5th"), the Fifth Avenue Tree Lighting, and the Naples Art Insti-
tute's New Years Art Festival. (Doc. #12, p. 10 n.4.) In 2024,
those events involved some combination of multi-day street clo-
sures, tens of thousands of attendees, security personnel deploy-
ments, and/or security fees ranging from $12,970 to $18,000. (<u>Id.</u>)
Indeed, the only asserted unconstitutional uses of the City's
permitting scheme are those Naples Pride challenges here.

Even if NPD assesses the "[p]otential for conflict or protests
(political/controversial issues)" in determining the security
needs of each special event, that is <u>not</u> inherently unconsti-
tutional. NPD should be making those determinations to ensure that
every special event is protected by enough security personnel and
adequate protocols in conformance with best practices. As dis-
cussed earlier, what the City cannot do is assess against an event
organizer the portion of additional fees attributable to the
event's controversial nature. Naples Pride may eventually succeed
in challenging a portion of the fee that was assessed here. But
that alone is insufficient to sustain a facial challenge to the
City's entire permitting scheme.

In short, the Court is not persuaded that the City of Naples'

permitting scheme is standardless, or that the potentially uncon-
stitutional applications of the permitting scheme "substantially
outweigh" its constitutional ones.    Thus, Naples Pride has not
established a likelihood of success on the merits of its facial
challenge to the permitting scheme, and on these grounds, the
motion for preliminary injunction is **DENIED**.

## B. Irreparable Injury

Having determined that Naples Pride has demonstrated a subst-
antial likelihood of succeeding on the merits of a portion of its
as-applied constitutional challenges to the City of Naples'
permitting decision, the Court turns to the remaining factors for
the issuance of a preliminary injunction.

"A showing of irreparable injury is the *sine qua non* of in-
junctive relief."    Siegel, 234 F.3d at 1176 (citation omitted).
"Regarding irreparable injury, it is well established that the
loss of First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury."    KH Outdoor, LLC
v. Trussville, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (citations
and internal punctuation omitted).    "Ordinances that violate the
First Amendment are 'per se irreparable injur[ies].'"    LaCroix v.
Town of Fort Myers Beach, Florida, 38 F.4th 941, 954–55 (11th Cir.
2022) (citations omitted).    "[A]n ongoing violation of the First
Amendment constitutes an irreparable injury."    FF Cosmetics FL,
Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017).

- 45 -

The nature of the injuries in this case cannot be cured by a mere award of monetary damages.  The Court finds that Naples Pride has satisfied its burden of showing irreparable injury.

**C. Balance of Injuries, Public Interest**

Naples Pride must also establish that the threatened injury outweighs the harm that a preliminary injunction may cause to the Defendants and that an injunction would not harm or do a disservice to the public interest.  <u>Siegel</u>, 234 F.3d at 1176.  "When the nonmovant is the government, the third and fourth requirements — 'damage to the opposing party' and 'the public interest' — can be consolidated because neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." <u>LaCroix</u>, 38 F.4th at 955 (citation omitted).  "As noted, even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance.  For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance."  <u>KH Outdoor</u>, 458 F.3d at 1272.

Both factors favor the issuance of a preliminary injunction in favor of Naples Pride on its as-applied challenges to the Permit's location and age restrictions.

**D. Bond Requirement**

Plaintiff contends that it ought not be required to post

security as a condition of the preliminary injunction because it seeks to vindicate constitutional rights. Defendants oppose this request, contending that the City would incur financial costs and will not be able to recover the additional costs from Naples Pride.

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required by the rule is a matter within the discretion of the trial court . . . and the court may elect to require no security at all." BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted). The Court finds it appropriate to require Naples Pride to post a nominal $100 bond.

**IV**

In sum, the Court finds that: (1) Naples Pride is substant-ially likely to prevail on the as-applied challenge to the Permit in Count I of its Complaint, and that (a) the First Amendment applies to a municipal government such as the City of Naples; (b) Naples Pride's "family friendly" drag performance is expressive conduct that constitutes "speech" under the First Amendment; (c) the drag performance will take place at a traditional public forum, or alternatively, at a limited public forum; (d) whether evaluated

under a viewpoint- or content-based standard, the Permit's location and age restrictions violate the First Amendment; (e) whether evaluated under a viewpoint- or content-based standard, a portion of the assessed security fees violate the First Amendment, but extraordinary relief is not warranted for the security fee at this time; and (f) Naples Pride has not shown that it is substantially likely to prevail on its facial challenge to the permitting scheme in Count II.

The Court also finds that Naples Pride has established that: (2) it is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the threatened injury to its First Amendment rights outweighs the harm a preliminary injunction may cause to Defendants; and (4) the issuance of a preliminary injunction is in the public interest. Finally, the Court finds that Naples Pride must post a nominal bond in the amount of $100.

Accordingly, it is now

**ORDERED:**

Plaintiff's Time-Sensitive Motion for Preliminary Injunction
(Doc. #12) is **GRANTED** in part as set forth above and is otherwise
**DENIED**.  A Preliminary Injunction will be issued separately.

**DONE AND ORDERED** at Fort Myers, Florida, this  12th  day of
May 2025.

_____

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Counsel of record