UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NAPLES PRIDE,

      Plaintiff,

v.                          Case No: 2:25-cv-291-JES-DNF

CITY OF NAPLES; NAPLES CITY
COUNCIL; TERESA HEITMANN,
TERRY HUTCHISON, RAYMOND
CHRISTMAN, BETH PETRUNOFF,
BILL KRAMER, LINDA PENNIMAN,
and BERNE BARTON, in their
official capacities as City
Council members; NAPLES
POLICE DEPARTMENT; and CIRO
DOMINGUEZ, in his official
capacity as Naples Chief of
Police,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on review of Defendants City of Naples, Naples City Council, Teresa Heitmann, Terry Hutchison, Beth Petrunoff, Bill Kramer, Linda Penniman, Berne Barton, Naples Police Department, and Ciro Dominguez's Motion to Dismiss (Doc. #113) filed on August 26, 2025. Defendants seek to dismiss the First Amended Complaint (FAC) (Doc. #106) filed on July 29, 2025. Plaintiff's Response (Doc. #117) was filed on September 16, 2025.

For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). As the Eleventh Circuit has recently summarized:

> When reviewing a motion to dismiss, we accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is facially plausible if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. When making the determination of whether a complaint states a plausible claim, we draw on our judicial experience and common sense.
> . . .
> We use a two-step process to determine whether a claim survives Rule 12(b)(6) scrutiny. At the outset, we determine what must be pled for each cause of action. . . . Then, we consider the well-pleaded factual allegations . . . to determine whether they plausibly suggest an entitlement to relief.

Caterpillar Fin. Services Corp. v. Venequip Mach. Sales Corp., 147 F.4th 1341, 1346-47 (11th Cir. 2025) (citations and internal punctuation omitted).

**II.**

The following facts are set forth in the FAC (Doc. #106) or in documents the Court may consider in deciding a motion to dismiss:

**A. Naples Pride and Pridefest Background**

Plaintiff Naples Pride ("Naples Pride") is, in its own words, a "grassroots 501(c)(3) nonprofit that provides social services to the greater Naples LGBTQ+ community. . .." (Doc. #106, ¶ 37.) Since 2017, Naples Pride has hosted a festival known as "Pridefest" each June (except for 2020 and 2021 due to the COVID-19 pandemic). The purpose of Pridefest is to celebrate the LGBTQ+ community and encourage members of that community to "express themselves openly and without fear." (Id.) Pridefest is Naples Pride's "largest fundraising event providing 30-50% of [Naples Pride's] annual budget." (Id., ¶ 49.)

Pridefest's main event, as described by Plaintiff, is "a family-friendly drag performance lasting between two and two-and-a-half hours." (Id., ¶ 54.) For Pridefest's first four years (2017, 2018, 2019, and 2022), all events, including the drag performance, took place outdoors on the mainstage in Cambier Park

in downtown Naples.    (Id.)    Holding the event outdoors "has symbolic and expressive importance to Naples Pride," "whose mission emphasizes bringing the Naples LGBTQ+ community 'out of the closet' and into the public square." (Id., ¶ 55.)    Through hosting such a prominent and outdoor drag performance, Naples Pride seeks to promote "the perspective that living or presenting as a gender inconsistent with one's sex assigned at birth should be accepted and openly celebrated." (Id., ¶ 56.)

Drag is "a type of performance art where performers caricature or challenge gender stereotypes by adopting dress or mannerisms stereotypical of a different gender[,]" which can (but does not inherently) include risqué elements.    (Id., ¶ 60.)    Naples Pride ensures that the drag performances at Pridefest are family-friendly by "forbid[ing] performers from incorporating any nudity or obscene content into their performances." (Id., ¶ 58.)    In fact, when citizen complaints triggered an investigation into the performance in 2022, the Naples Police Department concluded that the performances were not lewd or sexual because the "way the [performers] were dressed was no more revealing than being in a bathing suit at a public pool or beach."    (Id., ¶ 59.)

## B. The Permitting Process and Fee Schedule

Like any organization seeking to host an event on City property, Naples Pride must apply for and receive a permit from

the City Council to hold Pridefest in Cambier Park. Naples Ordinance No. 2023-15181 ("the Ordinance"), found at Doc. #55-1, sets forth the current permitting process and its standards and criteria for approval. The Ordinance also explicitly adopts the City's Special Event Permit Manual (the "Manual"). Naples No. 15181 Ch. 46, Art. II, Sec. 46-39(c)(1).

Naples Pride contends that the Ordinance allows the City Council to impose event-specific conditions on permit approvals including, but not limited to, conditions involving hours of operation, operational controls, or site plans. (Doc. #106.) The Ordinance provides that "[a]ny event specific conditions placed on the event by City Council as conditions of approval e.g. hours of operation operational controls, site plans etc... shall be included in or attached to the Resolution of approval." Naples No. 15181 Ch. 46, Art. II, Sec. 46-39(c)(2).

