**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

NAPLES PRIDE,

*Plaintiff*,

v.

CITY OF NAPLES and NAPLES CITY COUNCIL,

*Defendants*.

No. 2:25-cv-00291-KCD

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

RESPONSE TO STATEMENT OF MATERIAL FACTS .......... 2

ARGUMENT .......... 19

I. The Challenged Conditions Do Not Violate the First Amendment. .......... 19

- A. Cambier Park Being Used by Naples Pride for Pridefest Through the Special Events Program is a Limited Public Forum. .......... 20
- B. The Challenged Conditions are Viewpoint Neutral and Reasonably Related to Enhancing Safety. .......... 25
  - 1. The Challenged Conditions Are Viewpoint-Neutral. .......... 25
  - 2. The Challenged Conditions Are Reasonable. .......... 27
- C. Alternatively, Drag Shows for Children Are Not Protected Speech .......... 33

II. The Security Fees Charged to Naples Pride for Pridefest 2025 and Pridefest 2026 Do Not Violate the First Amendment. .......... 33

CONCLUSION .......... 35

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ACLU of Colo. v. City & County of Denver*,
569 F. Supp. 2d 1142 (D. Colo. 2008) .................................................. 27, 28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................19

*Bible Believers v. Wayne Cnty.*,
805 F.3d 228 (6th Cir. 2015) ....................................................................27

*Bl(a)ck Tea Soc'y v. City of Bos.*,
378 F.3d 8 (1st Cir. 2004)........................................................................29

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011)................................................................32

*Boddy v. Grech*,
178 F.4th 264 (6th Cir. 2026) ..................................................................26

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004)................................................................30

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*,
942 F.3d 1215 (11th Cir. 2019)......................................................... 28, 30

*Cent. Fla. Nuclear Freeze Campaign v. Walsh*,
774 F.2d 1515 (11th Cir. 1985)................................................................31

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........................................................................... 20, 21

*Forsyth County*,
505 U.S. 123 (1992) .................................................................................

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
11 F.4th 1266 (11th Cir. 2021) ......................................................... 27, 31

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .................................................................................33

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) ...................................................................................27

*Grider v. Abramson*,
180 F.3d 739 (6th Cir. 1999) ....................................................................31

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ....................................................................23

*Heffron v. Int'l Soc'y For Krishna Consciousness, Inc.*,
452 U.S. 640 (1981) .......... 31, 32

*Hill v. Colorado*,
530 U.S. 703 (2000) .......... 26

*Hopper v. City of Pasco*,
241 F.3d 1067 (9th Cir. 2001) .......... 30

*Keister v. Bell*,
29 F.4th 1239 (11th Cir. 2022) .......... 22

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) .......... 23

*Marcavage v. City of New York*,
689 F.3d 98 (2d Cir. 2012) .......... 29

*McDonough v. Garcia*,
116 F.4th 1319 (11th Cir. 2024) .......... 20, 22, 23, 24, 27

*Moms for Liberty — Brevard Cnty., Fla. v. Brevard Pub. Schs.*,
118 F.4th 1324 (11th Cir. 2024) .......... 23, 27, 28, 30

*Naples Pride, Inc. v. City of Naples*,
No. 25-11756, 2025 WL 2382975 (11th Cir. June 6, 2025) .......... 20, 24, 25, 26, 27, 28, 29

*Naturist Soc'y, Inc. v. Fillyaw*,
958 F.2d 1515 (11th Cir. 1992) .......... 31

*Near v. State of Minnesota ex rel. Olson*,
283 U.S. 697 (1931) .......... 27

*Oakes Farms Food & Distribution Servs., LLC v. Adkins*,
154 F.4th 1338 (11th Cir. 2025) .......... 27

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) .......... 25

*Ovadal v. City of Madison*,
416 F.3d 531 (7th Cir. 2005) .......... 26

*Parkland Republican Club v. City of Parkland*,
268 F. Supp. 2d 1349 (S.D. Fla. 2003) .......... 22, 24

*Parks v. City of Columbus*,
395 F.3d 643 (6th Cir. 2005) .......... 24

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) .......... 29

*PETA v. Giuliani*,
105 F. Supp. 2d 294 (S.D.N.Y. 2000) .... 22, 24

*PETA v. Giuliani*,
No. 00 CIV. 3972 (VM), 2000 WL 1639423 (S.D.N.Y. Oct. 31, 2000) .... 22

*PETA v. Giuliani*,
18 F. App'x 35 (2d Cir. 2001) .... 22

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) .... 22

*Reform America v. City of Detroit*,
37 F.4th 1138 (6th Cir. 2022) .... 31

*Reform America v. City of Detroit*,
542 F. Supp. 3d 628 (E.D. Mich. 2021) .... 29

*Rita v. Village of Tinley Park*,
No. 23-C-4931, 2024 WL 4346548 (N.D. Ill. Sep. 30, 2024) .... 24

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) .... 21

*Santa Monica Nativity Scenes Comm. v. City of Santa Monica*,
784 F.3d 1286 (9th Cir. 2015) .... 27, 31

*Satanic Temple v. City of Belle Plaine*,
80 F.4th 864 (8th Cir. 2023) .... 23

*Schenck v. Pro-Choice Network of W. N.Y.*,
519 U.S. 357 (1997) .... 31

*Scott v. City of Daytona Beach*,
186 F.4th 1286 (11th Cir. 2026) .... 25

*Searcey v. Harris*,
888 F.2d 1314 (11th Cir. 1989) .... 30

*Startzell v. City of Philadelphia*,
533 F.3d 183 (3d Cir. 2008) .... 24, 31

*Teesdale v. City of Chicago*,
690 F.3d 829 (7th Cir. 2012) .... 24

*Tolan v. Cotton*,
572 U.S. 650 (2014) .... 19

*United States v. Grace*,
461 U.S. 171 (1983) .... 22

*United States v. Kokinda*,
497 U.S. 720 (1990) .... 22, 29

*Vidal v. Elster*,
602 U.S. 286 (2024) ........................................................................ 25

*Vill. of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980) ........................................................................ 31

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ........................................................................ 33

*Warden v. Miranda*,
751 F. App'x 1030 (9th Cir. 2019) ........................................................ 22

*Warden v. Miranda*,
No. CV-14-02050-TUC-DCB, 2017 WL 3130664 (D. Ariz. July 24, 2017) ... 22

*Wolford v. Lopez*,
609 U.S. 185 (2026) ........................................................................ 33

**Statutes**

Naples Ord. No. 15181 Ch. 46, Art. II, Sec. 46-39 .......................................... 4

**Rules**

FED. R. CIV. P. 56(a) ........................................................................ 19

## INTRODUCTION

Due to concerns about the safety of Pridefest, Naples Pride moved the drag show portion of the event indoors and limited the audience to adults in 2023 and 2024. In 2025, however, Naples Pride sought to hold the drag show outdoors and for all ages. Citing similar safety concerns, the City Council approved Naples Pride's application subject to the same conditions under which the drag show successfully took place the prior two years: indoors and for adults only (the "Challenged Conditions"). Naples Pride claims that the City violated its First Amendment rights by conditioning its permits on the Challenged Conditions and assessing an allegedly discriminatory security fee, but Naples Pride is wrong on the law and the facts.

First, the Challenged Conditions do not violate the First Amendment because Cambier Park as used by Naples Pride for Pridefest through the special events program is a limited public forum and the Conditions satisfy the standard for that type of forum because they are viewpoint neutral and reasonable. In the alternative, drag shows for children are not speech protected by the First Amendment.

Second, the security fees charged to Naples Pride do not violate the First Amendment because they arise from the security needs for the special event itself and in no part arise from resources or personnel deployed solely in anticipation of violent protesters. Even if the security fees Defendants charged to Naples Pride *did* arise in part from resources or personnel deployed solely in anticipation of violent protesters—to be clear, they did not—those fees would be permissible viewpoint neutral conditions that are reasonable in light of the purpose served by the limited public forum.

## RESPONSE TO STATEMENT OF MATERIAL FACTS

1. Admitted.

2. Admitted.

3. Denied. NPD was aware of, investigated, and took into account when creating the Pridefest 2025 security plan several specific security concerns.[1] Sometime after Pridefest occurred in June 2023, but before Pridefest occurred in June 2024, NPD learned that it was behind in providing the minimal amount of security for special events according to national standards in light of the new threat environment faced by the Nation, a threat environment later underscored by attacks on large events such as the January 1, 2025 New Year's Day attack in New Orleans.[2] Further, Naples Pride's cited evidence does not establish that no "attempted violence of any kind" has ever occurred at Pridefest, only that Defendants are not aware of any attempted acts of violence that have occurred at Pridefest.

4. Denied. Naples Pride's cited evidence does not establish that Pridefest's "centerpiece" is the drag show or that drag performers are "marginalized individuals."