Pursuant to the Manual, upon submission of a permit application, the Special Events Committee (the "Committee") makes a recommendation to the City Council "based on the guidelines/policies/ordinances in place, and the impact on the community." (Doc. #12-20 at 4.) The Committee is comprised of representatives from various city departments, including the Parks Department, the Police Department, and the Fire Department. (Id.) Additionally, the City Manager has authority to approve or deny a

permit considering eleven separate factors including, *inter alia*, whether "[t]he event is generally compatible with the character of the city."[1]   (Id. at 10)

The fee schedule for use of the City's parks and other facilities is set forth in Appendix A of the Naples Municipal Code. Naples, FL., Mun. Code, App'x A § 28-32.  Pursuant to that fee schedule, the City charges nonprofit organizations (such as Naples Pride) $900 a day for hosting a large event in a park, and an additional $80 an hour to use Cambier Park's bandshell.  Naples, FL., Mun. Code, App'x A § 28-32(2)(l) & (7)(a).  The Municipal Code also authorizes the City Council to assess additional fee

---

[1] The eleven factors in their entirety are whether: (1) "[t]he applicant has complied with all required criteria outlined on the permit application form[;]" (2) "[s]ufficient city support personnel are available to assist in the conduct of the event[;]" (3) "[a]dequate support facilities are available for the event with the support facilities including, but not limited to, parking, refuse collection, sanitation, and lighting[;]" (4) "[n]o conflict exists with the requested event and other approved and previously scheduled events[;]"(5) "[t]he event will not result in the over-utilization of city facilities nor the over-utilization of one area of the city[;]" (6) "[t]o outstanding balances are due to the city for assistance from previous activities from the applicant[;]" (7) "[a]mplification of sound has been justified and is established at a level acceptable to the city manager[;]" (8) "[c]rowd size has been determined to be a manageable size for the proposed event and site[;]" (9) "[t]he event is generally compatible with the character of the city and/or the locale permits[;]" (10) "[t]he applicant complied with terms and conditions of any previously granted permits[;]" and (11) "[t]he event set up is deemed safe and free of safety concerns."  (Id.)

requirements, including as set forth in the Manual. Naples, FL., Mun. Code § 28-32(a). Pertinently, the Manual allows the City to "require Police, Fire, custodians, parking garage attendants, solid waste barricades, etc.," at events, with "all services provided for the event [to] be paid for by the [event organizer]." (Doc. #12-20 at 4.) The Manual gives the City discretion to determine what of those services are necessary to "ensure the safety of participants, minimize the inconvenience to residents and reduce the liability exposure to the City." (Id.)

The Manual does not provide criteria for assessing security needs. Instead, as identified in a January 14, 2025, email to the City Council, the Chief of Police uses the following six criteria to determine staffing needs and protocols at special events:

> (1) "Risk/Threat Assessments,"
> (2) "Real time intelligence/current events in the country/world,"
> (3) "Venue size, location, and capability/capacity,"
> (4) "Potential for conflict or protests (political/controversial issues),"
> (5) "Expected attendee crowd size," and
> (6) "Event particulars (i.e. night/day, alcohol involved, street closures etc.)"

(Doc. #106, ¶ 80.)

### C. Permitting for Pridefest

The City has historically issued permits for events at Cambier Park (and on its outdoor mainstage) to various private, non-government-affiliated groups "including events with political and

religious themes; events that some might view as controversial . . .; and events requiring paid tickets for entry." (Id., ¶ 86.) For example, then-presidential candidate Newt Gingrich, supporters of gun control, the Collier County Branch of the NAACP, Celebration Community Beach Church, a Naples arts organization, multiple concert bands, and an opera group have all been permitted to host events at Cambier Park utilizing the mainstage. (Id., ¶ 87.) According to Naples Pride, "in the entire history of Cambier Park and its mainstage, the City has never required an event organizer other than Naples Pride to hold any part of their event indoors, or to categorically prohibit minors from attending any portion of their event, for any reason." (Id., ¶ 89.)

Nevertheless, when Naples Pride applied for a Pridefest permit in early 2023, the City Council informed Naples Pride that the drag performance must be moved indoors and restricted to adults (18 years or older) or the permit would be denied. (Id., ¶¶ 97-100.)  During a conference call between City Council members, the Chief of Police, the City Manager, and Naples Pride, certain City officials informed Naples Pride that the restrictions were put in place "because of increased public opposition to drag[.]"  The officials further expressed concern about another motivated attack such as "Charlottesville" or "Orlando Pulse Nightclub" if the performance moved forward as planned. (Id., ¶ 99.)

Although Naples Pride initially rejected the permitting conditions, "to preserve its ability to host Pridefest at all" Naples Pride eventually accepted the City's demands. (Id., ¶ 101.) Moreover, "[a]s a small organization with a limited budget, Naples Pride never imagined that filing a lawsuit against the government to protect its constitutional rights was a viable option." (Id., ¶ 102.) Thus, the 2023 and 2024 Pridefest drag performances took place indoors and subject to the adults-only restriction. (Id., ¶¶ 103, 107.) Both overall attendance at the Pridefest event and Naples Pride's annual budget suffered losses as a result of the indoor performance. Specifically, Naples Pride suffered an approximate 46% decrease in its annual budget from 2022 to 2024. This reduction has impacted Naples Pride's ability to provide certain social services. (Id., ¶¶ 109, 110.)