5. Admitted.

6. Denied that the drag show has "never involved nudity, sexual acts, or any other content that could be considered lewd, obscene, or otherwise unlawful."[3]

---

[1] O'Reilly Decl. ¶¶ 34–48, ECF No. 174; O'Reilly Day 1 Dep. Tr. at 18:6–19:9, 124:13–125:8, 172:12–179:13, ECF No. 173-5; O'Reilly Day 2 Dep. Tr. at 23:9–24:8, 64:12–21, ECF No. 173-38.
[2] O'Reilly Decl. ¶ 25; O'Reilly Day 1 Dep. Tr. at 176:4–22; O'Reilly Day 2 Dep. Tr. at 111:12–112:4.
[3] Craciun Dep. Tr. at 21:4–22:2, ECF No. 173-13 (since drag show moved indoors and limited to adult attendees, Naples Pride has not enforced its "family-friendly" policy).

Denied that the Naples Police Department ("NPD") investigated and made conclusions concerning any Pridefest drag show other than the Pridefest 2022 drag show.[4] Denied that the NPD concluded that the Pridefest 2022 drag show was not "lascivious" overall and that no performer's dress was "more revealing than being in a bathing suit at a public pool or beach," but rather that the specific videos and evidence it reviewed did not constitute "lascivious" conduct and did not show dress "more revealing than being in a bathing suit at a public pool or beach."[5]

7. Admitted.

8. Denied that "Pridefest has always been open to the public, and anyone who wishes to attend may do so," because Naples Pride, during Pridefest, has exclusive use of the part of Cambier Park where the event takes place, has erected fences around the event, and charges for entry.[6] Denied that "[a]ll are welcome . . . whatever message they may wish to express to other attendees."[7]

9. Admitted.

10. Denied that the bandshell is "surrounded on three sides with stone walls."[8] Otherwise admitted.

11. Denied to the extent that "high-profile political figures," "controversial

---

[4] Pl.'s Ex. 65 at 5, ECF No. 166-17.
[5] *Id.*
[6] *See, e.g.*, Pridefest 2023 Application, ECF No. 173-6; Pridefest 2024 Application, ECF No. 173-7; Pridefest 2025 Application, ECF No. 173-8; Pridefest 2026 Application, ECF No. 173-9; B. Petrunoff June 7, 2023 Email Chain, ECF No. 173-10; O'Reilly Day 1 Dep. Tr. at 147:15–20.
[7] B. Petrunoff June 7, 2023 Email Chain at 6 (Craciun confirming that "Naples Pride has the right to refuse entry to those that show views contrary to our pride festival").
[8] Pl.'s Ex. 188, ECF No. 168-38 (showing that bandshell not "surrounded" on left and right sides by stone walls).

causes," and "adult themes" are vague and ambiguous terms and matters of opinion, not fact. Admitted that many different private groups have hosted events in Cambier Park and at its bandshell.

12. Admitted.

13. Admitted.

14. Denied that "[n]othing in Naples' ordinances, Special Events Manual ('Manual'), or custom limits Special Events (including those in Cambier Park) to any class of speakers or speech on specific topics." The special events program is limited to the class of speakers who wish to use public spaces for atypical activities that are not normally allowed in that space.[9] And the special event itself is limited to whatever subject the event organizer chooses.[10] Denied to the extent that "controversial topics" is a vague and ambiguous term and matter of opinion, not fact.

15. Denied in part. In addition to the language Naples Pride quotes, the Special Events Manual further states that "[i]n certain cases, an area within the even[t] can be deemed exclusive, but must be approved by the City Manager."[11]

16. Denied that "[t]he City has unbounded discretion to determine what services should be provided—and charged to the event organizer." The NPD has a defined and established set of criteria that it uses to determine what security is required

---

[9] Naples Ord. No. 15181 Ch. 46, Art. II, Sec. 46-39; Naples Ord. No. 2023-15181, ECF No. 55-1; Special Event Permit Manual at 3, ECF No. 173-1 ("Special Events Manual").
[10] *See, e.g.*, Pridefest 2025 Application; B. Petrunoff June 7, 2023 Email Chain at 6; O'Reilly Day 1 Dep. Tr. at 147:15–20.
[11] Special Events Manual at 5.

for each special event and what charges will be passed on to the event organizer.[12] And the Special Events Manual itself provides guidance on the types of services that may be required, such as police, fire, custodians, parking garage attendants, solid waste, barricades, and other similar services.[13] Otherwise admitted.

17. Denied to the extent that Naples Pride interprets Chief of Police Ciro Dominguez's list of criteria NPD uses to create the security plans for special events to necessarily "result[ ] in charges to the organizer." While NPD considers the factors Chief Dominguez listed—including potentially disruptive groups—when planning the overall security for all special events, Defendants do not charge event organizers for resources and personnel deployed solely to protect against outside influences.[14]

18. Admitted with respect to Naples Pride's initial application.

19. Admitted that the language Naples Pride quotes from Hutchison is accurate but denied to the extent that Naples Pride characterizes those quotations and Mayor Heitmann's statements.

20. Admitted.

21. Denied that "local anti-drag activists formed an organization called 'Stop Naples Drag' whose declared mission was to end the Performance." Naples Pride's cited evidence does not establish that "local anti-drag activists" formed Stop Naples

---

[12] O'Reilly Decl. ¶¶ 10–20, 30–59; *see also* O'Reilly Day 1 Dep. Tr. at 204:16–206:21, 234:16–235:5, 250:14–251:7, 268:11–270:21, 277:16–279:18, 288:9–16, 296:16–297:6; O'Reilly Day 2 Dep. Tr. at 104:24–105:12, 105:25–107:5; C. Dominguez Jan. 14, 2025 Email Chain, ECF No. 173-43.
[13] Special Events Manual at 4.
[14] *See* documents cited *supra* n.12.

Drag nor that the group's "declared mission was to end the Performance." Further denied to the extent that Naples Pride's cited evidence does not establish that Stop Naples Drag or GAP Stand were "part of a regional and nationwide wave of social and political backlash against drag."

22. Admitted that the language Naples Pride quotes from public commenters is accurate but denied to the extent that Naples Pride characterizes those quotations. Naples Pride fails to mention that numerous public commenters spoke in favor of Pridefest and the drag show at the meetings as well.[15]

23. Admitted that Naples Pride quotes the March 1, 2023, City Council Meeting Minutes accurately,[16] but denied that the quotes establish that Council Members "expressed hostility towards the Performance in a viewpoint- and content-based manner." Numerous public commenters spoke in favor of Pridefest and the drag show at the March 1, 2023, meeting.[17] Otherwise admitted.

24. Denied to the extent that "[m]ajor political backlash" is a vague and ambiguous term. Denied that Naples Pride's cited evidence contains the quotes attributed to a local business owner and demonstrates his commitment "to spend half a million dollars attacking Council members."[18] Denied that Naples Pride's cited evidence establishes that "[a]nti-drag activists … continued to demand that the Council

[15] *See, e.g.*, Feb. 1, 2023, Meeting Min. at 8, ECF No. 173-16; Feb. 15, 2023, Meeting Min. at 3, ECF No. 173-17; Mar. 1, 2023, Meeting Min. at 4, 7–8, ECF No. 173-18.
[16] *See* Pl.'s Ex. 14, ECF No. 165-14.
[17] Mar. 1, 2023, Meeting Min. at 4, 7–8.
[18] *See* Pl.'s Ex. 245 at 1:59:22, ECF No. 169-45 (not containing the quotes).

... impose the Restrictions." Otherwise admitted that Naples Pride's quotations are accurate but denied to the extent Naples Pride characterizes those quotations.

25. Denied that Naples Pride's cited evidence establishes that "Councilmember Hutchison helped organize several protests against the Performance" and that "Hutchison and Blankenship . . . encouraged [activists] to attend, protest, and petition for reversal."[19] Denied that Naples Pride's cited evidence establishes that Mayor Heitmann "expressed disapproval of the Performance in response to constituent outreach."

26. Denied that at the March 20, 2023, City Council Meeting, Mayor Heitmann moved to suspend the rules to immediately reconsider Naples Pride's special event permit.[20] Denied to the extent that Naples Pride characterizes the motion as one to "suspend the rules and immediately allow the reconsideration," but admitted that Blankenship's motion failed by a vote of 3–4.

27. Admitted that the language Naples Pride quotes from Hutchison is accurate but denied to the extent that Naples Pride characterizes those quotations. Denied that the cited evidence demonstrates that Hutchison "express[ed] outrage."

28. Denied to the extent that the evidence does not establish that Lt. O'Reilly

[19] *See, e.g.*, Blankenship Dep. Tr. at 100:16–101:15, ECF No. 166-37 (stating that he notified a constituent of upcoming Council meeting because "he's a constituent who expressed concerns about th[e] [Pridefest] event before, so I wanted him to know that it was coming up on an agenda again").