In 2025, the City once again conditioned issuance of the Pridefest permit on an adults-only and indoors-only drag performance, in addition to an estimated $30,697.50 "security fee."[2] (Id., ¶¶ 114, 135.) The proposed fee represented "approximately two-thirds of the total proceeds that Pridefest

---

[2] Had the City agreed to permit Naples Pride to host the drag performance outdoors, the City Council would have assessed an additional $13,462.50 for three "event officers" from the Naples Police Department, and various officers from the Collier County Sheriff Office ("CCSO"). (Id., ¶ 135.)

generated in 2024."  (Id., ¶ 136.)  It also represented a "sharp
increase" from security fees historically charged in connection
with Pridefest.  Until 2024, Naples Pride was never charged more
than $5,000 to host Pridefest, and in 2024 a security fee of
$15,520.00 was assessed.  (Id., ¶ 137.)[3]

    According to Naples Pride, the increased fees are
disproportionate to what the City charges other events that are
larger, more disruptive, and/or pose greater risks. The other
events and their respective fees include: (1) The annual Naples
Car Show ("Cars on 5th"), which closes many local streets and fills
them with luxury vehicles, was charged $16,276.25 in security fees
in 2024; (2) The Naples' Fifth Avenue Tree Lighting and Christmas
Walk, which attracts 10,000 to 15,000 people, takes place over two
days, and requires major street closures, was charged $18,000.00
in security fees in 2024; and (3) The Naples Art Institute's New
Year's Art Festival, a multi-day event with approximately 20,000
attendees, was charged $12,970.00 in security fees in 2024.

    According to Naples Pride the security fee quoted for
Pridefest is "grossly disproportionate" to comparable Pride

---

[3] Naples Pride asserts that "[b]ecause 2025 was the first time that
[it] was charged such an exorbitant security fee, it was also the
first time that Naples Pride could have filed suit alleging that
such a fee violated its first amendment rights."  (Id.)

events.  For example, Cape Coral, Florida – a city approximately an hour away from Naples – assessed a $7,682.59 security fee for its 2024 Pride Festival.  This was even though the event had "more than 3,000 attendees and featured an outdoor drag performance." (Id., ¶ 143.)  To justify the increased fees, the Naples Police cited increased safety concerns attendant to increased political opposition to drag, which Naples Pride contends is "a viewpoint and content-based rationale."  (Id., ¶ 144.)

Prior to issuance of the 2025 permit, City Council members informed Naples Pride that "due to public opposition to drag performance, [Naples Pride's] 2025 Pridefest permit application would not be approved at all if [it] sought to hold the drag performance outdoors."  (Id., ¶ 115.)  At a January 2025 public meeting during which the City Council officially considered the permit, several attendees, including members of the organization "Stop Naples Drag," accused members of the LGBTQ+ community of "grooming" children and "opposed Pride events altogether."  (Id., ¶ 118.)

Chief Dominguez and Lieutenant Michael O'Reilly of the Naples Police Department offered testimony during the January 2025 City Council meeting.  Both assured that the Police Department "could keep the peace at Pridefest, even if it included an outdoor drag performance[,]" and neither expressed a preference for an indoor

drag performance.   Nor did either officer suggest that an age restriction on the drag performance may be necessary for public safety.   Prior to the vote, "[w]hile some council members also cited purported security concerns[,]" "[t]he overriding justification that the council members offered for their votes was opposition to drag and the viewpoint expressed by Naples Pride's drag performance."  (Id., ¶ 122.)

### D. The Instant Suit and the 2025 Pridefest Event

On April 10, 2025, Naples Pride brought suit in federal court challenging the constitutionality of the permit restrictions. (Doc. #1).  On May 12, 2025, the undersigned issued a preliminary injunction at Naples Pride's request.  (Doc. #67.)  On May 20, 2025, a representative from CCSO contacted Naples Pride asserting that Naples Pride would be required to sign a "Special Detail Agreement" in order for the CCSO deputies to assist with the 2025 Pridefest.  Naples Pride ultimately signed the agreement subject to the explicit written condition "that the actual amount due will be determined after the conclusion of [Pridefest] consistent with any subsequent determination by the [Court]."  (Id., ¶¶ 166-169.) On June 6, 2025, the preliminary injunction was stayed by the Eleventh Circuit Court of Appeals.  (Doc. #90.)  Thus, the June 2025 drag performance was held indoors and subject to the adult-only restriction.  (Id., ¶ 175.)

There was no violence committed by or against Pridefest attendees at the 2025 Pridefest. Only a single protestor was arrested, and he was found outside the festival area. (Id.) The mainstage featured a performance by the Calendar Girls, a dance team comprised of women over the age of fifty. Naples Pride asserts that the "empowering performance – which featured over-the-top costumes, makeup, and wigs – resembled a drag performance in all ways but one: their gender presentation is consistent with their sex assigned at birth." (Id., ¶ 176.)

The drag performance took place at the Norris Center, an indoor stadium positioned an approximate four-minute walk from the entrance to Pridefest. (Id., ¶ 187.) Because the Norris Center has a capacity of 200 attendees, Naples Pride hosted three separate drag performances to accommodate the number of audience members who sought to attend the performance. (Id., ¶ 190.) Nevertheless, "even with these repeat showings, a maximum of 600 people could possibly attend the performance, and only 500 did." (Id.) Following the indoor performances at the Norris Center, the drag performers "made a non-performing appearance on the mainstage" with "no apparent reaction to their appearance on stage by any outside protesters—let alone any violence, rioting, or other civil unrest." (Id., ¶¶ 178, 179.) And after the event ended, Naples Pride's executive director stayed behind to ensure that "Cambier

Park was left cleaner than Naples Pride found it . . ..." (Id., ¶
180.)