[20] Mar. 20, 2023, Meeting Min. at 10, ECF No. 165-20; Pl.'s Ex. 59 at 9:16:00, ECF No. 166-9 (Blankenship moving to suspend the rules to allow the Pridefest permit reconsideration to be placed on a future meeting's agenda).

was on the March 21, 2023, call.[21] Denied to the extent that the evidence does not establish that the call was "at the request of Councilmember Petrunoff."[22] Denied that "Petrunoff warned that, in light of public opposition, Plaintiff risked cancellation of Pridefest altogether unless it acceded to the two Restrictions."[23]

29. Admitted that the language Naples Pride quotes from the cited documents is accurate but denied to the extent that Naples Pride characterizes those quotations. Denied that "the board changed its position out of fear that refusal would mean no Pridefest at all." Naples Pride's representatives repeatedly stated, both in private and public statements, that its decision to adopt the challenged conditions was based on safety.[24] Denied that Plaintiff "accept[ed] . . . the Restrictions." The City Council did not impose the challenged conditions on Pridefest 2023 or Pridefest 2024; Naples Pride adopted the conditions.[25] Defendants further note that Naples Pride concedes that it does not know what would have happened with its Pridefest 2023

---

[21] *See, e.g.*, Boodheshwar Dep. Tr. at 145:24–148:7, ECF No. 173-3 (testifying that the people on the call from the City were Petrunoff and Boodheshwar); Pl.'s Ex. 28, Petrunoff Dep. Tr. at 119:14–24, ECF No. 165-28 (no one from NPD was on the calls).

[22] Petrunoff Dep. Tr. at 115:15–119:24 (Petrunoff could not recall "who called who").

[23] Petrunoff Dep. Tr. at 115:19–131:18 (explaining that Craciun and Petrunoff "came up with the solution together to have it indoors, 18 plus" in light of Craciun's "expressed security concerns").

[24] C. Huffman Mar. 21, 2023, Email, ECF No. 173-20; Gaffoli Mar. 21, 2023, Text Chain, ECF No. 173-21; *see also* T. Renfro Mar. 21, 2023, Text Chain, ECF No. 173-22; T. Renfro Mar. 21, 2023, Email, ECF No. 173-23; D. Gaffoli Mar. 21, 2023, Email, ECF No. 173-24; Craciun June 17, 2023, Text Chain, ECF No. 173-25; C. Craciun Mar. 22, 2023, Email, ECF No. 173-26; Mar. 22, 2023, Meeting Min. at 3, ECF No. 173-27; Naples Pride Newsletter at 4, ECF No. 173-28; C. Craciun Mar. 29, 2023, Email, ECF No. 173-29; C. Craciun Mar. 31, 2023, Email, ECF No. 173-30; Kaitlyn Snook, *Naples Pride Moves Drag Show Indoors as Opposition Grows*, WGCU NEWS (Apr. 29, 2023), ECF No. 173-31; C. Soldavini May 25, 2023, Email, ECF No. 173-32; C. Soldavini Aug. 16, 2024, Email, ECF No. 173-33; Aug. 15, 2024, Naples Pride Letter, ECF No. 173-34; Craciun Dep. Tr. at 58:11–20, 83:20–86:6, 139:23–140:23, 142:6–14.

[25] *Id.*

permit if it had not voluntarily decided to move the drag show indoors.[26]

30. Denied that the Norris Center is located outside of Cambier Park.[27] Denied that Naples Pride's cited evidence establishes a specific audience capacity for Cambier Park's bandshell.

31. Denied that "[p]olitical headwinds continued thereafter" as unsupported by any specific citation to the record and on the basis that "political headwinds" is a vague and ambiguous term. Denied that Blankenship's mayoral campaign "featured his opposition to the Performance prominently."[28] Defendants further state that Blankenship lost that election.[29]

32. Admitted that Naples Pride "submitted its permit application for Pridefest 2024 shortly after Pridefest 2023." Otherwise denied.[30]

33. Admitted that Pridefest 2024's drag show took place indoors at the Naples Woman's Club with a seating capacity of 180 people. Otherwise denied.[31]

34. Admitted that Naples Pride sought to return the drag show to Cambier Park's bandshell for all ages for Pridefest 2025. Denied that there were "several reasons why" to the extent that Defendants dispute Naples Pride's purported reasons.[32]

---

[26] Craciun Dep. Tr. at 50:20–52:4.
[27] Pl.'s Ex. 188.
[28] Blankenship Dep. Tr. at 231:8–17 ("opposition to drag shows being held in Cambier Park" "was not a major issue to [him]"; it "might have come up as a minor question, a minor issue, but I don't recall that being a significant issue in the campaign"); *id.* at 250:4–251:24; *id.* at 233:2–234:23.
[29] *See id.* at 253:9–13.
[30] *See supra* ¶ 29; B. Petrunoff Nov. 21, 2023, Email, ECF No. 173-36; Naples Pride Letter (Aug. 15, 2024).
[31] *See supra* ¶ 32.
[32] *See infra* ¶¶ 35–44.

35. Denied that "[a]fter two years, the purported safety threats to Pridefest had not materialized."[33] For the remaining assertions, admitted to the extent that the statements are Naples Pride's opinion, but denied to the extent that Naples Pride's cited evidence does not establish the underlying factual bases for those opinions.[34]

36. Denied that Naples Pride's cited evidence establishes that "Hutchison again coordinated with anti-drag activists to mobilize opposition to Plaintiff's permit application." Admitted that the language Naples Pride quotes from Petrunoff is accurate but denied to the extent that Naples Pride characterizes those quotations. Further denied to the extent that Naples Pride implies Petrunoff mentioned permit fees in her messages with Craciun. Denied that more security personnel being included in a special event's security plan equates to "greater permit fees."[35]

37. Admitted that the language Naples Pride quotes from public commenters is accurate but denied to the extent that Naples Pride characterizes those quotations in any way (*e.g.*, "overflow[ing] with hateful anti-drag and anti-LGBTQ+ rhetoric," "forcefully demanded that the Restrictions remain in place," comments "express[ed] opposition to the Performance's viewpoint and content"). Defendants further state that numerous public commenters spoke in favor of Pridefest and the drag show at the January 15, 2025, meeting.[36]

---

[33] O'Reilly Decl. ¶¶ 10–59; Gaffoli May 16, 2025, Text Exchange, ECF No. 173-42; Soldavini Dep. Tr. at 89:2–90:11, ECF No. 173-41; Craciun Dep. Tr. at 84:4–86:6.

[34] *See*, e.g., Petrunoff Dep. Tr. at 137:15–138:10 (limiting the drag show to adults only would "lower the temperature of th[e] event"); Christman Dep. Tr. at 149:23–152:13, 236:8–24, ECF No. 167-18; O'Reilly Decl. ¶ 42.

[35] *See* documents cited *supra* n.12.

[36] Jan. 15, 2025, Meeting Min. at 3, 11, ECF No. 173-14.

38. Denied that "[t]he overriding justification [the Councilmembers] offered was opposition to the Performance's viewpoint and content." The Councilmembers voting in favor of the permit, subject to the Challenged Conditions, were explicit that they were doing so based on concerns about public safety.[37] Denied that Hutchison commented that an outdoor drag show would equate to "targeting children."[38] Naples Pride misquotes Christman in part, who stated that "drag shows are nonetheless offensive to many people in this community."[39] Otherwise admitted that the language Naples Pride quotes from the Councilmembers is accurate but denied to the extent that Naples Pride characterizes those quotations. Defendants further state that the City Attorney confirmed on the record that the City Council's decision was based "solely on safety," and no one objected.[40]

39. Denied that the City Council "reimposed the Restrictions." The City Council did not impose the challenged conditions on Pridefest 2023 or Pridefest 2024; Naples Pride voluntarily adopted the conditions.[41] Denied that Naples Pride's cited evidence establishes that "[i]n their contemporaneous communications and depositions, Council members admitted that their votes were motivated by opposition to the Performance's viewpoint or content."[42] The Councilmembers voting in favor of

---

[37] *See* Jan. 15 City Council Meeting Tr. at 91:3–17, 91:23–25, ECF No. 12-18 (Christman); *id.* at 93:22–24, 94:6–95:18 (Barton); *id.* at 102:22–25, 103:2–25 (Penniman); *id.* at 104:9–19 (Petrunoff); *id.* at 113:5–9, 113:16–21 (Mayor Heitmann).
[38] *Id.* at 83:17–87:3.
[39] *Id.* at 92:4–5.
[40] *Id.* at 120:13–121:3.
[41] *See supra* ¶ 29.
[42] *See* Pl.'s Ex. 210, ECF No. 169-10 (texts from Barton saying nothing about viewpoint- or content-

the permit, subject to the Challenged Conditions, were explicit that they were doing so based on concerns about public safety.[43]

40. Denied. The total security fees that the City charged Naples Pride for Pridefest 2025 was $23,327.50. Collier County, an entity that is not under the control of Defendants, separately invoiced Plaintiff.[44] Otherwise admitted.