On July 10, 2025, Naples Pride received an invoice from the
Naples Police Department for a portion of the fees owed for the
2025 Pridefest event. The invoice included, among other things,
three line-items related to security, including: "(a) 124 police
officer-man hours at a rate of $125 per hour for $15,500.00; (b)
42.5 police officer-man hours at a rate of $145 per hour for
$6,162.50; and (c) an additional $10 per hour for all officer-man
hours, totaling $1,665.00." (Id., ¶ 197.) On top of these fees,
Naples Pride received an additional invoice from the Collier County
Sheriff's Office (CCSO) for contracted services in the amount of
$10,300.57. This was despite the fact that the drag performance
was not held outdoors and the Naples Police Department had
previously represented that it would not contract with CCSO to
provide additional services at Pridefest unless the event was held
outside. (Id., ¶¶ 198-201.)

The total security fees "charged by Defendants or at their
direction" for the 2025 Pridefest amounted to $37,826.47. (Id.,
¶ 202.) Naples Pride asserts that these fees were not related to
any risk *inherent* to Pridefest, but rather, "because of the
anticipated hostile reaction by outsiders unaffiliated with

-14-

Pridefest to Pridefest's drag performance and the viewpoint it expresses." (Id., ¶ 198.)

**E. 2026 Pridefest Application**

On July 14, 2025, Naples Pride submitted its application for 2026 Pridefest. (Id., ¶ 222.) "Naples Pride intends to hold its next Pridefest in April 2026, and to include an outdoor drag performance open to all ages." (Id., ¶ 220.) Pridefest anticipates that the same permit restrictions will be imposed in the 2026 permit. (Id., ¶ 223.)

## III.

The FAC asserts three First Amendment claims against Defendants pursuant to 42 U.S.C. § 1983. In Count I Naples Pride brings an as-applied challenge to the 2025 Permit restrictions, challenging (1) the indoors-only restriction, (2) the adults-only restriction, and (3) the excessive purported security fee. (Doc. #106, ¶¶ 225-236.) In Count II Naples Pride brings an as-applied challenge to the same permit restrictions which are anticipated to be included in the 2026 permit. (Id., ¶¶ 237-239.) In Count III, Naples Pride asserts that the City's overall permitting scheme is facially invalid because it affords the City unfettered discretion to impose any restrictions it sees fit without any binding procedures or guidelines for determining when such restrictions should be imposed. (Id., ¶¶ 240-246.)

Defendants move to dismiss all claims against all defendants for various reasons.  The Court discusses each in turn.

### A. Official Capacity Claims

Defendants Heitmann, Hutchison, Christman, Petrunoff, Kramer, Penniman, and Barton, in in their official capacities as City Council members, and Ciro Dominguez, in his official capacity as Naples Chief of Police (collectively the "official capacity defendants"), assert that all claims against them must be dismissed because Section 1983 suits against officers in their official capacities are actually suits against the entity they represent. (Doc. #113 at 2.)  Plaintiff does not discuss this aspect of the Motion to Dismiss in its Response.  The Court agrees with the official capacity defendants.

A suit brought pursuant to 42 U.S.C. § 1983 against an officer in his or her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent," rather than against the officer individually. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).  See also Owens v. Fulton Cnty., 877 F.2d 947, 952 n.5 (11th Cir. 1989) ("For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents."); Penley v. Eslinger, 605 F.3d 843, 854

(11th Cir. 2010) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent" (citation and quotation omitted)). Accordingly, all claims brought against the official capacity defendants are redundant of claims against their respective entities.[4]

Additionally, as defendants note (Doc. #113, p. 3, n. 1), a Florida police department "is not a proper defendant in a suit for damages because the Police Department does not have the capacity to sue and be sued." Florida City Police Dept. v. Corcoran, 661 So. 2d 409, 410 (Fla. 3d DCA 1995). The allegations in the FAC clearly establish that the Naples Police Department is an integral part of the city government through which the City of Naples fulfills its policing functions. Therefore, the Naples Police Department is also not an entity subject to suit. Corcoran, 661 So. 2d at 410.

The Court grants this portion of Defendants' Motion to Dismiss and dismisses the FAC without prejudice as to defendants Heitmann, Hutchison, Christman, Petrunoff, Kramer, Penniman, Barton, and

---

[4] Given this ruling, it is unnecessary to resolve whether City Council members are entitled to legislative immunity, as they assert. (Doc. #113, pp. 3-4.)

Ciro Dominguez in their official capacities and as to the Naples
Police Department.

**B. As-Applied Challenge in Counts I and II**

Count I alleges that Defendants City of Naples (the City) and
the Naples City Council (the City Council) have unconstitutionally
burdened Naples Pride's First Amendment speech and expression
rights by imposing the following three restrictions on its drag
performance: (1) an indoors-only requirement; (2) an adults-only
requirement; and (3) security fees calculated on the reaction of
outside actors who disagree with Naples Pride's speech, i.e., a
heckler's tax. (Doc. #106, ¶ 226.) Naples Pride asserts that
Cambier Park is a traditional public forum where the City's right
to limit expressive activity is sharply circumscribed. (Id., ¶
227.) The three restrictions, according to Naples Pride,
constitute viewpoint and content-based restrictions. (Id., ¶¶
228-231.) Viewpoint-based restrictions on speech are
categorically forbidden by the First Amendment (Id., ¶ 232), while
content-based restrictions are presumptively unconstitutional and
subject to strict scrutiny in a traditional public form such as
Cambier Park. (Id., ¶ 233.) Naples Pride asserts that Defendants
cannot show the restrictions are narrowly tailored to serve a
compelling government interest, thus violating the First
Amendment. (Id.)