41. Admitted that the security fees the City charged to Naples Pride for Pridefest have increased since 2017, but denied to the extent Naples Pride is characterizing those increases as specific to Pridefest (as opposed to an increase in security fees charged to all special events) or as contrary to the reasons Defendants have explained for why NPD increased the security fees.[45]

42. Denied that Defendants "justified these fee increases based on the 'controversial' nature of Pridefest and the possibility of protests." While NPD considers potentially disruptive groups when planning security for special events, Defendants do not charge event organizers for resources and personnel deployed solely to protect against outside influences, such as protesters.[46] Denied that Chief Dominguez "justified the increase in permit fees by citing purported safety concerns

---

based opposition to the drag show); Pl.'s Ex. 58 at 256:5–12, ECF No. 166-8 (Heitmann explaining that she wanted to make a decision that would "keep[ ] the event safe"); Pl.'s Ex. 28 at 153:10–17 (Petrunoff explaining that she had "safety concerns" about approving the Pridefest 2025 permit application without the challenged conditions); Pl.'s Ex. 118 at 198:24–199:6 (Christman explaining that having the drag show outdoors was "going to elevate again rather than continue to de-escalate public safety and security concerns"); Pl.'s Ex. 114 at -00878, ECF No. 167-14 (stating only that Kramer and Hutchison—who voted against approving Pridefest 2025 at all—"cit[ed] concerns over the event's content and its alignment with community standards").

[43] *See supra* ¶ 38.

[44] July 7, 2025 Invoice from City of Naples to Naples Pride, ECF No. 174-9.

[45] O'Reilly Decl. ¶¶ 10–59.

[46] *See* documents cited *supra* n.12.

due to political opposition to drag" at the January 15, 2025, City Council meeting.[47] Denied that after the January 15, 2025, City Council meeting, when NPD officers met with Naples Pride representatives, the officers showed the representatives "a copy of the City's written cost criteria." Instead, NPD officers showed the representatives the NPD's Incident Response Continuum, which is a a tiered, risk-based security framework that takes into account certain factors and acts as a starting point for determining the level of security an event will require; it does not establish any costs or specify what charges will be passed on to an event organizer.[48] Otherwise admitted that the language Naples Pride quotes from various documents is accurate but denied to the extent that Naples Pride characterizes those quotations.

43. Denied to the extent that the Incident Response Continuum is a tiered, risk-based security framework that accounts for certain factors and acts as a starting point for determining the level of security an event will require; it does not rigidly establish the necessary security for a special event.[49] Admitted that Defendants require special event organizers to reimburse the City for certain security fees arising from their events, but denied that Naples Pride's cited evidence establishes that any security

---

[47] Jan. 15 City Council Meeting Tr. at 6:2–13 (explaining that NPD "look[s] at everything that has to do with the event" when planning security, including "intelligence information, current events, past events, historic events, the venue, the footprint, the size, the accessibility, the time and date, the potential for conflict, the expected size of the crowd" and "music, entertainment"); *id.* at 5:22, 8:22 (explaining that the NPD is "apolitical," including in planning special event security); *id.* at 7:5–12 (explaining that because NPD now plans security to "national standards," fees have gone up and that "[i]t costs more to have events" today "because there's more threats out there" than in years past).

[48] O'Reilly Decl. ¶ 12; Incident Response Continuum, ECF No. 173-39; O'Reilly Day 1 Dep. Tr. at 18:17–19:9; O'Reilly Day 2 Dep. Tr. at 47:25–66:13; Jan. 15 City Council Meeting Tr. at 20:6–12, 21:1–7.

[49] *Id.*; *see also* documents cited *supra* n.12.

measures at issue in this case were "not objectively reasonable or necessary."[50]

44. Denied. While NPD considers potentially disruptive groups when planning the overall security for all special events, including Pridefest, Defendants do not charge event organizers for resources and personnel deployed solely to protect against outside influences, such as protesters.[51]

45. Admitted to the extent that Naples Pride submitted public records requests to the City both before and after the January 15, 2025, City Council meeting, but denied to the extent that Naples Pride characterizes what those public records requests allegedly showed (*e.g.*, that Naples Pride "was being charged much more than other events that were larger in size and more logistically complex").[52]

46. Denied that Naples Pride's evidence establishes that Naples Pride had "limited resources" that "prevented it from obtaining counsel until March 21, 2025."

47. Denied that Naples Pride "immediately moved for a preliminary injunction" after filing this action on April 10, 2025.[53]

48. Denied that "once again, the Council reimposed the Restrictions." The City Council did not impose the challenged conditions on Pridefest 2023 or Pridefest 2024; Naples Pride voluntarily adopted the conditions.[54] Denied that the Pridefest

[50] *See* documents cited *supra* n.12.
[51] O'Reilly Decl. ¶¶ 20, 34–48; Ex. RR, C. Dominguez Oct. 28, 2025, Email (filed herewith); *see also* O'Reilly Day 1 Dep. Tr. at 204:16–206:21, 234:16–235:5, 250:14–251:7, 266:2–6, 268:11–270:21, 277:16–279:18, 288:9–16, 296:16–297:6; O'Reilly Day 2 Dep. Tr. at 25:15–25, 32:6–33:12, 79:20–80:7, 80:24–82:16, 104:24–105:12, 105:25–107:5, 109:7–16, 110:20–113:8; C. Dominguez Jan. 14, 2025, Email; O'Reilly Opp'n Decl. ¶¶ 4, 7–8 (Oct. 6, 2026) (filed herewith).
[52] O'Reilly Decl. ¶¶ 60–66; O'Reilly Opp'n Decl. ¶ 9; C. Dominguez Oct. 28, 2025, Email.
[53] *See* ECF No. 12.
[54] *See supra* ¶ 29.

2026 event permit required the drag show to be held at the Norris Center as opposed to just "inside" without specifying a venue.[55]

49. Denied. Defendants charged Naples Pride $22,860 for security for Pridefest 2026.[56] It is Defendants' understanding that the Collier County Sheriff's Office separately charged Naples Pride for the SWAT services they provided, which amounted to $9,920.[57] Naples Pride was therefore charged approximately $850 *less* in total for Pridefest 2026 security than Pridefest 2025 security.

50. Denied. While NPD considers potentially disruptive groups when planning the overall security for all special events, including Pridefest 2026, Defendants do not charge event organizers for resources and personnel deployed solely to protect against outside influences, such as protesters.[58]

51. Denied that Naples Pride's Pridefest 2025 permit was subject to a motion to reconsider by the City Council.[59] Admitted that Boodheshwar could not recall any other event during his time as City Manager where a member of City Council voted to suspend the rules of procedure to reconsider a special event permit application.

52. Denied to the extent that Naples Pride characterizes the City's safety or security concerns as "purported." Otherwise admitted.

53. Denied to the extent that Naples Pride characterizes the City's safety or

---

[55] Pridefest 2026 Application.
[56] Pridefest 2026 Invoice, ECF No. 174-14.
[57] O'Reilly Decl. ¶ 59.
[58] *See* documents cited *supra* n.51; *see also* O'Reilly Day 1 Dep. Tr. at 196:7–201:23; O'Reilly Day 2 Dep. Tr. at 26:9–27:25, 27:6–10, 108:24–109:2; O'Reilly Opp'n Decl. ¶ 3.
[59] *See* document cited *supra* n.20.

security concerns as "purported." Otherwise admitted.

54. Denied.[60]

55. Denied. The Councilmembers voting in favor of the permit, subject to the Challenged Conditions, were explicit that they were doing so based on concerns about public safety.[61] Some of the safety concerns arose from the nature of Pridefest being an event held in an open, porous venue with a high concentration of people in a small area or from the possibility of a random violent attack.[62]

56. Denied that "any security threats were purely hypothetical."[63] Naples Pride's cited evidence does not establish that no "attempted act of violence has ever occurred at Pridefest," only that Defendants are not aware of any attempted acts of violence that have occurred at Pridefest. Admitted that NPD did not conclude that there were any specific actionable threats to Pridefest 2025 or 2026. Denied that NPD "did not act in a manner consistent with the belief that any true threat existed."[64] Denied that Naples Pride's cited evidence establishes that "other cities have held outdoor drag performances without any attempted or actual violence."