Alternatively, Count I alleges that even if Cambier Park or its bandshell are a limited public forum, the restrictions would be unconstitutional under standards applicable to such a forum. (Id., ¶ 234.)

In Count II, Naples Pride asserts that unless enjoined, Defendants will unconstitutionally burden its speech and expression at the 2026 Pridefest by imposing the same three restrictions. (Id., ¶¶ 237-239.) Naples Pride asserts the 2026 restrictions would violate the First Amendment for the same reasons as the 2025 Pridefest restrictions.

Defendants argue that the as-applied challenges in Count I and Count II fail to state a plausible claim because the permit restrictions are consistent with the First Amendment. Defendants argue that embedded in the FAC are facts which show: (1) the relevant forum is not Cambier Park itself, but rather the Pridefest event, which constitutes a limited public forum, and (2) all permit restrictions are reasonable and viewpoint neutral given the security concerns inherent to such a large public event. (Doc. #113, ¶¶ 5-10.)

Defendants additionally argue that Count II (challenging the 2026 permit restrictions) is not ripe for adjudication because "the requirements of a permit for 2026 and related security fees depend on future assessments by various city departments including

the Police Department and the City Council." The Court will address Defendants' ripeness challenge to Count II in subsection B of the instant Opinion and Order. In any event, Defendants argue Count II fails to state a claim for the same reason Naples Pride's challenge to the 2025 permit restrictions fails to state a claim. (Id. at 20-21.)

Naples Pride responds that the FAC satisfies its burden at this stage of the proceeding by plausibly alleging content discrimination in a traditional public forum and viewpoint discrimination. (Doc. #117 at 7-8.)

### (1)  First Amendment Activity

Naples Pride alleges that its drag performance is "indisputably protected speech for First Amendment purposes." (Doc. #106, ¶¶ 7, 16, 22, 65, 131 (internal citation and quotation omitted.)) Defendants do not challenge that drag performance constitutes protected First Amendment speech or expression. Instead, Defendants argue that "[t]he City's permit conditions were based on objective considerations unrelated to viewpoint . . ." and were reasonable in light of the forum's purpose. (Doc. #113 at 11.) For purposes of the Motion to Dismiss, the Court finds that Naples Pride has sufficiently established that its drag performance is expressive activity protected by the First Amendment.

### (2)  Forum Analysis

The Court next considers the proper standard for evaluating the City's permit restrictions.  "The government's ability to impose restrictions on speech varies depending on the nature of the forum." McDonough v. Garcia, 116 F.4th 1319, 1322 (11th Cir. 2024).  Courts employ a "forum analysis" to evaluate government restrictions on private speech occurring on government property. Barrett v. Walker Cnty. Sch. Dist., 872 F.3d 1209, 1224 (11th Cir. 2017) (citing Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 215 (2015).)  Forum analysis directs courts to engage in a two-step process to determine the appropriate level of scrutiny for a challenged restriction on speech.  First, a court must determine the type of forum involved in an underlying set of facts.  Four types of forums are recognized by the Supreme Court: (1) the traditional public forum, (2) the designated public forum, (3) the limited public forum, and (4) the nonpublic forum. McDonough, 116 F.4th at 1322.  Second, a court must apply the test specific to that forum in evaluating whether a challenged restriction violates the First Amendment.  McDonough, 116 F.4th at 1322.  Content restrictions in the first two categories must survive strict scrutiny, while regulations in the second two categories need only be "viewpoint neutral and reasonable." Id.

In its FAC, Naples Pride alleges that "Cambier Park, the desired location of Naples Pride's drag performance is a traditional public forum . . .." (Doc. #106, ¶ 227.)  From there, Naples Pride asserts that the City's permit restrictions are subject to strict scrutiny but fail that standard.  (Id., ¶ 233.)

Defendants maintain, however, that "[w]hen considered in its proper context, the relevant forum is not Cambier Park generally; it is [the Pridefest event], which occurs as part of the City's Special Events program." (Doc. #113 at 6.)  According to Defendants, the Eleventh Circuit "all but concluded" that the Pridefest event was a limited public forum in its decision staying the Court's Preliminary Injunction.  (Id. at 5.)  From there, Defendants assert that the permit restrictions are subject to the lesser standard, which they satisfy.  (Id. at 7-8.)

Both sides place reliance where it does not belong.  Naples Pride relies in large part on the undersigned's findings in connection with the preliminary injunction.  But that Opinion and Order did not address the sufficiency of the original Complaint, much less the FAC. Defendants rely on the Eleventh Circuit decision staying the preliminary injunction, which they assert "all but concluded" the forum at issue here is a limited public forum.  But the Eleventh Circuit did not actually make such a holding.  Even if it did, such a determination would not be binding precedent

because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[,]" thus "the findings of fact and conclusions of law made by a court granting a preliminary injunction [or a stay thereof] are not binding [on the case on the merits]." Univ of Texas v. Camenisch, 451 U.S. 390, 395 (1981). See also Long v. Benson, 383 Fed. Appx. 930, 931 (11th Cir. 2010) (noting that an appellate court's decision with regard to a preliminary injunction "does not affect the law of the case on the merits."). In any event the Order staying injunctive relief did not address the sufficiency of a complaint.