57. Admitted that the Special Events Manual describes NPD as "subject

[60] O'Reilly Decl. ¶¶ 60–66 (explaining that it is not useful to compare the security fees for different special events because each event has unique characteristics that affect security planning); O'Reilly Opp'n Decl. ¶ 9; Liebbe Dep. Tr. at 223:10–19, ECF No. 172-3 (explaining that different cities "follow different models" for the amount of security needed at special events and agreeing that it is "acceptable for people to disagree" on the level of security needed).
[61] *See supra* ¶ 38.
[62] O'Reilly Decl. ¶¶ 14–15; Petrunoff Dep. Tr. at 121:22–125:10, 160:8–14; Pl.'s Ex. 3 at ROG 8, ECF No. 165-3; Blankenship Dep. Tr. at 147:20–148:22; Christman Dep. Tr. at 188:2–191:5.
[63] O'Reilly Decl. ¶¶ 30–59; Petrunoff Dep. Tr. at 121:22–125:10; Christman Dep. Tr. at 188:2–191:5.
[64] O'Reilly Decl. ¶¶ 30–59.

matter experts" on special event security. Admitted to the extent that NPD stated that it could provide a reasonable level of security for Pridefest 2025 whether the drag show was held indoors or outside,[65] but denied to the extent Naples Pride omits that NPD stated that it preferred the indoors option, since it would be easier to secure.[66] Admitted to the extent that Defendants stated "[w]hile the City's police also believe adequate security could be provided in both an[ ] open and indoor spaces, a closed indoor space would be easier to keep secure than an open-air stage."[67] Otherwise denied.

58. Denied.[68]

59. Denied. Defendants considered approving Pridefest 2025 and Pridefest 2026 subject to no restrictions but ultimately decided that the challenged conditions were necessary to ensure the requisite level of safety.[69]

60. Denied. Naples Pride's cited evidence does not establish that "[t]he Norris Center's capacity" is "less than 5% of the capacity of the Cambier Park bandshell" or that it "substantially curtailed the audience for the Performance."

61. Admitted that the adults-only condition "prevented minors from attending the Performance." Denied that Naples Pride's cited evidence establishes that the adults-only condition made it "impossible for many parents with children to

---

[65] Jan. 15 City Council Meeting Tr. at 7:13–19, 8:15–19; 16:9–17:16.
[66] O'Reilly Decl. ¶ 42; O'Reilly Day 1 Dep. Tr. at 80:3–11, 300:6–301:12, 305:14–21; C. Dominguez Jan. 12, 2025, Email, ECF No. 173-37.
[67] Pl.'s Ex. 242 at ROG 9, ECF No. 169-42.
[68] Petrunoff Dep. Tr. at 137:15–138:10 (limiting the drag show to adults only would "lower the temperature of th[e] event"); Christman Dep. Tr. at 149:23–152:13, 236:8–24; Gaffoli May 16, 2025, Text Exchange; Soldavini Dep. Tr. at 89:2–90:11; Craciun Dep. Tr. at 84:4–86:6.
[69] *See supra* ¶ 38.

attend" the drag show. Denied that "[t]his prevented Plaintiff from communicating the Performance's positive message of pride and self-acceptance to an entire category of people"—characterizing a message as "positive" is a matter of opinion, not fact. Denied that Naples Pride's cited evidence establishes that there were any "minors struggling with stigma over their identifies" that were prevented from attending the drag show or that they would "most benefit from" the drag show's alleged message.

62. Denied that Naples Pride's cited evidence establishes that the challenged conditions "compell[ed] Plaintiff to convey the message that certain forms of gender expression are shameful and should be kept 'in the closet.'" Admitted that Naples Pride believes "the expressive message of Pridefest [is] that all gender identifies and forms of gender expression should be celebrated in the open," but denied that Naples Pride's cited evidence establishes the underlying factual bases for that belief.

63. Denied that the challenged conditions were "imposed as a direct result of protesters who falsely equated Plaintiff and drag performers with pedophiles and child molesters" and that the challenged conditions "validated those false and malicious stereotypes."[70] Denied that Naples Pride's cited evidence establishes that the challenged conditions "imposed stigmatic harm on Plaintiff's members, performers, and audience," especially considering that Naples Pride voluntarily adopted the same conditions for safety reasons in 2023 and 2024, so they cannot be discriminatory.[71]

64. Denied that "the indoors-only Restriction actually created safety risks"

---

[70] *See supra* ¶¶ 21–28, 37–39.
[71] *See supra* ¶¶ 29, 38.

and that this was supposedly "confirmed by NPD's own internal analyses." The indoors condition enhanced safety at Pridefest.[72] Denied that Naples Pride's cited evidence establishes that the indoors condition "required attendees to exit the secured festival grounds, walk along public streets, and wait outside to gain entry" because, when the drag show was held in the Norris Center for Pridefest 2023, 2025, and 2026, attendees could have walked through Cambier Park to reach that venue.[73] Denied that "[t]his forced attendees to come face-to-face with protesters who had not been security-screened." Naples Pride's cited evidence does not establish that the indoors condition "forced" attendees to come face-to-face with protesters, nor that interactions between attendees and protesters increased as a result of the indoors condition.[74]

## ARGUMENT

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[75] Because Naples Pride is the movant, Defendants' evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor."[76] Naples Pride has not established that it is entitled to summary judgment under these standards.

### I. The Challenged Conditions Do Not Violate the First Amendment.

The Challenged Conditions placed on the drag show in 2025 and 2026 are

---

[72] O'Reilly Decl. ¶ 42; O'Reilly Opp'n Decl. ¶ 15.

[73] *See* Operation Guardian Spectrum at 18, ECF No. 174-5; *see also* Liebbe Exp. Rep. at 14–16 (May 4, 2026), ECF No. 169-43 (without conceding admissibility).

[74] Liebbe Dep. Tr. at 99:11–123:19, 202:10–207:9; O'Reilly Opp'n Decl. ¶ 6.

[75] FED. R. CIV. P. 56(a).

[76] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam).

consistent with the First Amendment. The first step of the analysis is determining the nature of the forum. Here, the City has created a vehicle (the special events program) for creating limited public forums in public locations, like Cambier Park.[77] The special events program itself is limited to speakers making an atypical use of public spaces. And Cambier Park as used by Naples Pride for Pridefest through the special events program is "limited to a specific class of speakers,"[78] namely, Naples Pride and the individuals it allows to speak at Pridefest. Because the forum is properly characterized as a limited public forum, the next step is determining whether the challenged conditions are viewpoint neutral and reasonable.[79] The Challenged Conditions are both viewpoint neutral and reasonable because they are reasonable safety measures that do not target any viewpoint.[80] Naples Pride's arguments to the contrary fail.

### A. Cambier Park Being Used by Naples Pride for Pridefest Through the Special Events Program is a Limited Public Forum.

A forum cannot be determined "merely by identifying the government property at issue," so courts must "focus[ ] on the access sought by the speaker."[81] Here, the "speaker" was Plaintiff, and the "access" was to Cambier Park as part of the City's special event program to host Pridefest. So, the "forum" is Cambier Park as used through the City's special event program to host Pridefest.[82]

Finding a program to be the forum, rather than the physical location is

[77] *See Naples Pride, Inc. v. City of Naples*, No. 25-11756, 2025 WL 2382975, at *2 (11th Cir. June 6, 2025).
[78] *McDonough v. Garcia*, 116 F.4th 1319, 1328 (11th Cir. 2024) (en banc).
[79] *See id.* at 1329.
[80] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2.
[81] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985).
[82] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2.

consistent with Supreme Court precedent. In *Cornelius*, the plaintiff was excluded from participating in a federal workplace charity drive, and the Court held that the forum was the charity drive, not the federal workplace.[83] In *Rosenberger v. Rector & Visitors of University of Virginia*, a university's exclusion of religious groups from student activities funds involved the limited forum of the funding program, not the university itself.[84]

Here, Naples Pride does not seek access to Cambier Park on the same terms as any member of the public to use the park for its normal uses. Instead, Naples Pride has used the special events program to access Cambier Park through the advantages of that program to conduct Pridefest-related activities, including its drag show. Those advantages include, among others, being granted exclusive use of the portion of Cambier Park where Pridefest is located and the ability to erect fences around the event, exclude individuals from the event, and charge for entry.[85] Like the plaintiffs in *Cornelius* and *Rosenberger*, Naples Pride does not seek access to a broad government forum, but a limited one: Cambier Park being used by Naples Pride for Pridefest through the special events program.