The principles that control resolution of the motion are set forth near the beginning of this Opinion and Order:  A Complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). The Court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff.  A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is facially plausible if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  This plausibility standard is not akin to a probability requirement, but it asks for more than a

sheer possibility that a defendant has acted unlawfully. The Court uses a two-step process, first determining what must be pled for each cause of action, then whether the well-pleaded factual allegations plausibly suggest an entitlement to relief. See Caterpillar Fin. Services Corp, 147 F.4th at 1346–47. Applying these principles, the FAC is sufficiently pled.

### (3)    FAC Plausibly Alleges Claims

#### (a)    Indoors-Only and Adults-Only Restrictions

Defendants assert that the indoors-only restriction to the 2025 Pridefest permit was viewpoint neutral and reasonable "to ensure the safety of [the Pridefest] event" due to the wave of anti-drag sentiment spreading across the United States and Florida. Indeed, according to Defendants, "in light of the escalating tensions around drag performances, it was reasonable for the City to conclude that any event related to drag – whether a drag performance or a protest against drag – would present elevated security concerns." (Doc. #113 at 8.) The indoors-only restriction was merely a product of "the commonsense notion that holding the drag show in a controlled, indoor environment would make securing the event easier, as reflected by the police department's increased security estimate for holding the event outdoors." (Id. at 9.) Defendants likewise contend that the Pridefest permit's adults-only restriction for the drag

performance passes muster under the viewpoint neutral and
reasonable standard for a limited public forum because excluding
children "facilitates security by ensuring that particularly
vulnerable members of the public would not be present in a high-
threat environment, and it also could reduce the risk of a violent
act against the event."  (Doc. #113 at 9.)

    Naples Pride responds that it has plausibly alleged that the
cited security concerns were "pretextual and insubstantial[,] that
the restrictions were grossly disproportionate to any legitimate
security concern[,]" and that, in practice, the indoors-only
restriction increased, rather than decreased the danger to
Pridefest attendees.  (Doc. #117 at 15.)  The Court agrees with
Naples Pride that the FAC sufficiently sets forth its causes of
action against Defendants.

    As alleged in the FAC, multiple members of the City Council
justified their votes to restrict the Pridefest permit based not
on any purported security or safety concerns, but rather, on public
opposition and the Council Members' respective views on drag as a
whole.  For example, at the January 2025 public meeting Hutchison
asserted that an outdoor drag performance would equate to
"targeting children," characterized any notion that the drag
performance is "family friendly" as "the new woke label for drag
shows around children," and asserted that an outdoor drag

performance would force members of the public to "acknowledge [its]
lewdness[;]"   Christman  explained  that  the  drag  show  should  be
held  inside,  in  part,  because  "drag  shows  are  offensive  to  many
people  in  this  community[,]"  although  he  also  cited  a  concern  for
safety  due  to  the  possibility  of  outside  violence;  Kramer  justified
his  vote  to  restrict  the  permit  by  stating  that  "the  people  I
represent,  the  vast,  vast  majority,  more  than  ten  to  one  do  not
want  a  drag  show  in  Cambier  Park[;]"   Penniman  explained  that  she
had  received  "hundreds  of  emails"  from  constituents  urging  her  to
"just  move  the  drag  show  inside[,]"  because  they  "don't  care  for
that  particular  part  of  Pridefest[;]"  Petrunoff  similarly
justified  her  vote  to  restrict  the  permit  because  of  opposition
from  the  community;  and  Heitman  stated  that  "it  was  loud  and  clear
that  our  constituents  didn't  want  the  drag  queen  show  outside  in
the  Cambier  Park  .  .  .  I  support  freedom  of  speech  and  support  the
Pride  event  taking  place.   But  that  drag  queen  show  in  the  public
park  without  the  support  of  our  constituents  is  not  okay."  (Id.
¶¶ 123, 124, 126, 127, 128, 129.)

Although  Defendants  offer  a  theory  (the  purported  safety
concerns)  for  asserting  that  the  indoors-only  and  adults-only
restrictions  are  viewpoint  neutral,  taking  the  allegations  in  the
FAC  as  true,  it  is  more  than  plausible  that  the  overarching
justification  for  the  City  Council's  indoors-only  and  adults-only

restrictions was public opposition to drag and the council members'
own viewpoints on the matter.  Only one Council Member, Barton,
justified his vote solely based on safety concerns, noting that
the Naples Police Department and the pricing differential between
and indoors and outdoors show had made it clear that it would be
easier for the Police Department to maintain public safety if the
show was held indoors versus outdoors.  (Id., ¶ 125.)

"A government's desire to protect the ears of its residents
'is not enough to overcome the right to freedom of expression.'"
Honeyfund.com Inc., 94 F.4th at 1281 (citing Cohen v. California,
403 U.S. 15, 21 (1971)).  While the Council Members (and their
constituents) may perceive drag performance as "offensive" or
"lewd", this viewpoint is not enough to remove drag from the ambit
of First Amendment protection.  See Iancu v. Brunetti, 588 U.S.
388, 388 (2019) (holding that a bar on "immoral or scandalous"
expression is viewpoint based and collides with the First
Amendment's free speech mandate.); Snyder v. Phelps, 562 U.S. 443,
458 (2011) ("[T]he government may not prohibit the expression of
an idea simply because society finds the idea itself offensive or
disagreeable.")  See also Oakes Farms Food & Distribution Services,
LLC v. Adkins, 154 F.4th 1338, 1348 (11th Cir. 2025) ("Speech
cannot be . . . punished or banned [] simply because it might
offend a hostile mob.")  This is especially true, where, as here,

the Naples Police Department explicitly confirmed that it could safely accommodate an outdoor performance at the same public meeting that the Council Members voiced their opposition. Accordingly, the Court finds that Naples Pride has pled sufficient facts to allege that the indoors-only and adults-only restrictions were imposed in violation of the First Amendment under either constitutional standard.