Plaintiff argues that because Pridefest occurs in Cambier Park, a park normally open to the public for activities normally associated with a public park, traditional public forum analysis applies because parks are historically public forums.[86] But parks are not per se traditional public forums for all times and all purposes, especially where

[83] *Cornelius*, 473 U.S. at 800–01.
[84] 515 U.S. 819, 829 (1995).
[85] *See* Response to Statement of Material Facts ("RSMF") ¶ 8.
[86] *See* Pl.'s Part. MSJ at 28–29 (Sep. 14, 2026), ECF No. 164 ("Mot.").

the park is simply the geographic location of a separate event through which the First Amendment activity will take place (*e.g.*, Pridefest).[87] "The mere physical characteristics of the property cannot dictate forum analysis," which is why sidewalks and military bases with public access are not always public forums.[88] It is why a city-owned sidewalk on a university campus was not per se a public forum and instead was a limited public forum.[89] And it is why a public sidewalk outside the ticketed area of a state fairground was a "limited public forum."[90] Additionally, a city "may create a limited public forum by temporarily reserving a portion of what is a traditional public forum for a limited purpose and for discussion of certain topics."[91] And a government can "transform a traditional forum into a more limited one" when there is "a change in the 'nature,' 'use,' 'characteristics,' 'purpose,' or 'function' of the forum."[92]

Pridefest in Cambier Park as part of the special events program is a limited public forum. A limited public forum is either (1) "limited to a specific class of speakers" or (2) "limited to speech on specific topics."[93] In conducting the analysis,

---

[87] The Supreme Court has not held that parks are "automatically" public forums "without further inquiry." *Id.* at 28 (citing *United States v. Grace*, 461 U.S. 171, 177, 179 (1983)). *Grace* was limited to the question of "public sidewalks." *Grace*, 461 U.S. at 175. And even those were only "*generally*" considered "public forum property" "without further inquiry." *Id.* at 179.

[88] *United States v. Kokinda*, 497 U.S. 720, 727 (1990) (plurality opinion) (citing *Greer v. Spock,* 424 U.S. 828 (1976)).

[89] *See Keister v. Bell*, 29 F.4th 1239 (11th Cir. 2022).

[90] *Powell v. Noble*, 798 F.3d 690, 700 (8th Cir. 2015).

[91] *Parkland Republican Club v. City of Parkland*, 268 F. Supp. 2d 1349, 1357 (S.D. Fla. 2003); *see also PETA v. Giuliani*, 105 F. Supp. 2d 294, 316 (S.D.N.Y. 2000), *adopted* No. 00 CIV. 3972 (VM), 2000 WL 1639423 (S.D.N.Y. Oct. 31, 2000), *aff'd*, 18 F. App'x 35 (2d Cir. 2001).

[92] *Warden v. Miranda*, No. CV-14-02050-TUC-DCB, 2017 WL 3130664, at *14 (D. Ariz. July 24, 2017), *aff'd,* 751 F. App'x 1030 (9th Cir. 2019).

[93] *McDonough*, 116 F.4th at 1328.

courts must carefully determine the forum in which speech has been restricted.[94] *McDonough* held that city council meetings are not traditional public forums because they allow "public comment limited to a specific subject matter,"[95] namely, "matters pertinent to the City."[96] In *Moms for Liberty*, the Eleventh Circuit held that a school board meeting is a limited public forum because it is "for parents and community members to express themselves on school matters of community interest."[97]

Under the special events program, the City allows speakers to temporarily engage in *atypical* use of public spaces to hold events such as festivals, parades, and concerts.[98] Naples Pride's permit for Pridefest, for example, allows a *specific class of speakers* to engage in speech on *specific topics* relating to Pridefest, establishing both of the factors for a limited public forum.[99] The fact that the forum is limited is also demonstrated by the fact that Naples Pride is allowed to erect fencing to cordon off portions of Cambier Park from members of the public who do not buy a ticket and to exclude members of the public if they express disagreement with the content or viewpoint of Pridefest. And the City can terminate its program at will.[100] These

---

[94] *Id.*
[95] *Id.* at 1329.
[96] *Id.* at 1328 (internal quotation marks omitted).
[97] *Moms for Liberty — Brevard Cnty., Fla. v. Brevard Pub. Schs.*, 118 F.4th 1324, 1331 (11th Cir. 2024) (internal quotation marks omitted).
[98] *See* Special Events Manual at 3.
[99] *Hays Cnty. Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) supports this contention as it held "the district court erred in finding that the university is *not* a limited public forum" when the university "authorize[d] students to distribute by hand literature on matters of public concern on the outdoor parts of the campus." *Id.* at 118 (emphasis added).
[100] *See Koala v. Khosla*, 931 F.3d 887, 899 (9th Cir. 2019); *Satanic Temple v. City of Belle Plaine*, 80 F.4th 864, 868 (8th Cir. 2023).

activities are not normal activities typically associated with the day-to-day use of a public park. While Cambier Park may be a traditional public forum for many activities (*e.g.*, handing out leaflets), accessing the park through the special events program to use it for special events, like Pridefest, is a *limited* public forum per *McDonough*.[101]

Hosting Pridefest in the park through the special event program is analogous to other events that have been held to be limited public forums. In *PETA*, the court found that an art festival held in "various public open spaces throughout the City" (including parks) was "either a nonpublic forum or a limited public forum."[102] The festival "[w]as limited to the approximately 500 approved sponsors given selective access" to the public spaces, and their expression was limited to the exhibit's purposes and guidelines as opposed to the "right of general access to these open spaces when they serve exclusively as a public forum."[103] Similarly, *Parkland Republican Club* held that city streets were a limited public forum for purposes of a parade,[104] and *Rita v. Village of Tinley Park* held that special events "hosted in parks and other traditionally public spaces that receive the highest degree of First Amendment protection" were nonetheless limited public forums for those particular contexts.[105] Here, reserving the park for atypical use by Pridefest through the special events program is a limited public

---

[101] *See* 116 F.4th at 1328; *see also Naples Pride, Inc.*, 2025 WL 2382975, at *2.
[102] 105 F. Supp. 2d at 297, 317, 319.
[103] *Id.* at 318–19.
[104] 268 F. Supp. 2d at 1355.
[105] No. 23-C-4931, 2024 WL 4346548, at *10 (N.D. Ill. Sep. 30, 2024). Cases holding that public streets remained traditional public forums for demonstrators during permitted events that were open to the general public are inapposite; they address the rights of non-permittees, not the nature of the forum for the permitted event itself. *See Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008); *Teesdale v. City of Chicago*, 690 F.3d 829 (7th Cir. 2012); *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005).

forum.

### B. The Challenged Conditions are Viewpoint Neutral and Reasonably Related to Enhancing Safety.

#### 1. The Challenged Conditions Are Viewpoint-Neutral.

A speech restriction is viewpoint-based if it "targets not merely a subject matter, but particular views taken by speakers on a subject."[106] The Challenged Conditions the City imposed on Pridefest's drag show in 2025 and 2026 did not discriminate against Naples Pride's viewpoint but rather facilitated access to Cambier Park to ensure that Pridefest could occur in a reasonably safe manner.[107]

Plaintiff's citations regarding the test for viewpoint-based discrimination address *content-based* discrimination and therefore should not inform the court's analysis of whether there was *viewpoint-based* discrimination here.[108] *Scott* did not decide the question of viewpoint discrimination at all.[109] *Otto* held that there was viewpoint discrimination, but only in the situation where a law "codif[ied] a particular viewpoint" and "*prohibit[ed]* [individuals] from advancing any other perspective."[110] Here, Plaintiff's speech was *not* prohibited at all. Additionally, the Challenged Conditions would have been implemented because of safety concerns present *regardless* of the viewpoint expressed by Plaintiff.[111] And "there is no viewpoint discrimination

---

[106] *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (internal quotation marks omitted).
[107] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2; RSMF ¶ 38; Defs.' MSJ at 9–10, ECF No. 173.
[108] *See* Mot. at 23 (citing *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020); *Scott v. City of Daytona Beach*, 186 F.4th 1286, 1305 (11th Cir. 2026)).
[109] *See* 186 F.4th 1286.
[110] 981 F.3d at 864 (emphasis added).
[111] RSMF ¶ 38; Defs.' MSJ at 23–27 (Sep. 14, 2026), ECF No. 173 ("Defs.' MSJ").

when the same result would have occurred in the absence of any illegitimate motive."[112] The City Council imposed the conditions in 2025 and 2026 based on concerns about public safety.[113] The best evidence of the Councilmembers' thinking at the time they made their votes is of course the explanations they gave in making those votes. Their explanations cite "public safety" as the reasons for their decisions.[114] There is no evidence that Defendants would have done anything differently for similar events involving *different* viewpoints. Additionally, Naples Pride's own representatives told the City Council that NPD's threat assessment in 2025 was not discriminatory.[115]

Other cases cited by Plaintiff finding viewpoint discrimination are distinguishable as they address restrictions that *prohibited* drag performances.[116] Or they address laws that *banned* speech.[117] Here, the drag performance *was allowed*.