The Court further finds that Naples Pride has pled sufficient facts to refute any assertion that the indoors-only and adults-only permit restrictions are reasonable in relation to "the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated," or that the drag performance is "naturally incompatible with the purposes of the [Cambier Park bandshell as a limited public] forum." Moms for Liberty, 118 F.4th at 1332.

As alleged in the FAC, "[t]he City's practice is — and at all relevant times has been — that permits for events in Cambier Park and on its outdoor mainstage are open to all comers, including those expressing particular viewpoints." (Doc. #106, ¶ 87.) Permits allowing use of the outdoor main stage have been issued, for example, to Opera Naples' "Festival Under the Stars" event that, one year, involved performance of an operatic work "tell[ing] the story of a young Japanese man who flees home *disguised in drag*

to escape marrying an older woman." (Id. (emphasis in original)).
Outdoor showcasing of performance art – even scandalous
performance art – open to all ages appears from the face of the
Amended Complaint to be not only compatible with, but also one of
the chief purposes for Cambier Park's mainstage.

### (b)  The Security Fee Restriction

Defendants also contend that the City's assessment of
security fees for the Pridefest event was viewpoint neutral and
reasonable in light of the Naples Police Department's
"professional judgments" with regard to the size, timing,
duration, and location of the event. (Doc. #113 at 12-13.) Naples
Pride does not dispute the proposition that the Police Department
can make professional judgments on how to calculate certain costs
related to the event, but contends that the City impermissibly
imposed costs on Naples Pride "stem[ing] from the perceived threat
of outsiders with viewpoint-based objections." (Doc. #117 at 17.)
This heckler's veto or heckler's tax is alleged to have violated
the First Amendment.

The Eleventh Circuit considered the reasonableness of certain
permitting fees and the framework for how they can be permissibly
fixed within the context of a traditional public forum in the
decision in Central Florida Nuclear Freeze Campaign v. Walsh, 774
F.2d 1515 (11th Cir. 1985). There, the court held, in pertinent

part, that an Orlando permitting ordinance was unconstitutional as applied to a non-profit anti-nuclear organization seeking to hold a parade and rally at an outdoor recreation area based, in part, on "the potential for hostile counter activity."  Id. at 1517. The Walsh court explained that

> Although the presence of out-of-town demonstrators and the potential for hostile counter activity are proper factors to be considered in determining what level of police protection is needed for a public demonstration, we conclude that such factors cannot be considered in fixing the costs of protection to those asking to exercise their First Amendment rights. Otherwise, the result would operate to charge more for speech which is unpopular or controversial, in the mind of a public official. This does not comport with the First Amendment principle of equality of expression under the Constitution.

Id.  Later, the Supreme Court considered permitting fees attendant to a white nationalist demonstration in Forsynth County, Georgia, and similarly held that "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."  Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 134-35 (1992) (citations omitted).

In the FAC, Naples Pride alleges that the Naples Police Department sent Naples Pride an invoice "for a portion of the fees owed" for 2025's Pridefest on July 10, 2025.  (Doc. #106, ¶ 97.) Pursuant to that invoice, Naples Pride owes a total of $27,525.90

to Defendants (not counting separate amounts purportedly owed to
CCSO). The invoice specifically includes the following line items
related to security: "(a) 124 police officer-man hours at a rate
of $125 per hour for $15,500.00; (b) 42.5 police officer-man hours
at a rate of $145 per hour for $6,162.50; and (c) an additional
$10 per hour for all officer-man hours, totaling $1,665.00[,]" for
a total of $23,327.50. (Id.)

Naples Pride alleges that "all or substantially all of these
security-related fees were charged not because of any risk inherent
to Pridefest or its activities, but because of the anticipated
hostile reaction by outsiders unaffiliated with Pridefest to
Pridefest's drag performance and the viewpoint it expresses."
(Id., ¶ 198.) Naples Pride cites the following supportive facts:
(1) that Naples Police Department explicitly cited concerns
related to political opposition to drag when assessing the security
fee, (2) that Naples Police Lieutenant Michael O'Reilly
specifically stated in an email that the fee estimate included
"two added officers . . . based on best practices for planned
events involving protesters or sensitive topics[,]" (3) that
Lieutenant O'Reilly further cited to a purported need for "[four]
officers detailed to stage security and [additional officers] for
protester monitoring and coordination," given the Naples Police
Department's expectation that there would "likely be an increase

in protester activity for a public [i.e., outdoor] performance[,]"
should the drag performance be held outdoors, and (4) that Naples
Pride was informed, at a meeting with the Police Department, that
Pridefest was categorized as a "Tier 1" event due to the
"controversial" "nature of the event." (Id. ¶¶ 21, 145, 150, 152.)