Similarly, Naples Pride has continuously characterized the Challenged Conditions as a "heckler's veto,"[118] but there can be no heckler's veto when "[n]o speaker is silenced[ ] [a]nd no message is prohibited."[119] Neither Pridefest nor its drag

---

[112] *Boddy v. Grech*, 178 F.4th 264, 274 (6th Cir. 2026) (citation and quotation marks omitted).
[113] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2; RSMF ¶ 38; Defs.' MSJ at 23–27.
[114] RSMF ¶ 38.
[115] *Id.*
[116] *See* Mot. at 23–24, 24 n.122.
[117] *Id.* at 24, 26.
[118] *Id.* at 25–26. Plaintiff claims the Seventh Circuit found there was a "heckler's veto" because an individual was prevented from protesting on an overpass due to the "safety hazard" it created. *See id.* at 26 (citing *Ovadal v. City of Madison*, 416 F.3d 531, 537–38 (7th Cir. 2005)). But the court there expressly held that the question was open and remanded for the lower court to determine "whether the city's rule . . . [was] capable of content-neutral application." *Ovadal*, 416 F.3d at 537–38.
[119] *Hill v. Colorado*, 530 U.S. 703, 734 (2000).

show have been "veto[ed]."[120] Nor were they "punished or banned."[121] The City Council simply imposed conditions on a special event permit approval to ensure public safety, without favoring the viewpoint of either the drag show or any protesters thereof. It "would expand the heckler's veto doctrine significantly" to hold it "applies to neutral regulations that do not target particular speech."[122]

Viewpoint neutral conditions meant to enhance safety may be imposed to prevent harm, including harm posed by "unruly demonstrators."[123] Law enforcement "may take *any appropriate action* to maintain law and order that does not destroy the right to free speech by *indefinitely silencing* the speaker."[124] The Challenged Conditions were appropriately imposed to "[a]ddress[ ] the practical problems crowds pose."[125] Conditions imposed to protect a special event, its participants, and the public do not evince hostility to the event's message.

**2. The Challenged Conditions Are Reasonable.**

Because the forum is a limited one, "reasonableness" review, rather than strict or intermediate scrutiny, applies.[126] A restriction "in a limited public forum 'need not be the most reasonable' or even 'the only reasonable limitation.'"[127] The Challenged

---

[120] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2.
[121] *See Oakes Farms Food & Distribution Servs., LLC v. Adkins*, 154 F.4th 1338, 1348 (11th Cir. 2025). Nor were they "prevented." *See Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 722 (1931.)
[122] *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1294 (9th Cir. 2015).
[123] *ACLU of Colo. v. City & County of Denver*, 569 F. Supp. 2d 1142, 1178 (D. Colo. 2008).
[124] *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 253 (6th Cir. 2015) (en banc) (emphasis added).
[125] *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1294 (11th Cir. 2021).
[126] *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *McDonough*, 116 F.4th at 1328.
[127] *Moms for Liberty*, 118 F.4th at 1332 (quoting *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 692 (2010)).

Conditions succeed under the "reasonableness" standard.[128]

Plaintiff incorrectly states the test for reasonableness.[129] As explained by the Eleventh Circuit, under the reasonableness test "purpose-based restrictions must be wholly consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated, and prohibited speech must be naturally incompatible with the purposes of the forum."[130] Plaintiff skips the first part of this analysis.[131] Here, the Challenged Conditions are consistent with the government's interest. The purpose of the special events program is to enable special events not just to be held, but to be held safely. Concerns based on "assumptions as to what threats there are, how likely they are to occur, and what harm might result" are appropriate, so long as they "include an assessment of the particular characteristics of the event, including its timing and the geography of its location."[132] That is the case here. The City Council prescribed the Challenged Conditions based on the same sort of reasonable safety concerns that led Naples Pride to adopt them in the first place.[133] Plaintiff also omits the relevant condition for the second part of the analysis. It is not "*restricted* speech" that must be "naturally incompatible,"[134] but "*prohibited* speech."[135]

---

[128] *See Naples Pride, Inc.*, 2025 WL 2382975, at *2.
[129] *See* Mot. at 35–38.
[130] *Moms for Liberty*, 118 F.4th at 1332 (internal citations omitted).
[131] *See* Mot. at 35.
[132] *ACLU of Colo.*, 569 F. Supp. 2d at 1175–76.
[133] RSMF ¶¶ 29, 38.
[134] Mot. at 35.
[135] *Moms for Liberty*, 118 F.4th at 1332 (emphasis added); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1246 (11th Cir. 2019) (applying the second part when addressing a "ban" and "prohibition" on speech).

Here, Plaintiff's speech was not *prohibited*, so this aspect of the test does not apply.

Plaintiff argues the second part of the analysis requires "legitimate need." Mot. at 36. But the Eleventh Circuit has not required "legitimate need." The Challenged Conditions would pass in any event because, "[a]s Naples Pride agreed when the two conditions were first imposed, they were 'necessary' 'due to safety concerns' and to 'put the safety of [its] guests first.'"[136] Plaintiff also suggests evidence of risks is needed to satisfy this analysis; otherwise those risks are speculative.[137] But the Supreme Court has "not required" proof of "past disturbances" or "evidence that future disturbance would be likely," even "to justify the *denial* of access."[138] If reasoning for a regulation "rings of common-sense," that "is sufficient . . . to uphold [it] under reasonableness review."[139] Here there was evidence of risk, as Plaintiff implemented the same security measures for safety reasons in 2023 and 2024.[140]

The Councilmembers voting in favor of the Pridefest 2025 application explained that they were primarily concerned about the safety of the event and the attendees. Plaintiff characterizes the decision to implement the Challenged Conditions as having "overrode the view of NPD." Mot. at 36. But NPD *preferred* the indoors option, since it would be easier to secure.[141] This is reflected by the increased personnel NPD

[136] *Naples Pride*, 2025 WL 2382975, at *2.
[137] *See* Mot. at 36.
[138] *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 52 n.12 (1983) (citing *Greer v. Spock,* 424 U.S. 828 (1976)) (emphasis added); *see also Reform America v. City of Detroit*, 542 F. Supp. 3d 628, 640 (E.D. Mich. 2021); *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 13–14 (1st Cir. 2004); *Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012).
[139] *Kokinda*, 497 U.S. at 734–35 (plurality opinion) (citation omitted).
[140] *See* RSMF ¶¶ 29, 32.
[141] *Id.* ¶ 57.

estimated for holding the event outdoors.[142] Excluding children facilitated security by reducing the risk of a violent act against Pridefest.[143] And contrary to suggestions otherwise by Plaintiff,[144] the government "has the discretion to choose between reasonable alternatives" in enacting restrictions.[145] That the Council gave weight to safety considerations and implemented the Challenged Conditions was reasonable.

Defendants satisfy the additional requirement that there are "objective, workable standards" and "[]consistent enforcement."[146] This requires the government "to articulate some sensible basis for distinguishing what may come in from what must stay out."[147] Enforcement cannot be "haphazard and arbitrary."[148] Here, City Council determined what security-related conditions it would require at Pridefest and explained its reasoning on the record, taking into account the NPD's assessment and past experience. This process is therefore different from a situation where decisions were "left to the Chief's personal discretion, to be based on whatever factors he deem[ed] appropriate at any given point in time" in "an unprincipled, *ad hoc* manner" with "no established standards."[149] Nor is this a case where "enforcement was so inconsistent that it is impossible to discern the standard used."[150] Defendants made a

---

[142] Pridefest 2025 Indoor vs. Outdoor Cost Estimates (Nov. 14, 2024), ECF No. 174-8.
[143] Petrunoff Dep. Tr. at 137:15–138:10.
[144] *See* Mot. at 36–37.
[145] *Searcey v. Harris*, 888 F.2d 1314, 1321–22 (11th Cir. 1989).
[146] Mot. at 37 (quoting *Moms for Liberty*, 118 F.4th at 1332–33, 1325–38).
[147] *Moms for Liberty*, 118 F.4th at 1332 (quoting *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16 (2018)).
[148] *Id.* at 1333 (quoting *Cambridge Christian Sch.*, 942 F.3d at 1243).
[149] *Bourgeois v. Peters*, 387 F.3d 1303, 1318 (11th Cir. 2004).
[150] *Moms for Liberty*, 118 F.4th at 1335. *Hopper v. City of Pasco* is inapposite as the court determined the forum was a designated public forum and assessed the policy under strict scrutiny rather than reasonableness. *See* Mot. at 37; *cf. Hopper v. City of Pasco*, 241 F.3d 1067, 1081 (9th Cir. 2001).

reasonable decision informed by the guidance documents and experience they had. And as explained, NPD agreed that holding the event indoors would be preferable for safety reasons.[151] Plaintiff suggests that because the event was permitted outside previously, it could not reasonably be moved inside later.[152] But there is no support "for the proposition that a city that chooses to permit [events] in its public spaces for some period of time becomes estopped by the First Amendment from withdrawing that permission if those [events] happen, eventually, to invite 'controversy.'"[153]