Reading these facts in a light most favorable to Naples Pride,
as the Court is required to do at this stage of the proceedings,
the Court finds that Naples Pride has pled sufficient facts to
plausibly state a claim that the security fee portion of the
permitting fees assessed for the 2025 Pridefest (and those likely
to be imposed for the 2026 Pridefest) impermissibly shifted
security fees related to prospective hostile protestors to Naples
Pride. Accordingly, the Court denies Defendants' Motion to Dismiss
Pridefest's as-applied challenge to the security fee and the
remainder of the permit restrictions as stated in Counts I and II
of the Amended Complaint.

### C. Facial Challenge to Permitting

Defendants also seek dismissal of Naples Pride's facial
challenge to the Special Events Permitting process in Count III,
asserting that the City's permit process is a content-neutral time,
place, and manner restriction containing adequate standards to
guide the City's decision to issue a permit. (Doc. #113 at 16.)
Naples Pride responds that the FAC alleges the permitting scheme

allows the City to assess fees based on unconstitutional
considerations related to an event's content because the Ordinance
lacks "narrow, objective, and definite standards to guide [the
City][,]" in determining whether and how to issue a permit. (Doc.
#117 at 17-18 (citing <u>Forsyth</u>, 505 U.S. at 129-133)). In other
words, Naples Pride contends that the permitting scheme is facially
invalid because it affords Defendants "unbridled discretion" to
restrict speech and expressive conduct. (<u>Id.</u> at 18.)

A permitting scheme may be facially challenged where it "vests
unbridled discretion in a government official over whether to
permit or deny expressive activity." <u>Tracy v. Florida Atl. Univ.
Bd. of Trs.</u>, 980 F.3d 799, 809 (11th Cir. 2020). <u>See also Jarrard
v. Sheriff of Polk Cnty.</u>, 115 F.4th 1306, 1321 (11th Cir. 2024),
<u>cert. denied sub nom. Moats v. Jarrard</u>, 145 S. Ct. 2702 (2025);
<u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 755-56
(1988). "Excessive discretion . . . is constitutionally suspect
because it creates the opportunity for undetectable censorship and
signals a lack of narrow tailoring." <u>Burk v. Augusta-Richmond
Cnty.</u>, 365 F.3d 1247, 1256 (11th Cir. 2004). To avoid invalidation
of a permitting scheme "a government entity must promulgate
'narrowly drawn, reasonable, and definite standards to guide the
official [decisionmaker's] decision.'" <u>Jarrard</u>, 115 F.4th at 1321
(quoting <u>Tracy</u>, 980 F.3d at 809).

Here, the permitting scheme affords the City Manager sole discretion to approve or deny a permit considering eleven separate factors, including whether "[t]he event is generally compatible with the character of the city . . .." (Doc. #12-20 at 10.) The decisionmaker can (and indeed must) take into account the content and viewpoint of an event's message in assessing whether to grant a permit, without specific standards other than his or her own opinion. The general compatibility factor sufficiently vests unguided discretion in the City Manager to pose a risk of chilling speech and violate the First Amendment's unbridled-discretion principles. Thus, Naples Pride has stated a plausible facial claim as to the City's permitting process, and Defendants' Motion to Dismiss Count III is denied.

### D. Ripeness of Count II

Defendants also argue that Count II of the Amended Complaint, seeking relief related to the 2026 Pridefest event, is not ripe for adjudication at this time because the permitting process for 2026 has not yet been completed. (Doc. #113 at 21.) Naples Pride responds that it has plausibly alleged that Defendants will seek to reimpose the same constitutional violations that have been imposed on the Pridefest event for the past three years. (Doc. #117, p. 19.) The Court agrees with Naples Pride.

The ripeness doctrine precludes courts from considering claims that are not "sufficiently mature" or are "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." Medmarc Cas. Ins. Co. v. Fellows Labriola LLP, No. 25-10837, 2025 WL 2886733, at *3 (11th Cir. Oct. 10, 2025) (quoting Trump v. New York, 592 U.S. 125, 131 (2020)). Defendants argue that the requirements of the Pridefest permit have varied from year to year, as have the security fees, and therefore the 2026 permit is too speculative to create a justiciable case or controversy.

It is certainly true that the City has not issued a permit for the 2026 Pridefest. But it is also true that the City has committed itself to both the adults-only and indoors-only restrictions, as well as some amount of security fee calculated by anticipated reaction to a drag performance. The City Council in public statements have committed to positions in 2025 which would apply equally in 2026. Moreover, Defendants have (and continue to) defend the restrictions in the instant suit. See Robinson v. Attorney General, 957 F.3d 1171 (11th Cir. 2020) (courts "may infer the state's intent to enforce" a challenged law in the future "from the fact that it has 'vigorously defended the [law] in court' after it was challenged."). Thus, the dispute for the 2026 permit is sufficiently mature to constitute a ripe case or controversy.

Accordingly, it is now

**ORDERED**:

Defendant's Motion to Dismiss (Doc. #113) is **GRANTED in part
and DENIED in part** as follows:

1. The Motion is **GRANTED** as to defendants Teresa Heitmann,
   Terry Hutchison, Beth Petrunoff, Bill Kramer, Linda
   Penniman, Berne Barton and Ciro Dominguez in their official
   capacities and as to the Naples Police Department, all of
   whom are **DISMISSED** without prejudice from the First Amended
   Complaint (Doc. #106).

2. Defendants' Motion to Dismiss (Doc. #113) the First Amended
   Complaint is otherwise **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this ___13th___ day
of January 2026.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record

-36-