Even if a higher level of scrutiny were required due to the nature of the forum,[154] the Challenged Conditions would satisfy it. Public safety and security are not only significant[155] but also compelling government interests.[156] And a state may regulate the use of its parks and streets for the protection of the public health, safety, and welfare.[157] Even in a traditional public forum, "the state remains free to take action to maintain public order."[158] More specifically, security considerations for a large private festival such as Pridefest are appropriate given the context of the event as opposed to other forums of expression.[159] The government has an interest in the orderly movement and

---

[151] RSMF ¶ 57.
[152] *See* Mot. at 37–38.
[153] *Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1294.
[154] Contrary to what Plaintiff represents, *see* Mot. at 30 n.128, the Eleventh Circuit applied intermediate scrutiny in the cases cited, rather than strict scrutiny. *See Fort Lauderdale Food Not Bombs*, 11 F.4th at 1291; *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1523 (11th Cir. 1992); *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1522–23 (11th Cir. 1985).
[155] *See, e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997); *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999).
[156] *See, e.g.*, *Reform America v. City of Detroit*, 37 F.4th 1138, 1149–50 (6th Cir. 2022).
[157] *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980).
[158] *Startzell*, 533 F.3d at 197.
[159] *See e.g.*, *Heffron v. Int'l Soc'y For Krishna Consciousness, Inc.*, 452 U.S. 640, 650–51 (1981).

control of such an assembly of persons.[160] And government entities may focus not just on ensuring the safety of the community, but also on *protecting the safety of the speaker himself*.[161] As the Eleventh Circuit noted in *Bloedorn*, it is appropriate to consider the "attributes" of the forum—its "outdoor location" and "highly trafficked area" with "limited number of security personnel."[162]

Here, the Challenged Conditions were narrowly tailored to address safety concerns identified related to Pridefest. Holding the drag show indoors enhances safety by making it more difficult for malicious outside actors to attack the event and limiting the show to adults only lessens the likelihood of an attempted attack. Indeed, as Naples Pride itself acknowledges, the indoors and adults-only conditions were first adopted by Naples Pride at a time when controversy surrounding drag shows was sharply increasing and, specifically, when a "group of anti-drag activists campaigned to ban Pridefest's drag performance."[163] In light of the escalating tensions around drag shows and organized opposition specifically targeting Pridefest's drag show, the City reasonably concluded that any event related to drag would present elevated security concerns. They then tailored the Challenged Conditions to provide a solution to address those specific concerns—implementing the *same conditions* that Naples Pride *itself* adopted for safety reasons in 2023 and 2024. And the drag show went forward in both 2025 and 2026, before a live audience, in the Norris Center inside Cambier Park,

[160] *See id*. at 650.
[161] *See Bloedorn v. Grube*, 631 F.3d 1218, 1239 (11th Cir. 2011).
[162] *Id.*
[163] First Am. Compl. ¶ 10, ECF No. 106 ("FAC").

and the rest of Pridefest proceeded outdoors.[164]

### C. Alternatively, Drag Shows for Children Are Not Protected Speech.

As Defendants fully explain in their motion for summary judgment,[165] drag shows for children are not protected by the First Amendment. While such speech may not be obscene and may be protected as to adults, the original understanding of the freedom of speech embodied in the First Amendment did not include protections for speech directed at minors "manifestly tending to the corruption of the morals of youth,"[166] which the Founding Generation would have understood to include live performances directed at children challenging social norms of sexuality and gender.[167]

## II. The Security Fees Charged to Naples Pride for Pridefest 2025 and Pridefest 2026 Do Not Violate the First Amendment.

Plaintiff claims the security fees charged to Naples Pride were higher due to the cost of addressing protesters.[168] But Naples Pride was not charged for *any* fees related to security to address protesters, so this argument fails.

Defendants *do not* charge event organizers for resources and personnel deployed solely to protect against outside influences.[169] The City charges event organizers for the resources and personnel necessary, in NPD's professional judgment, to secure the event itself, including any threats inherent to the event (*e.g.*, threats arising from alcohol being served), and to secure the venue in which the event is being held (*e.g.*,

---

[164] *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); RSMF ¶¶ 30, 64.
[165] Defs.' MSJ at 28–30.
[166] *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 473 (2025).
[167] *See Wolford v. Lopez*, 609 U.S. 185, 196–97 (2026).
[168] *See* Mot. at 38–39.
[169] RSMF ¶ 17.

Cambier Park, a large, "porous" venue surrounded on four sides by public streets).[170] For any security resources or personnel "external" to the event, such as police officers patrolling the surrounding streets, those costs are not passed on to the event organizer.[171] Since in or around 2023 to 2024, the costs passed on to event organizers for *all* special events in Naples increased for a variety of viewpoint neutral reasons.[172]

The NPD took potential protester activity into account when creating the security plan for Pridefest 2025.[173] Potential protester activity was the basis for having ERTs on standby at Pridefest 2025.[174] But the costs incurred from the ERTs were *not* charged to Naples Pride.[175] The SWAT teams deployed at Pridefest 2025 were to handle potential large-scale attacks that could occur based on content- and viewpoint-neutral factors (*e.g.*, an active shooter attack), including the nature of the venue (*i.e.*, a large, open-area park surrounded on all sides by public streets), the number of people present, and the time of day.[176] Because the costs incurred from the SWAT teams arose from the nature of the Pridefest event itself, those costs *were* charged to Naples Pride.[177] Like with Pridefest 2025, while the Pridefest 2026 security plan did take into account potential protester activity, the costs associated with security in anticipation of that

---

[170] RSMF ¶¶ 16–17, 44.
[171] *Id.*
[172] *See id*; *see also* O'Reilly Decl. ¶¶ 21–26.
[173] *See* O'Reilly Decl. ¶¶ 34–48; *see also* O'Reilly Day 1 Dep. Tr. at 204:16–205:21, 234:16–235:5, 250:14–251:7, 268:11–270:21, 277:16–279:18, 288:9–16, 296:16–297:6; O'Reilly Day 2 Dep. Tr. at 104:24–105:12, 105:25–107:5; C. Dominguez Jan. 14, 2025, Email.
[174] *See* O'Reilly Decl. ¶¶ 44–45; O'Reilly Day 2 Dep. Tr. at 25:15–25, 106:13–24, 109:7–16.
[175] *See* documents cited *supra* n.169.
[176] *See* O'Reilly Decl. ¶ 46; O'Reilly Day 2 Dep. Tr. at 110:20–113:8.
[177] *See* O'Reilly Decl. ¶ 46; O'Reilly Day 1 Dep. Tr. at 266:2–6; O'Reilly Day 2 Dep. Tr. at 110:20–113:8.

protester activity were not charged to Naples Pride.[178]

Plaintiff acknowledges that permit fees that do not require a permittee to pay for the costs associated with protesters are constitutional.[179] Because Plaintiff was not required to pay such costs, its claim regarding security fees should fail.

If the Court determines that the security fees Defendants charged to Naples Pride for Pridefest 2025 and Pridefest 2026 *did* arise in part from resources or personnel deployed solely in anticipation of violent protesters, those fees would be permissible under the First Amendment because the forum is a limited public forum, and the fees are viewpoint neutral conditions that are reasonable in light of the purpose served by the forum. The fees here are viewpoint neutral because they are to ensure that Pridefest could occur in a reasonably safe manner regardless of the viewpoint of the protesters or Naples Pride. And the fees are reasonable in light of the purpose of the forum, which is to enable special events to be held safely. Accounting for potentially disruptive groups when planning security for an event is essential,[180] so assessing fees to provide security in light of those groups would be reasonable.

## CONCLUSION

The Court should deny Plaintiff's motion for summary judgment.

---

[178] *See* O'Reilly Decl. ¶¶ 55–57.

[179] *See* Mot. at 38 n.131 (citing *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1321–22 (11th Cir. 2000)).

[180] *See* O'Reilly Decl. ¶ 18.

Dated: October 16, 2026

Respectfully submitted,

/s/ Nicole J. Moss
Nicole J. Moss*
Peter A. Patterson*
Nicholas Varone*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
ppatterson@cooperkirk.com
nmoss@cooperkirk.com
nvarone@cooperkirk.com
*Admitted pro hac vice

Andrew William Justin Dickman
(Florida Bar No. 238820)
Matthew Rodrick McConnell
(Florida Bar No. 126161)
Odelsa Flores-Dickman
(Florida Bar No. 345120)
DICKMAN LAW FIRM
809 Walkerbilt Rd., Suite 6
Naples, FL 34110
Tel: (239) 434-0840
andrew@dickmanlawfirm.org
matthew@dickmanlawfirm.org
ody@dickmanlawfirm.org

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed and served on all counsel of record via the U.S. District Court for the Middle District of Florida's CM/ECF electronic filing system on October 16, 2026.

Dated: October 16, 2026

Respectfully submitted,

/ s/ Nicole J. Moss
Nicole J. Moss*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9659
nmoss@cooperkirk.com

*Admitted *pro hac vice*